U.S. DISTRICT COURT FOR THE NORTHERN
DISTRICT OF OHIO, EASTERN DIVISION

**CHARNA E. SHERMAN**

                         Plaintiff,

    v.

**SARDAR BIGLARI,**

**MAXIM INC.,**

**LATHAM & WATKINS, LLP,**

**CHRISTOPHER J. CLARK,** and

**SANDEEP SAVLA**

                         Defendants.

Index No.:

Judge:

**<u>COMPLAINT</u>**

**Jury Demand Endorsed Hereon**

Now comes Plaintiff, Charna E. Sherman ("Sherman"), *pro se*, and for her Complaint against the above-captioned Defendants states and avers upon information and belief:

**<u>INTRODUCTION</u>**

1.      According to *Forbes*, in 2015, fast food magnate, Sardar Biglari ("Biglari"), CEO of public Biglari Holdings, Inc. ("BH"), was a "Warren Buffet Wannabe."  But as borne out in two baseless and malicious lawsuits Biglari filed in 2015, he shares much more in common with Donald Trump:  "pussy" tapes and a reputation for bad behavior with women; a "shady" and vindictive business reputation; a dubious record of business success; a predisposition to "make stuff up" and spread fake news and alternative facts; his own "fixer" with a law license; and a mindset that "a lawsuit is something that rich people do when someone makes them mad."

2.      Sherman was named as a Defendant, with her client, in the second of these lawsuits.

3.      On November 23, 2015, the December issue of *Maxim* magazine was published online.  *Maxim* is a lad mag owned by Maxim Inc. ("Maxim"), a BH subsidiary, and as detailed herein, Biglari's alter ego. The cover of the issue was a

nearly nude photo of the famous model Alessandra Ambrosio. The inside cover story about her included a two-page centerfold-type photo of Biglari with the model on the balcony of his Monaco hotel suite under the caption "A View to a Kill." ("Centerfold Photo").

4.     On December 2, 2015, the *New York Post* (*"Post"*) published a trivial article about Biglari being "really creepy" at the photo shoot of the model. ("Photo Shoot").  The only material *news* about the Photo Shoot in the article, which had not already been reported previously by the *Post,* was that the model had asked *Maxim's* Fashion Director, and was assured by him, that photos taken of her with Biglari would *not* be published in the December issue of *Maxim*. (Hereinafter this exchange between the model and the Fashion Director will be referred to as the "Photo Shoot Truth").

5.     Maxim's PR experts advised Biglari just to "brush aside" the article as "media gossip." A senior manager at Maxim not only agreed he should "[s]hrug it off," but advocated that Biglari "take a page from Donald Trump" and "bold[ly]" "counter the narrative" with a textbook Trump refutation: "I'm the least creepy person I know."

6.      Instead, Biglari and Maxim, represented by the powerhouse law firm Latham & Watkins, LLP ("Latham"), filed a lawsuit for defamation and breach of a

non-disclosure ("NDA") agreement in the Supreme Court of New York for the County of New York. (Hereinafter this first case will be referred to as the "First Action," and the court will be referred to as the "Lower Court.") The target of the suit, however, was not the *Post*, but rather the Fashion Director. Worse, Biglari, Maxim and Latham knew, *inter alia*, that the *Photo Shoot Truth was in fact true*, and that neither Biglari nor Maxim had suffered any damages. But worst of all, Biglari and Maxim sued this individual defendant *knowingly* with *"no proof"* he was the source of the article, and overwhelming and compelling evidence he was not.

7. As discovery in the First Action has borne out, and as set forth more fully below, Biglari, Maxim *and Latham* filed the First Action for improper and unlawful purposes, including to silence the Fashion Director by means of a suit he could not afford to defend, and to make his plight as a defendant an example to intimidate others from coming forward to disclose the truth.

8. Nevertheless, another former employee -- who was a real source to the *Post* of the Photo Shoot Truth – courageously refused to stay silent while a former colleague incurred the blame for his actions. He retained Sherman to represent him, and she reached out to Latham's lead lawyers on the case – Christoper J. Clark ("Clark") and Sandeep Savla ("Savla") -- to try to negotiate a

private, out-of-court settlement.  She informed them that the First Action was not only baseless, but filed in bad faith, and also that her client had information, including incriminating tapes he had made of Biglari at Maxim, that were relevant to the lawsuit.  Even though – or perhaps because -- the Latham lawyers knew she was right about the lack of merit and bad faith basis of the First Action, Latham refused to dismiss the case against the Fashion Director, as Sherman demanded, and instead dug the hole they were in even deeper.

9.      Clark, Savla and another Latham partner, Benjamin Naftalis, each with sterling credentials in white collar crime, made a snap "determination" in under two hours -- on the basis only of Sherman's first, short settlement call with Savla ("First Call") -- that Sherman was "**attempting to commit <u>criminal extortion</u>**." As set forth herein at considerable length, the evidence is overwhelming that *they knew* Sherman was not engaged in any such criminal conduct. As the Lower Court twice ruled, these were "clearly settlement negotiations."   And more, as delineated below, given what Biglari, Maxim and Latham actually *knew* at the time of this First Call, Latham's "determination" clearly was just a pretext these partners "made up" to justify ***their decision to fraudulently, unethically, and surreptitiously tape record*** these settlement

negotiations and bait Sherman in an attempt to entrap her into making such a threat.

10.    As the transcripts record, four Latham lawyers over three more calls labored to extract the right sound bite, all the while preparing a lawsuit to sue Sherman and her client for "***criminal extortion***."  They were unsuccessful. Sherman repeated in each call that the First Action was baseless and filed in bad faith, and demanded its dismissal.  She drew and connected the dots for them to her client as a source of the December *Post* article.  And she detailed that her client had embarrassing and incriminating information ***relevant to the First Action***, which would ***come out in the litigation*** if they did not dismiss it.

11.    Throughout such steamrolling, this army of big shot lawyers paid no heed to the accurate analysis of a solo, female lawyer from Cleveland, Ohio about the inevitable consequences of *their* having brought in public a defamation case over a tawdry article on behalf of a client with reputations for behaving badly towards women, and engaging in unethical, shady and vindictive business practices.  At Latham's request for a written settlement demand, Sherman even sent them quotes from the tapes her client had made, including:

> i)    Biglari *and the Vice Chairman of the BH Board* instructing the Maxim staff to "bullshit" and "make up" stuff up about the model and the Photo Shoot; and

ii)     Biglari opining on how to elevate vulgar "pussy" shots:  with "beautiful settings. Like, Picasso and, I won't say the other P-word, okay?"

12.     These white collar experts even eschewed their own expertise. Before the last of three surreptitiously recorded calls, Sherman told them she "was out of town." They nonetheless surreptitiously taped her while she was in Florida, a two-party consent state.  Had they have investigated, they would have learned that it was a *crime* to tape her in Florida.

13.     Latham's request for a settlement demand was just a ruse to buy more time to finish their filings.  Again, rather than negotiate, they chose to dig their hole even deeper:   the same lead lawyers who filed the baseless First Action, filed – secretly and *ex parte* -- a separate, second baseless action, this time against Sherman and her client for "*criminal extortion*."  ("Second Action"). Simultaneously they secured a temporary restraining order and thereafter a Sealing Order, which ordered Sherman's and her client's silence.

14.     It has taken almost three years of excruciating litigation of both Actions, including multiple appeals, to get the Second Action dismissed, and secure *dispositive court rulings rejecting every material element of this unconscionable extortion claim*.  After reviewing the transcripts of the taped

calls, Latham's sworn affirmations, and even opinions of reputable ethics experts, the Supreme Court of New York, Appellate Division, First Department (hereinafter "Appellate Court") could not find in any of the massive court records in either Action:

> i)   Any threat by Sherman to disclose confidential information to third parties; or
>
> ii)  Any confidential information.

And further, the Appellate Court determined the cases were not just related, but dismissed the Second Action on precisely that ground: "because all the issues involved in it will be disposed of when the [the First Action] is resolved."

15.    In the interim, the Lower Court disqualified Latham for its involvement in taping Sherman, and Biglari and Maxim switched to a local, three-lawyer firm headed by a self-proclaimed "*front line fixer*." Tellingly, Biglari and substitute counsel – on behalf of Biglari and Maxim – wholly abandoned the "extortion" claims Latham had constructed and pursued on behalf of the same clients.  Significantly, when Sherman appealed the Lower Court's refusal to dismiss her -- because the claim "sounded in extortion," just as Latham had argued -- substitute counsel *conceded that the Lower Court was just "wrong."* Even more significantly, when Sherman sought to take discovery of Biglari and

Latham in the Second Action, substitute counsel, on behalf of Biglari and Maxim, opposed it, vigorously arguing the opposite of what Latham had maintained on behalf of the same clients: "extortion" was "irrelevant" to the "narrowly framed" "simple limited legal issue" in the Second Action of the enforceability of two purported NDA's Sherman's client had executed.

16.     Further, there is now incriminating and public proof -- extracted during discovery, over obstreperous opposition -- that Biglari, through Maxim, pursued an ***unlawful, unethical and vindictive scheme to "kill" the offending story "by whatever means possible."***  Latham not only knowingly conspired with its clients in this improper Scheme, but at times even directed it, including suing Sherman for extortion and going to appalling lengths to further try to incapacitate her as opposing counsel.   (Hereinafter the "Scheme").

17.     Here, Latham's lawyers were not just Biglari and Maxim's front line army in targeting and pursuing opposing counsel with sham litigation, but also the generals of criminalizing as "extortion" what they knew to be "clearly settlement negotiations." ***Conspicuously, no affidavit from the Plaintiff, either by Maxim or Biglari, was ever filed***.  Just as significantly, as detailed below, ***Biglari, Maxim <u>and Latham knew information as of the First Call</u> that precluded any such unconscionable claim***, *which they all concealed from the Lower Court, from*

*Sherman*, and even the ethics experts they subsequently retained.  And especially important to this lawsuit, precisely because of the backgrounds and expertise of the Latham lawyers, they **knew** how ruinous an allegation of criminal extortion, especially by them, would be – and was -- to Sherman's legal career and practice in Cleveland, Ohio.

18.    The Latham lawyers further weaponized Biglari's Scheme with improper, fraudulent, unethical, and illegal "scorched earth" litigation tactics. As to their surreptitious taping of Sherman, one of the country's leading ethics experts opined that "*the facts of this particular matter present an especially egregious set of malignant circumstances that cry out for the harshest condemnation of the law firm of Latham & Watkins, the sanctioning of the firm, even its disqualification from this matter and an award of fees.*"

19.    As detailed below, Latham piled on even further, inluding:

*i)*    Latham repeatedly and falsely accused Sherman of violating court orders;

*ii)*    Latham sought, without basis, to restrict Sherman's representation of her client in the First Action;

*iii)*    Latham threatened, without basis, to report Sherman to the "appropriate bar authorities;"

*iv)*    Latham threatened, without basis, to object to Sherman's *pro hac vice* admission in the First Action;

*v)*      Latham opposed, without basis, Sherman timely disclosing the Second Action to her malpractice carrier;

*vi)*      Latham opposed, without basis, Sherman's obligatory disclosures about the Second Action to the Florida Bar;

*vii)*      Clark lied about the litigation in *Politico*, after Latham secured a Lower Court order to silence Sherman from defending herself.

*viii)*      In an attempt to defend Latham's unethical taping of Sherman, Latham knowingly and materially misled, and withheld material information from, two reputable ethics experts. Even though Latham had to know that each of these ruinous opinions addressing Sherman's alleged "extortion" were inaccurate, Latham nonetheless proffered them to the Lower Court.

*ix)*      Latham knowingly failed to preserve material information Sherman requested be preserved.

20.      This lawsuit accordingly seeks to hold accountable not just Biglari and Maxim, *but their lawyers too*, who knowingly and willfully participated and conspired in, and at times even directed, Biglari's Scheme. In furtherance of the Scheme, Latham engaged in a chronic and extreme pattern of abuse to bully and intimidate Sherman, knowingly eschewed their roles and responsibilities as lawyers and officers of the court, and purposely sought to undermine the very underpinnings of the adversary system. In so doing, they forfeited any

immunization from liability under the shield typically afforded attorneys advising their clients.

21.  Despite Latham's disqualification from the Second Action and withdrawal from the First Action, Latham's participation in the Scheme did not cease. In response to lawful subpoenas served on Latham and its lawyers, Latham relied on substitute counsel to move to quash them. But the arguments substitute counsel advanced expose precisely how outrageous and clearly unrelated *Latham's* extortion claims, on behalf of the same clients, were to the Second Action.  Indeed, substitute counsel argued that information about Sherman's "extortion" was "***irrelevant***." Latham further failed to produce responsive, unprivileged documents that substitute counsel conceded Latham had and would produce.

22.  Perhaps Latham's behavior was as appalling as it was because it pre-dated the #MeToo movement, and these lawyers could just not conceive that their conduct would ever be examined.  Yet, Sherman from the outset forecast that too: just a week after Latham sued her, she expressly warned them of future consequences of *"[their] decision-making,"* including "[their] extension" "to lawsuits" of Biglari's proclivity for "making stuff up." Now, almost three years later with the advent of the #MeToo era, this lawsuit has even more far-reaching

import. This case squarely addresses the extreme and unprofessional lengths to which this preeminent law firm stooped to defend a now-demonstrable "creep," just as the legal profession is increasingly confronting revelations of more and more lawyers – from fixers to even pillars in the legal community -- who have gone too far in defending their rich and powerful clients accused of bad behavior.

23.    Accordingly, here the lawyers are jointly and severally liable with their clients for this intentional, tortious and malicious Scheme. Just like their clients, the lawyers "made stuff up" to advance Biglari's *modus operandi* of engaging in frivolous and vindictive fights to spread to the press and his shareholders material falsehoods about his management of his businesses. Indeed, even though Biglari spent "immense resources" of his company on the Actions, the enormous dockets of each make clear that Biglari, in cahoots with his lawyers, never intended to litigate either sham case, precisely because they were brought for improper purposes to silence, bully and intimidate the Defendants, and by their example, to silence, bully and intimidate others.

24.    This Complaint accordingly asserts three causes of action.

        *i)*      **Abuse of Process**:  Sherman asserts joint and several liability
                  against each Defendant for abuse of process, including as a
                  conspiracy to abuse process, for filing the Second Action

against Sherman, and securing orders to restrain and silence Sherman, for grossly improper purposes, including to bully, intimidate, punish, and incapacitate her as a lawyer, and harm her legal career, her law practice and her livelihood in Cleveland, Ohio. As a result of such tortious abuse of process, the Defendants proximately and directly caused irreparable harm to Sherman's legal career, her law practice and her livelihood in Cleveland, Ohio. The Defendants are liable to her for compensatory and punitive damages.

ii) **Malicious Prosecution**. Sherman asserts joint and several liability against each Defendant for malicious prosecution, including as a conspiracy to commit malicious prosecution, for maintaining the Second Action against Sherman. The Second Action against Sherman was dismissed, based on findings, *inter alia*, which precluded the claim of extortion asserted against Sherman. The evidence is overwhelming that the Defendants pursued the Second Action against her with malice to harm her legal career, her law practice and her livelihood in Cleveland, Ohio. As a result of such tortious malicious prosecution, the

Defendants proximately and directly caused irreparable harm to Sherman's legal career, her law practice and her livelihood in Cleveland, Ohio. The Defendants are jointly and severally liable to her for compensatory and punitive damages.

iii) **N.Y. Jud. Law Section 487**. N.Y. Jud. Law Section 487 ("Section 487") provides a statutory private cause of action for a "party injured" against lawyers who deceive, and/or collude in deceiving, with the intent to deceive the court or any party. Here, Latham and its lawyers, with the intent to deceive the Lower Court:

a. conspired with, colluded with and/or consented to their clients' serial, fraudulent representations to the Lower Court; and/or

b. "made up" their own deceits and fraudulent representations to the Lower Courts.

As prescribed by the statute, Latham and its lawyers are liable to Sherman not only for her pecuniary damages directly and proximately caused by their deceits, collusion, and/or consents, but also "must forfeit treble damages."

25.    To the extent Latham asserts that it is not responsible for the

fraudulent, unethical, improper, tortious, malicious and/or illegal conduct

asserted herein of Clark and/or Savla, this Complaint seeks relief directly against

the individual lawyers as well.

26.    Given the convoluted and prolonged history of the litigation of both

Actions, the evidence in support of these causes of action are organized as

follows:

**THE PARTIES**

**JURISDICTION AND VENUE**

**FACTUAL BACKGROUND**

**I.**  <u>**Summary of the Related Lawsuits**</u>

    **A.**  <u>The First Action</u>

    **B.**  <u>The Second Action</u>

**II.**  <u>**Maxim was Biglari's Alter Ego**</u>

**III.**  <u>**The Scheme**</u>

    **A.**  <u>Biglari, Maxim and Latham Frivolously, Knowingly and in Bad Faith Sued the Wrong Insider</u>

    **B.**  <u>Sherman's First Contacts with Latham, including the First Call</u>

**C.** Three Latham Partners "Determined" Sherman was "Attempting Criminal Extortion" and Decided to Surreptiously Tape Three Subsequent Conversations with Her

**D.** Latham's Surreptitious Taping of Sherman was Unethical

**E.** At the Time of the First Call, Biglari, Maxim and Latham *Knew They* Were Pursuing an Unethical, Unlawful and Malicious Scheme to Silence the Truth "By Any Means Possible"

**F.** At the Time of the First Call, Maxim, Biglari and Latham *Knew* that the First Action Had No Merit

   *a. At the time of the First Call, Biglari, Maxim and Latham Knew They had Sued the Wrong Insider*

   *b. At the time of the First Call, Biglari, Maxim and Latham Also Knew the First Action Was Frivolous on the Merits*

**G.** At the Time of the First Call, Maxim, Biglari and Latham *Had to Know* that There Were No "Clear Cut" Non-disclosure Agreements Binding on Sherman's Client

**H.** At the Time of the First Call, Maxim, Biglari and Latham *Knew* Biglari Had Not Suffered Any Injury

   *a. Biglari Already Had a Reputation as a Creep*

   *b. Biglari Did Not Have a Business Reputation for Trustworthiness, Integrity, Dependability and Professional Fitness*

      *i) Biglari's Purchase of Maxim*

      *ii) The Proxy Fight with Groveland*

      *iii) Biglari's Reputation for Vindictiveness*

iv) *Biglari's "Wreck[age]" of Maxim*

v) *The Cracker Barrel Poison Pill*

vi) *Biglari's Tender Offer*

vii) *Biglari Was in Fact Not Trustworthy and Did Not Have Integrity*

- Before the First Call, Biglari lied to the press

- Before the First Call, Biglari knew Maxim was engaging in deceptive publishing practices

- Before the First Call, Biglari knew he was violating federal securities public disclosure laws

**I.** <u>At the Time of the First Call, Maxim, Biglari and Latham *Knew* Maxim Had Not Suffered Any Injury</u>

**J.** <u>Despite Knowledge Before the First Call Which Precluded Latham's Extortion "Determination," Latham Surreptitiously Recorded Three More Calls With Sherman To Try – Unsuccessfully -- to Entrap Her</u>

**K.** <u>Despite More Developments Concerning the Photo Shoot Truth, Latham Still Proceeded with Recording the Third and Fourth Calls</u>

**L.** <u>Sherman's December 21 Settlement Proposal</u>

**M.** <u>Latham Appeared in Court the Next Day, *Ex Parte*, to Sue Sherman and Silence Her, in Order to Incapacitate Her as Opposing Counsel</u>

**N.** Latham Repeatedly and Knowingly Accused Sherman – Falsely -- of Violating Court Orders and Sought, Without Basis, to Restrict Sherman's Represention of Her Client in the First Action

**O.** Latham Threatened, Without Basis, to Report Sherman to the "Appropriate Bar Authorities"

**P.** Latham Opposed, Without Basis, Sherman's Obligatory Disclosures to Her Malpractice Carrier

**Q.** Latham Opposed, Without Basis, Sherman's Obligatory Disclosures to the Florida Bar

**R.** Biglari, Maxim and Latham Pursued a Coordinated Press Campaign to Leverage Sherman and Feifer's Court Ordered Silence to Spread Alternative Facts and Fake News About the Suits

**S.** Biglari, Maxim and Latham Opposed Sherman and her Client's Motion for Latham's Disqualification by Submitting Knowingly Inaccurate, Damning Expert Opinions About Her Based on Assumptions of Fact Biglari, Maxim and Latham Knew to Be Materially False

**T.** Biglari,Maxim and Latham Knowingly Failed to Preserve Material Information Sherman Specifically Requested Be Preserved

**U.** Biglari, Maxim, and Latham Fraudulently Opposed Sherman's Motion to Be Dismissed From the Second Action

**V.** Biglari and Maxim's New "Fixer" Not Only Abandoned the Extortion Claim Against Sherman, But Admitted it was ***Irrelevant***

**W.** Biglari and Latham Refused to Comply with ***"Irrelevant"*** Discovery

**X.** Biglari's Improper Purpose to Manipulate the Market

## CAUSES OF ACTION

## THE PARTIES

### Plaintiff Charna E. Sherman

27.     Sherman is an attorney admitted and practicing in Ohio, admitted and on inactive status in Washington, D.C., and, during the pendency of the litigation addressed herein, was admitted in Florida, where she owns a second home. She has practiced law at the highest level without blemish for over 33 years. Almost eight years ago, she resigned from the partnership of an international AmLaw200 law firm and launched her own, woman-owned litigation boutique, Charna E. Sherman Law Offices Co., LLP, in Cleveland, Ohio.

28.     Despite then-pending claims against Sherman for extortion in the Second Action, the Lower Court admitted Sherman *pro hac vice* in the First Action. The Lower Court, however, denied her *pro hac vice* admission in the Second Action, due to the likelihood Sherman would be a witness.  Sherman was thus precluded from representing her client, who was also sued in the Second Action.

Over Sherman's objection, the Court also ruled that she could either represent herself or be represented by counsel, but not both. Accordingly, Sherman retained the same attorney who joined her as co-counsel in representing Sherman's client in the First Action.

29.     Sherman's background and credentials are set forth at

www.charnalaw.com.

30.     Sherman has devoted much of her legal career to issues concerning diversity, and specifically advancing women in the law.

31.     She also is a #MeToo victim.  In 2017, she joined 17 other current and/or former Harvard University students and employees in claiming that a renown Harvard professor engaged in sexually inappropriate and harassing conduct over almost four decades.

32.     Sherman is also a BH stockholder.


**Defendants**

Defendants Sardar Biglari, and his alter ego, Maxim, Inc.

33.     **Sardar Biglari**  ("Biglari") is the Founder, Chairman of the Board, and Chief Executive Officer of Biglari Holdings Inc. ("BH"), a public company listed on the New York Stock Exchange.

34.     Even though BH's and Biglari's financial reputation is most often
associated with a focus on fast food businesses -- Steak N Shake Operations, Inc.,
Western Sizzlin Corp. and Cracker Barrel – Biglari insists to his shareholders that
BH is not a restaurant company, but a holding company with diverse businesses
concerning which he is the *sole* capital allocator.

35.     Thus on or about February 27, 2014, he allocated $12 million for BH's
purchase of Maxim Inc. ("Maxim"), which publishes *Maxim* magazine, a long-
notorious "lad mag."  As alleged more fully below, from the outset of this
purchase and for years after, there has been a recurring narrative in the press and
online that Biglari bought *Maxim* to get close to the models.  According to the
sworn testimony of Philip Cooley ("Cooley"), the Vice Chairman of the BH Board
and a non-independent Director of BH during all relevant times herein, by the
date of his deposition in June, 2017, Biglari's purchase of Maxim had cost BH
shareholders over $39 million. Just recently, the *New York Post*, on December 4,
2018, reported that Maxim has yet  "to turn its first profit" and has resorted to
"sleazy" model contests purportedly to raise money for Wounded Warriors; but
"75 percent of the funds actually go to boost money-losing Maxim's own bottom
line" and constituted "an estimated 19 percent of the company's total 2017
revenue."

36.     Biglari and Maxim are the named Plaintiffs in the First Action. Only

Maxim was the named Plaintiff in the Second Action.

37.     But for all purposes material to this lawsuit, Maxim was Biglari's alter

ego, as alleged more specifically below, and Biglari acted through Maxim.  Thus

allegations herein against and about Maxim also constitute allegations against

and about Biglari, who acted through Maxim.

38.     Upon information and belief, Biglari resides in Bexar County, Texas,

where BH's headquarters are located.

39.     During the times relevant herein, upon information and belief,

Maxim's principal headquarters were in New York County, New York.  The most

recent issue of *Maxim* reports that Maxim still operates an office there.


Defendants Latham & Watkins, LLP, Christopher Clark, Esq., Sandeep Salva, Esq.,
& Benjamin Naftalis, Esq.

40.     **Latham & Watkins, LLP ("Latham"),** upon information and belief, is a

global law firm, with more than 2,600 lawyers in 30 offices located in 14

countries, but has no office in Ohio.  Latham claims on its website that it does not

have a headquarters.  Upon information and belief, Latham is not a citizen of

Ohio.

41.     Latham is reputed to be one of the highest grossing law firms in the world, and the first Am Law 100 law firm in 2017 to exceed $3 billion in annual revenue.

42.     Latham represented Biglari and Maxim in filing and maintaining the First and Second Actions on behalf of Biglari and Maxim.  Two partners, Christopher J. Clark, Esq. ("Clark") and Sandeep Savla, Esq. ("Savla"), were the lead attorneys for the Plaintiffs in each case.

43.     Upon information and belief, the then-Global Chairman and Managing Partner of Latham throughout its representation of Biglari and Maxim herein was Bill Voge.  Further upon information and belief, on or about March, 2018, he abruptly resigned that post in the wake of a #MeToo scandal.  Of bearing to the subject litigation, Voge reportedly threatened the alleged accuser; contemporaneous texts of his have been reported to state: "It is not threats about jail. She will be in jail!!!"

44.     Upon information and belief, during the pendency of the subject Actions, Latham, including Clark, became "embroiled" in a representation of another reputedly rich and powerful client accused of unsavory behavior, Elliott Broidy.  This time, Latham was attempting to void an NDA their client signed with a former Playboy Playmate. *The American Lawyer* reported: "Anyway you look at

it, representing a fat cat in his effort to get out of paying his pregnant girlfriend (who then had an abortion) is a bit sordid. Not exactly the typical kind of matters that Latham handles." Further to Clark's pattern and practice of speaking to the press about his cases, as occurred with respect to the Actions at issue herein and addressed below, Clark communicated with the press concerning his representation of Broidy.

45. Latham's formal representation of Biglari and Maxim in these lawsuits ended when the Lower Court ordered the disqualification of Latham from the Second Action. Latham simultaneously withdrew from the First Action (upon the Lower Court's ruling that its disqualification in that case was denied without prejudice to renew). Nonetheless, as alleged more specifically below, Latham continued to participate in the Scheme.

46. Upon information and belief, both before and after the subject litigation and continuing to date, Latham has represented Biglari, BH and other Biglari related companies, partnerships and other entities, including providing legal advice as to securities laws, securities compliance, and securities litigation. Upon information and belief, soon after filing the subject Actions, Latham, again represented by Clark and Savla, represented Biglari in a frivolous and vindictive case similar to the First Action against another alleged individual source of an

allegedly defamatory article, instead of, as here, the publisher of the article.  After

the addition of this filing to Latham's Biglari docket, one observer in the

investment community questioned whether Biglari is a "serial defamation victim."

47.     **Christopher J. Clark** ("Clark"), upon information and belief, is an

attorney licensed in the State of New York, who joined Latham as a partner on or

about May 16, 2012. Upon information and belief, he previously was the head of

the white collar practice at Dewey & LeBoef LLP ("Dewey").  Upon information

and belief, Dewey filed for bankruptcy on or about May 28, 2012.

48.     Upon information and belief, during relevant times herein, Clark was

the then-Global Co-chairman of Latham's financial institutions group and/or then-

Co-chairman of its securities litigation and professional liability practice. On

Latham's website, Clark touts his experience as a former Assistant U.S. Attorney

("AUSA").  During the pendency of the Actions, he also co-authored Client Alert

Commentaries published on the site which purport to signify expertise relevant to

the claims alleged herein, including with respect to, *inter alia*, *i)* DOJ policies and

the US Attorneys' Manual, and *ii)* the attorney-client privilege and waiver thereof.

49.     Upon information and belief, Clark works in Latham's New York City

office, and resides in New York, New York.

50.    **Sandeep Savla** ("Savla"), upon information and belief, is an attorney licensed in the State of New York, who joined Latham as a partner on or about November, 2015, just about a month before he surreptitiously tape recorded Sherman.

51.    Savla on Latham's website touts his experience and expertise in securities law.  When he joined Latham, Clark extolled that Savla's "judgment, sharp instinct and deep understanding of the financial institutions industry distinguishes him …."   During the pendency of the Actions, Savla also co-authored Client Alert Commentaries published on the site which purport to signify expertise relevant to the claims alleged herein, including with respect to, *inter alia*, the attorney-client privilege and waiver thereof.

52.    Upon information and belief, Savla works in Latham's New York City office, and resides in New York, New York.

## JURISDICTION AND VENUE

53.    This Federal Court has original jurisdiction under 22 U.S. Code Section 1332. The Plaintiff, on the one hand, is a citizen of Ohio.  Defendants, on the other hand, are all citizens of other states.  The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

54.     This Federal Court can exercise personal jurisdiction over each of the out-of-state Defendants on multiple grounds.

55.     Upon information and belief, Maxim and Biglari, through his alter ego Maxim, regularly do business in the State of Ohio, and have continuous and systematic contacts in the State of Ohio.  *Maxim* magazine is a national magazine, and upon information and belief, is regularly advertised and sold throughout Ohio and to subscribers in Ohio.  Cleveland.com, *Maxim's* online magazine, and others, for example, have profiled Ohio models who have participated in Maxim's model contests.  As alleged *supra*, Maxim has reportedly run these contests purportedly to raise money for Wounded Warriors, but the revenue generated, including by Ohio models and Ohio voters who pay to vote for the models in the contest, constitutes a substantial portion of Maxim's total revenue.

56.     Upon information and belief, Latham lawyers have long, regularly appeared in Ohio courts, including the United States District Court for the Northern District of Ohio ("NDOH"), and the law firm has other regular, commercial contacts in Ohio in furtherance of the firm's business.  Latham thus has continuous and systematic contacts in the State of Ohio.   Latham boasts on its website that it is "[t]ruly a 'one-firm' firm" that "services clients with the best-suited teams *regardless of location*." (Emphasis added).  The site touts a Latham

team victory this year in "a big patent fight" in the NDOH. Clark specifically is listed on the NDOH docket as the lead lawyer for Ohio defendants in a securities fraud case brought by the SEC in 2009. The docket records activity in the case through June 2016. The website further extols its victory in 2015 before the U.S. Court of Appeals in a "roller-coaster case spanning three decades" in federal court in the Southern District of Ohio. Its website and other reports online further document that the firm appears to regularly recruit and/or hire lawyers from Ohio law schools and Ohio firms, and judicial clerks from courts in Ohio.

57. Alternatively, this Federal Court can also exercise personal jurisdiction over each of the out-of-state Defendants pursuant to Federal Rule of Civil Procedure 4 and the Ohio long arm statute, Ohio Revised Code 2307.382(A)(6), because, *inter alia*, each of the Defendants intended to cause and conspired to cause tortious harm to Sherman's legal career, her law practice, and her livelihood in Cleveland, Ohio, and in fact caused such harms in Ohio.

58. In Lower Court filings in the Second Action, Latham, on behalf of Biglari and Maxim, represented that they knew Sherman was in Cleveland, Ohio for at least three of the four telephone calls which they had with her and based upon which they made up the linchpin lie asserted against her in the Second Action that she allegedly "committed extortion." Further pursuant to the Scheme

addressed herein, Latham baselessly threatened to report Sherman to the

appropriate Bar authorities, baselessly threatened to oppose her admission as an

Ohio lawyer *pro hac vice* in the First Action, baselessly prevented her from timely

disclosing their lawsuit against her to her Ohio malpractice carrier, and

unreasonably demanded the Ohio carrier (and other insurers to which the carrier

owed disclosures) agree to a court-ordered Sealing Order.

59.    In furtherance of the Scheme, Biglari, Maxim and/or Latham further

retained and materially misled two reputable legal ethics experts to secure

knowingly inaccurate, career-ruining opinions about her.  These opinions were

proffered to the Lower Court by Latham, on behalf of Biglari and Maxim, to

further the Scheme.  According to the testimony of Maxim's corporate

representative, Maxim is still seeking to recover Latham's fees associated with

these opinions from Sherman's client in the First Action.

60.    The abuse of process alleged herein was instituted with the service of

process of the Complaint and related papers on Sherman in Ohio.

61.    Venue is proper in this Federal Court under 28 U.S. Code Section

1391 because the Scheme was knowingly and intentionally targeted at injuring

and jeopardizing Sherman's legal career, legal practice and livelihood in

Cleveland, Ohio, and in fact harmed her legal career, legal practice and livelihood

in Cleveland, Ohio. A substantial part of the most material conduct giving rise to the claim occurred in Ohio, including Sherman's location in Cleveland, Ohio for three of the four telephone calls upon which the linchpin lie of her purported "extortion" was based. Upon information and belief, this threshold "determination" never would have been made or pursued if Sherman had not been a solo female practitioner in the midwest city of Cleveland, Ohio.

## FACTUAL BACKGROUND

### I. Summary of the Related Lawsuits

#### A. The First Action

62. **The First Action was a defamation and breach of contract suit by Biglari and Maxim against former Maxim employees – Fashion Director Wayne Gross, and thereafter Sherman's client, Deputy Editor Jason Feifer -- as sources of a December 2, 2015 *New York Post* article that Biglari was "really creepy" at the Photo Shoot of a famous model.**

63. On December 10, 2015, Biglari and Maxim, represented by Latham , filed in the Supreme Court of New York for the County of New York ("Lower Court") a defamation and breach of contract action against the former Fashion

Director of *Maxim* magazine, Wayne Gross ("Gross"). It is captioned *MAXIM INC. AND SARDAR BIGLARI v. WAYNE GROSS and JASON FEIFER*, Index No. 654137/2015, and is still pending. The filings in the First Action are too voluminous to attach hereto, but are incorporated herein by reference.

64. *Maxim* has long been known as a "lad mag" magazine. Specifically, the Complaint alleged that Gross was the source for an article published on December 2, 2015 in the *New York Post* ("December *Post* Article") that reported, *inter alia*, that at a Photo Shoot in Monaco, a famous model – Alessandra Ambrosio – asked Gross, and was assured by him, that photos taken of her with Biglari would not be published in the December issue of *Maxim*. (Hereinafter this exchange between the model and Gross will be referred to as the "Photo Shoot Truth"). Nonetheless, one such photo -- widely viewed as "creepy" -- appeared in the issue, over the objections of Maxim's senior management, as a two-page centerfold-type spread for the cover story about the model, ("Centerfold Photo").

65. After Sherman disclosed to Latham that they had sued the wrong defendant, the Plaintiffs added her client, Jason Feifer ("Feifer"), former Deputy Editor of *Maxim*, as a Defendant in the First Action on January 4, 2016. Biglari, Maxim and Latham kept Gross in the case without any good faith basis to allege – falsely -- that "Gross made the False Statements to Feifer."

66.     Despite Sherman's repeated demands that Gross be dismissed, Biglari, Maxim and their lawyers kept Gross in the First Action as a defendant – without basis – until a "confidential settlement" was reached.

67.     According to Biglari and Maxim's own filings, Biglari has spent "immense resources" of his company over three years of litigation purportedly to defend his reputation in a publicly filed case, and, according to the binding testimony of a corporate representative for Maxim, to "prove the truth of what happened **to the public**." But as the enormous court files of the case document, none of Biglari, Maxim, or his counsel ever intended to actually litigate the case – not only was the Photo Shoot Truth true, but Biglari could not afford his real reputation to come out during his tender offer to regain control of his public company, Biglari Holdings Inc. ("BH"). Rather, they were bent on obstructing discovery in order to pursue a war of attrition; as Maxim's corporate representative later admitted under oath, *"to keep everything under wraps until Mr. Feifer has to go through the expense and time in order to allow the truth to come out."* This improper objective has been made even more plain by Biglari's belated claw-back of his claim of defamation altogether, almost two years after filing the First Action, and tellingly, just before his announcement of controversial merger plan to acquire even more control over BH.

68.     Illustrative of the multitude of obstreperous and glaring discovery

failures still at issue, in the three years since the case was commenced, Biglari has

still not appeared for deposition in either case, even though his deposition was

first noticed on April 6, ***2016***, and despite court orders.  Nor have the Plaintiffs

even produced the key email Biglari and Maxim expressly relied on (and quoted

only in part) in every version of their Complaint about Gross trying to "kill" the

Centerfold Photo.  These obstructionist tactics were overwhelmingly based on

knowing lies about Sherman and a "made up" fear she would abuse discovery. On

May 17, 2018, the Appellate Court finally sanctioned the Plaintiffs for discovery

abuses based on this "*unfounded assertion that they feared defendants would

make the documents public*."

69.     Recently, Feifer has re-asserted a counterclaim for fraudulent

inducement, and asserted new counterclaims for abuse of process and malicious

prosecution for the injuries *he* sustained from the intentional, tortious and

malicious conduct of Maxim described herein.

**B**.     The Second Action

70.     **The Second Action was a declaratory judgment action brought by**

**Maxim against Sherman and her client Feifer for "criminal extortion."**

71.    On December 22, 2015, Maxim, represented by Latham, filed a
Second Action against Sherman and her client Feifer in the same Lower Court.  It
was captioned *MAXIM INC. v. JASON FEIFER and CHARNA SHERMAN*, Index No.:
162933/2015. It was dismissed by the Supreme Court of New York, Appellate
Division, First Department (hereinafter "Appellate Court") on May 17, 2018.  The
filings in the action are too voluminous to attach hereto, but are incorporated
herein by reference.

72.    In short, and as alleged more fully below, when Sherman contacted
Latham that she represented a client who had information that the First Action
against Gross was frivolous and even filed in bad faith and attempted to quietly
reach a settlement out of court, Latham purportedly "determined" that she was
"attempting criminal extortion," and filed suit, *ex parte* and under seal, to enjoin
Sherman and her client from publicly disclosing allegedly confidential information.

73.    Their "Complaint for Declaratory Relief" alleged a single count for a
declaratory judgment that the same non-disclosure provisions in identical
agreements at issue in the First Action were enforceable.

74.    Nonetheless, the opening paragraph of the Complaint alleged,
falsely:

> This action seeks to stop Feifer and his attorney, Sherman, from **engaging in extortion** by willfully disregarding the obligations imposed by non-disclosure and employment termination agreements that Feifer entered into with Maxim, and instead demanding better terms – and much more money – in a new contract as the **ransom for not providing confidential information to third parties.**

(Emphasis added).

75.     The Complaint thereafter specified – falsely -- that Sherman had allegedly **"threatened" "public" "disclosure"** of *i)* recordings of business meetings at Maxim; and *ii)* photographs of notes of confidential information relating to a BH filing with the Securities and Exchange Commission ("SEC").

76.     As set forth more fully herein and further documented in the extensive court file, Sherman never **threatened** any such **public disclosure**.  In the express context of settlement negotiations, she informed Latham that her client had information that was **relevant** to the truth of the facts and claims they had elected to put at issue in the **public** First Action. She not only presciently previewed some of information that "**would come out <u>in the litigation</u>**", but explained why it was relevant, including:

> *i)*     Tapes of Maxim meetings recording Biglari and BH Vice Chairman of the Board, Philip Cooley, not only making creepy comments about the model and the Photo Shoot, but

instructing the staff to "make stuff up" about the model and the Photo Shoot; and

ii) Photos of notes about Biglari's contentious poison pill battle with Cracker Barrel, just a month earlier, that were "likely to be relevant" "at least on damages" to his reputation in the First Action, since they addressed "on their face" Biglari's "belief that he was being disparaged in that controversy as well."

77. Just as Sherman predicted, all of this embarrassing information, and more, has come out in the First Action, not only because the information was relevant to the claims asserted in the public case, but also because the information was not confidential.

78. Latham submitted multiple affidavits by its partner Sandeep Savla, under penalty of perjury, about the alleged "facts" concerning the substance of his communications with Sherman and Latham's purported "determination" of her commission of extortion. In each, he made knowing and materially false representations, both affirmatively and by omission. Conspicuously, no affidavit from the Plaintiff, either by Maxim or Biglari, was ever filed. Nor was evidence of any disclosure, or even a threat of disclosure, of confidential information to third parties ever presented, even in transcripts of surreptitious and unethical tape recordings Latham made of three of four conversations with Sherman.

79.     At the first joint case conference on February 8, 2016, the presiding

Justice called the suit a "vanity project" by Biglari. She also shared that in prior *ex*

*parte* communications Latham had with her, she had told Latham what she

thought of their case, and demonstrated her view by spitting. Thereafter, over the

course of the litigation, mutiple court rulings rejected -- without qualification and

with finality -- every material element of this unconscionable claim by Maxim and

its counsel.

80.     **Holdings – Sherman's Communications with Latham were**

**Settlement Negotiations:** The Lower Court twice ruled that Sherman's

communications with Latham were clearly settlement communications.

Specifically, the Lower Court's May 3, **2016** decision and order in the Second

Action stated that when the conversations were recorded, "[w]hat is compelling is

that at the time Sherman was representing a client in settlement negotiations."

Similarly, in the Lower Court's April 20, **2017** decision and order in the Second

Action, the Court found the secretly recorded conversations were "clearly

settlement negotiations."

81.     **Holding -- The information Sherman raised with Latham was not**

**"confidential information":** On appeal of a motion by press intervenors to obtain

access to the sealed court files,  the Appellate Court took it upon itself to review

the entire court file and found that not a single document was confidential,

eviscerating Biglari, Maxim, and their counsels' claims that any of its documents

or information was confidential. The First Department ordered the entire court

files of both Actions be ***unsealed***. Significantly, the Appellate Court further

allowed Maxim to seek protection for any document in either case filed after the

press sought to intervene that it deemed confidential or that contained

confidential information. ***Conspicuously, none of Biglari, Maxim or any of their***

***counsel sought confidentiality protection pursuant to that order for any such***

***document or even any part of a document.***

82. **Holding -- There was no threat to disclose confidential information**

**to third parties:** On May 17, 2018, the Appellate Court expressly ruled:

> Maxim failed to establish that it would suffer irreparable harm
> absent the preliminary injunction it sought (see Chiagkouris v 201 W.
> 16 Owners Corp., 150 AD3d 442 [1st Dept 2017]). ***We find no support***
> ***in the record for Maxim's assertions that Feifer or his counsel***
> ***threatened to disclose confidential information to third parties.***

(Emphasis added). Further on that date, the Appellate Court sanctioned the

Plaintiffs in the First Action for discovery abuses that were based on the

"***unfounded assertion that they feared defendants would make the documents***

***public***."

83.    **Holding -- The two actions are related and not separate.** In the same opinion, the Appellate Court further rejected Maxim's contention that the Second Action was separate and unrelated to the First Action.  The Court dismissed the entire Second Action for declaratory judgment "because all the issues involved in it will be disposed of when the pending breach of contract action" – *i.e.,* the First Action – "is resolved."

## II.    Maxim was Biglari's Alter Ego

84.    As alleged *supra*, for all purposes material to this lawsuit, Maxim was Biglari's alter ego, and Biglari acted through Maxim.  The evidence is overwhelming that Maxim was Biglari's alter ego and acted through Maxim, as set forth in this section.

85.    Biglari alleges in the First Action that he is sole director, as well as the "creative force behind Maxim."  Cooley similarly testified at deposition that the BH Board of Directors expected Biglari "to be the creative force to add aesthetic infusion into the brand."

86.    Cooley further testified at deposition that even "in March of 2015, after [BH] had spent significant capital on hiring a new team of 60 people, … Mr.

Biglari [was] still responsible at that time for the granular operation of Maxim, "

and that the BH Board of Directors expected Biglari "to spend a disproportionate

amount of time in March 2015 on Maxim."

87.     *Politico* similarly reported that "[a] *Maxim* staffer" said that Biglari

"has always" "exercise[d] full editorial control over" the magazine.

88.     According to Biglari's recent verified interrogatory response as to his

"roles and duties … with respect to the Photo Shoot and the content of the

December Issue," he swore he "was the Editor-in-Chief of Maxim Magazine." This

sworn answer covers many months when Kate Lanphear formally held the EIC

position for which, upon information and belief, she received lucrative

compensation. Maxim did not announce the naming of Biglari as EIC until January

8, 2016, after the July 26, 2015 Photo Shoot and the November 23, 2015 online

publication of the December issue.

89.     According Cooley's sworn testimony, Biglari made the decision to file

the First Acton. Upon information and belief, Biglari also made the decision to file

the Second Action.

90.     As both an Officer and Director of BH during all relevant times herein,

Biglari's conduct had to comply with BH's Corporate Governance Guideines and

BH's Code of Conduct.  Accordingly, he was required at all times relevant herein,

*inter alia*, to obey and comply with applicable law; act honestly and ethically at all times; engage only in fair and open competition; and make disclosures that are full, fair, accurate, timely and understandable. Further, the Code expressly prohibited him from intentionally concealing or falsifying information or misrepresenting or omitting material facts necessary to avoid misleading the company's independent public auditors or investors. Public reports in the press and online memorialize further that Biglari addressed the subject litigation with his stockholders at each of the annual shareholders' meetings in 2016, 2017 and 2018.

91.     Nonetheless, according to Cooley's sworn testimony, Biglari did not adhere to numerous corporate formalities concerning the subject suits, including *inter alia*:

i)     Cooley did not "know" in what official capacity or "what hat [Biglari] had on at the time" he made the decision to file the First Action;

ii)     Cooley was "quite sure" Biglari "did not consult" him;

iii)     Cooley "doubt[ed]" anyone on behalf of BH approved the filing in advance;

iv)     Cooley "absolutely" had never read it;

v)  Cooley did not know if anyone on behalf of BH approved or ratified the lawsuit after it was filed, or even if it ever came up before the Board of Directors;

vi)  Cooley had done nothing to find out about the truth of what happened at the Photo Shoot;

vii)  Cooley did not know if the Audit Committee had ever evaluated whether or not the litigation was in the interest of Maxim or BH;

viii)  Cooley testified that it was "beneath his dignity" to even be deposed on why filing a lawsuit about what "he said she said" was in Maxim's interest;

ix)  Cooley agreed that a million dollars spent on lawyers would be material to the instrinsic value of Maxim, but had "no idea" how much money Maxim had spent on legal fees.

x)  Cooley did not even know that Biglari was a personal plaintiff in the case;

xi)  Cooley "doubt[ed]" anybody other than Biglari had approved Biglari's pursuing a personal cause of action, did not know if Biglari was contributing to the legal fees for litigating the case, had "no idea" who would get the money were Biglari to recover an award, and "doubt[ed]" it was even important for him to know in any of his official capacities;

xii)  Cooley was not aware of any informal or formal joint representation agreements;

xiii)  Cooley "ha[d] no idea" whether "there [was] any point in time when Mr. Biglari disclosed to the shareholders . . . that he was the creative force of Maxim from the get go with respect to its aesthetic design and content"; and

xiv) Cooley testified that the only experience which qualified Biglari for such a role was that Biglari "lives his life in an aesthetic way."

92. Over the relevant time period, BH's quarterly filings with the SEC did not separately itemize the fees and expenses of the subject litigation. These filings further appear to have bundled the subject litigation with other BH litigation in generically reporting that "unresolved claims pending" in "various legal proceedings" were "not likely to have a material effect on results of operations, financial position or cash flows."

93. Maxim's PR agency not only advised against using the Centerfold Photo of Biglari with the famous model in the December issue of *Maxim*, but also objected to Biglari's branding that issue "*Maxim by Biglari*."  According to the sworn testimony of the lead PR representative for Maxim, Biglari chose instead to "conflate the magazine with himself," causing the *Maxim* brand "to take a massive hit."  No evidence has been produced during discovery in the subject actions evidencing Biglari ever seeking or securing any approval for the "*by Biglari"* branding, nor does it appear to have been specifically disclosed in any of BH's quarterly SEC filings over the relevant period or to date.

94.     Documents produced by Biglari and Maxim reflect Biglari's use of employees and lawyers from other BH related entities to conduct additional Maxim business relevant to the subject litigation.

95.     At least by May 2015, the subject Photo Shoot of the famous model in Monaco was internally referred to as the "Biglari requested shoot." Biglari directed *BH-related staff* to assist with related arrangements, including for the Photo Shoot to occur not just at the hotel Biglari stayed at, but in Biglari's suite.

96.     Cooley also testified that he had no idea why an employee of Steak n Shake was involved in the negotiation and finalization of a lucrative $100,000 contract Maxim entered into with the famous model after the records of the agency representing her were subpoenaed in the First Action; but he agreed that to the extent Maxim was getting free services of the employees of other subsidiary or related companies, the calculation of at least the expenses under this scenario would undervalue the expenses of Maxim, and thus bear on the measure of Maxim's instrinsic value.

97.     Because Maxim is accordingly Biglari's alter ego, allegations herein against and about Maxim also constitute allegations against and about Biglari, who acted through Maxim.

## II.    **The Improper, Unlawful, Tortious, Malicious, and Unethical Scheme**

### A.   Biglari, Maxim and Latham Frivolously, Knowingly and in Bad Faith Sued the Wrong Insider

98.    Feifer worked as *Maxim*'s Deputy Editor from February 2015, when he was fraudulently hired as part of what was supposed to be a re-branding and re-launch of the magazine, until he was fired on November 20, 2015, as part of the wholesale termination of the relaunch team.

99.    On November 23, 2015, *Maxim* posted online the December issue on which Feifer had worked, including directly with Biglari. He was shocked to see the Centerfold Photo of Biglari with the famous model under the headline "View to a Kill," since it had long been widely shared among the magazine staff that the model had asked that pictures with Biglari not be published in the magazine – *i.e.,* the Photo Shoot Truth.  Indeed, after the online pictures were taken down about a half-hour after they went up, a colleague still at the magazine sent him a g-chat that there were "french mumblings" – between the Maxim's French Features Director, Jacqueline Miro, and the French Art and Design Director, Guillaume Bruneau -- that the model's "manager was given our word that we wouldn't use that photo …."

100.    That day, Feifer *for the first time* reached out to a reporter at the *New York Post,* who had previously published a series of articles about Biglari being creepy, muscling onto the Photo Shoot, and returning Maxim to its beer-and-babes formula because he wanted "to meet the scantily clad models."   The *Post* reporter published the Photo Shoot Truth in the December *Post* Article, attributing it to an "insider."

101.    When Feifer learned weeks later that Biglari and Maxim had sued the wrong insider -- Gross -- over the new information in the December *Post* Article *he* had provided to the reporter, he contacted Sherman. Sherman was in Florida at the time attending a conference.


**B.**  Sherman's First Contacts with Latham, including the First Call

102.    Around 5:00 pm on Sunday, December 13, 2015, Sherman contacted Clark by email, wherein she communicated Feifer's revocation of his execution of Maxim's severance offer and requested that "efforts" be "undertake[n] … forthwith to cancel any … arrangements" underway for payment by Maxim of the consideration of additional compensation.  Sherman further requested to speak with him "as soon as possible" "to discuss a suitable termination agreement"

which she specified *"would have bearing" on the First Action*. ("First Sherman Email").

103.   Clark responded shortly thereafter by email that "We do not represent Maxim regarding this matter" and "we have no knowledge of it." Feifer later that evening forwarded the First Sherman Email to the Maxim HR Department.

104.   The next morning, December 14, 2015, Maxim's HR Department at 9:18 AM forwarded the First Sherman Email to Maxim's COO/CFO Robert Price ("Price") and General Counsel Ian Warren ("Warren").  Despite Clark's representations to Sherman the prior evening, Warren forwarded the chain to Clark and Savla at 9:50 AM.  Savla left Sherman a voicemail at some time before her return flight from Florida landed after noon.   Sherman emailed him at 12:24 PM that "I just landed and received your voicemail. I will try to reach you this afternoon in between meetings." ("Second Sherman Email")

105.   Sherman and Savla agree that they "had an initial telephone conversation" on December 14, 2015 "as a follow-up to the [First] Sherman Email." (Hereinafter "First Call"). Savla swore to the Lower Court it "was unrecorded."  They spoke just before an afternoon meeting, to which Sherman had referred in the Second Sherman Email.

106.    The only alleged "facts" ever disclosed to date by Maxim and Latham to the Lower Court, Sherman or her client about this initial conversation are set forth in an affirmation Savla made under the penalty of perjury and submitted to the Lower Court on April 4, 2016 ("Savla Third Affirmation").  Those "facts" are only as follows:

107.    Sherman allegedly made three "state[ments]":

i)      The case against Gross had no merit;

ii)     Sherman's client had additional information that would be damaging to Maxim and Biglari, including recordings; and

iii)    Maxim and Biglari would not want this damaging information to become public.

For these statements, Savla cited *"Id.* P 33".

108.    Sherman allegedly made four "request[s]":

i)      Dismissal of the case against Gross so that it "does not roll out of control";

ii)     A different termination agreement between Maxim and Feifer containing non-disparagement and liquidated damages provisions;

iii)    A positive reference for Feifer, and

iv)     A severance payment equal to the salary he earned during the approximately nine months that Sherman's client was at Maxim.

For these requests, Savla cited "*Id.*"

109.    Sherman allegedly "stated that time was of the essence … *Id.* PP 34-35**."**

110.    Sherman allegedly "stated … that if her demands were met, the information in Feifer's possession would not become public. *Id.* PP 34-35."

111.    Sherman allegedly "also" made three "state[ments]" about Feifer:

  *i)*      "Feifer was unemployed.…"

  *ii)*     Feifer "was in 'difficult circumstances'.…"

  *iii)*    Feifer "was not present at the Photo Shoot at issue in the Gross action."

For these statements, Savla cited "*Id*. P 33; Savla Feb. Aff., Ex. A, at 10."

112.    Upon information and belief, Savla's citations to paragraphs 33, 34 and 35 referenced paragraphs in the Complaint in the Second Action. Such citations were misleading, however, since Savla conspicuously failed to disclose that those paragraphs included quotes from the tape recording of *the second call Savla had with Sherman **later** on December 14*.   ("Recorded Second Call").

113.    Similarly, misleading was Savla's citation to "Ex. A" of another sworn affirmation Savla earlier submitted to the Court on February 16, 2016 ("Savla Second Affirmation"), since Exhibit A was a purportedly certified transcript of the Recorded *Second* Call.

114.    Both Sherman's contemporaneous notes of this initial conversation and her sworn affirmation about this initial conversation further support that Savla's Third Affirmation about the First Call was materially false and/or misleading, both in his affirmative representations and material omissions.

115.    Nevertheless, it was Savla's rendition of the First Call with Sherman upon which three partners at Latham purportedly "determined" she was "attempting to commit criminal extortion" and decided to surreptitiously tape the next three calls with her.

116.    The First Call ended just before 3:30 PM.  Public records confirm Sherman's attendance at a public meeting at that time as the then Vice President (now President) of the board of a public agency.

**C.**  Three Latham Partners "Determined" Sherman was "Attempting Criminal Extortion" and Decided to Surreptitiously Tape Three Subsequent Conversations with Her

117.    According to Savla, he, Clark, and another Latham partner, Benjamin Naftalis, ("Naftalis"), "met" "after this call . . . to discuss it."  According to Savla, all had "white-collar defense experience," and Clark and Naftalis were also "former prosecutors from the U.S. Attorney's Office for the Southern District of New York, with experience in federal criminal law experience." According further to Savla,

these three Latham partners "reviewed the elements of the New York Penal Law on extortion," and based solely on Savla's rendition of the First Call and their "review of these elements," they "determined that Sherman's conduct constituted an attempt at criminal extortion under New York state law." Per their "analysis," the elements of this crime were satisfied by the following:

i) Sherman evinced a threat to publicly disclose Maxim's confidential information to third parties;

ii) Sherman was willfully disregarding the obligations imposed by "clear cut" NDAs her client had entered into with Maxim; and

iii) Sherman was demanding better severance terms as "ransom" for not providing confidential information to third parties.

Further according to Savla, "[p]articularly telling was Sherman's insistence that her demands were 'time sensitive' and that Maxim agree on terms 'as soon as possible.'"

118. Based solely on this record, Latham decided to surreptitiously record further calls with Sherman. According to Savla, "As viewed by the Latham attorneys, these circumstances made it justifiable to commence recording further calls with Sherman to collect evidence of an attempt to stop her criminal conduct."

119.   No evidence was ever proffered to the Lower Court indicating that this determination was re-examined after each call to determine whether further taping was purportedly justified.

120.   The beginning of the transcript of the Recorded Second Call between Sherman, on one end, and Savla and, to Sherman's surprise, Naftalis, on the other end, reflects Naftalis, before "placing a call" to Sherman, carefully stating for the record: *i)* the date – "December 14, 2015"; *ii)* the time – "about 5:30 Eastern"; *iii)* the identities of the participating Latham attorneys – Savla and Naftalis;  *iv)* their location – "New York City";  *v)* Sherman's identity – "Charna Sherman … who represents Jason Pfeiffer, a former employee of Maxim magazine; and *vi)* Sherman's location -- "in Cleveland, Ohio*."  Accordingly, all of the above and any other prerequisite or related acts, including but not limited to due diligence, legal or factual research, law firm and/or client approvals, *if any*, and all recording and other arrangements, occurred within a window of *only two hours*.


### D.  Latham's Surreptitious Recording of Sherman was Unethical

121.   As Sherman and her client detailed at length in subsequent defense motion papers to disqualify Latham ("DQ motion"), Latham's surreptitious recording of Sherman violated numerous professional ethics rules for lawyers,

including Rules of Professional Responsibility Rule 1.2 addressing fraud, Rule 4.1

addressing truthfulness in dealing with others, and Rule 8.4(c) addressing

dishonesty, fraud, deceit, and misrepresentation. As the transcripts bear out,

none of the four Latham lawyers who participated in their next three calls with

Sherman ever told her they were recording the telephone conversations and

never asked her permission to record the conversations.

122.   In support of Sherman's DQ motion, one of the nation's leading

experts on professional ethics in the law, Lawrence J. Fox, Esq., offered the

following opinion to the Lower Court as to the gravity of Latham's misconduct:

> While I believe that Latham & Watkins violated the New York City Bar
> opinion that prohibits the tape-recording of communications unless
> it invokes a generally accepted public good, it is my view that ***the
> facts of this particular matter present an especially egregious set of
> malignant circumstances that cry out for the harshest
> condemnation of the law firm of Latham & Watkins, the sanctioning
> of the firm, even its disqualification from this matter and an award
> of fees.*** Quite simply, the litigation process is difficult and expensive
> enough. Any approval of the firm's conduct and/or the failure to
> mete out an appropriate punishment, will lead to the opening of a
> second front in garden variety litigation, as wholesale surreptitious
> recording of opposing counsel's telephone calls will become the
> standard of care, a required practice.

(Emphasis added).

123.  Further, Savla's sworn after-the-fact defense of the legal and factual bases of the three Latham partners' decision to so proceed conspicuously reflected no contemporaneous:

> *i)* Research or consultation with anyone else as to the ethics of so proceeding;
>
> *ii)* Research or consultation with anyone else on the wiretapping laws in Ohio, or wherever else they believed Sherman was when she expressly told them she "was out town" before the Recorded Fourth Call;
>
> *iii)* Research or consultation on conflicts of laws, and thus what state law would apply to their surreptitious recording;
>
> *iv)* Any re-evaluations of their "determination" and/or ethics of continuing to surreptitiously tape Sherman after each of the Recorded Second and Third Calls; and
>
> *v)* Consultation even with their clients.

124.  In further defense of their conduct, Latham proffered two opinions of ethics experts. As addressed below, Biglari, Maxim, and Latham knowingly withheld from these experts key facts material to their expert analyses and opinions.  And indeed, the Appellate Court's subsequent findings squarely and dispositively refute their assumptions and conclusions.

125.  Even though Biglari, Maxim and Latham used these secretly recorded conversations as a purported basis to sue Sherman for extortion, Biglari, Maxim

and Latham conspicuously did not proffer these transcripts with the initial "extortion" papers they secretly filed on December 22, 2015, or even disclose in their papers that transcripts existed. In fact, they did not proffer the transcripts for almost two months on February 16, 2016.

**E.** At the Time of the First Call, Biglari, Maxim and Latham *Knew They* Were Pursuing an Unethical, Unlawful and Malicious Scheme to Silence the Truth "By Any Means Possible"

126.    Significantly, in the Savla Third Affirmation, Savla swore as to ***Maxim's and Latham's knowledge*** after the First Call. Specifically, in paragraph 7, he affirmed: "At this time, ***Maxim and Latham** had no basis **to know** of a* potential claim against Feifer related to his actions." (Emphasis added).

127.    This material affirmation was ***knowingly, intentionally, and maliciously false***. It is refuted on the very face of the Complaint in the Second Action filed by Latham on behalf of Maxim. Specifically, Savla admitted in the previous paragraph 6 of the Savla Third Affirmation that Sherman had told him in the First Call that her client "had recordings." The Second Action explicitly and repeatedly complained that Feifer's retention of these recordings constituted a breach of his purported agreements with Maxim. Indeed, the gravamen of their "extortion" claim was that Sherman's "statements" "evinced that Feifer has

breached [the subject agreements] by not returning information, documents or materials, as required by these provisions."

128.   So it could not be more significant that Biglari, Maxim and Latham **knew** much more than Sherman did at the time of the First Call, and much more than they have ever disclosed to the Lower Court, the Appellate Court, the Defendants or their experts according to their reports. Even the discovery scraps Sherman and Feifer fought to secure over the last three years, over relentless, obstructive and ultimately sanctioned opposition, demonstrates that Latham made up their claim of extortion against Sherman as part of the Scheme:  that is, a **"proactive" press "strategy" "dictated" by Biglari to "***kill***" the spread of the truth of what happened at the Photo Shoot "***by whatever means possible*."**

129.   Those means started with telling lies to the press, but knowingly expanded into a litigation strategy to file frivolous lawsuits their clients never intended to pursue against weak defendants they expected to quickly fold, all in order to spread Biglari's "alternative facts" and "fake news" about the Photo Shoot, and silence and intimidate those who knew the truth.   The following sections accordingly detail **what Biglari, Maxim and Latham _knew_ about this Scheme _at the time of the First Call_,** which exposes just how baseless and malicious their "determination" was of Sherman "attempting to commit

extortion." As used herein, knowledge encompasses actual knowledge, reckless disregard for the truth, and/or knowledge that had to have been or should have been known.

**F.** At the Time of the First Call, Maxim, Biglari and Latham *Knew* that the First Action Had No Merit

130.    The first "fact" Savla disclosed in the Savla Third Affirmation about the First Call was that Sherman "stated that the case against Gross had no merit." Savla conspicuously omitted disclosing, however, that Biglari, Maxim and Latham also knew that they had filed a knowingly frivolous case against Gross, including having "no proof" that Gross was even a source for the allegedly defamatory December *Post* Article.

131.    Biglari, Maxim and Latham knew before the the First Call that the First Action was knowingly frivolous on multiple grounds.

*a.* *At the time of the First Call, Biglari, Maxim and Latham Knew They had Sued the Wrong Insider*

132.    Biglari, Maxim and Latham knew before the First Call they had no good faith basis to sue Gross, and thus at least after the First Call, Biglari, Maxim,

and Latham had to have at least suspected that Sherman represented a source of the December *Post* Article.

133.    Biglari knew that Feifer had not only been actively involved in the content of the December issue, but he had directly spoken to Feifer about the Photo Shoot.  Further, he knew that Feifer objected to Biglari's view that Maxim need not publish the truth, including with respect to the Photo Shoot.  Sherman's notes of the First Call are consistent with Savla's rendition that she informed him that Feifer had recordings, but significantly, reflect further that she also described their contents as including Biglari "eschew[ing] fact checking and insist[ing] on taking liberties with the truth." Maxim, and thus Biglari, also knew that Feifer had recently been terminated and was disgruntled.

134.    It is also noteworthy that Sherman specified in the First Sherman Email that she not only wanted to discuss a termination agreement that "would have bearing" on the Gross case, but also communicated Feifer's revocation of precisely the same termination terms that were the basis of the suit against Gross.

135.    More, Latham's knowledge that they had sued Gross without any good faith factual basis had to have bearing on the lens with which Latham analyzed the purpose of Sherman's reaching out to them.

136. Internal documents indicate that at least Maxim's Chief Financial Officer and/or Chief Operating Officer, Robert Price ("Price"), was directly involved in communications both with Latham and the firm's PR agency concerning, *inter alia*, the preparation and filing of the First Action against Gross.

137. On December 1 -- even *before* publication of the December *Post* Article on December 2 – Price informed one of the staff at Maxim's PR firm that "Maxim is in the process of suing Wayne Gross for slander and wanted to know if we should push out to the press." She reported to her superior that "I reiterated that **we had no reason to believe it was him** …." The lead PR agent responded: "**They have no proof**. Not how slander works." (Emphasis added). Recently produced documents from the PR firm reflect further that Price received a copy of the published article from the PR firm the next day (sent at 7:21 AM). He responded at 9:02 AM: "Nonsense. Frustrating. We are suing as discussed. We need to prepare positive release. …" Later that afternoon, the PR staff circulated drafts of "Alessandra Talking Points" which reflected an addition: "**we cannot be accusing Wayne when we do not know that it's him**".

138. In fact, the only "proof" Biglari, Maxim or Latham ever proffered to the Lower Court that Gross was the source was the sole and wholly insufficient fact that Gross was the only Maxim employee at the Photo Shoot. Presumably

that is why Savla made the point in his rendition of the First Call that he asked and Sherman confirmed that Feifer was not at the Photo Shoot.  But even over a month later -- after *i)* they had wrongly sued Gross, sued Feifer twice, and sued Sherman, *ii)* after Sherman expressly informed Clark and Savla that Feifer was "reasonably certain" that "he was the ***only direct source***" of the Photo Shoot Truth reported in the December *Post* Article,  *and iii)* after Sherman further informed them that Feifer had never spoken to Gross about it -- Latham defended the purported merit of their clients' case against Gross in a brief filed with the Lower Court, as follows:

> By the admission of his counsel, former Maxim employee Jason Feifer was *a* source for the Post Article. Compl. ¶¶ 18, 20. Feifer, however, was not present at the Photo Shoot, and therefore could not have personal knowledge of the Photo Shoot. Compl. ¶ 3. ***Thus, the fact remains that Defendant was the only Maxim employee present at the Photo Shoot***.

(Emphasis added).  When asked at deposition in **2016** about what "facts" on which Maxim based the First Action against Gross, Maxim's corporate representative responded: *"The fact that he was the only Maxim employee at the shoot."*

139.    But at least Biglari and Maxim knew well before filing the First Action against Gross that there was an extensive record of others who were not at the

Photo Shoot **who knew the Photo Shoot Truth** and could have been a source of its publication in the December *Post* Article. Since Savla swore under oath as to what "***Maxim and Latham knew***" before filing the Second Action against Sherman, this knowledge must also be imputed to Latham. In addition, upon information and belief, Latham knew, had to know, and/or recklessly disregarded this critical information, and more, would have learned it had they complied with their professional duty to have undertaken an adequate pre-filing investigation.

140.   The First Action expressly acknowledged on its face that the *Post* reporter "cit[ed]" an "insider" or "insiders" as the source of the Photo Shoot Truth.  Gross was no longer even an insider, since he had been terminated months ago in September.

141.   Gross testified that, pursuant to his role and responsibililties as Fashion Director, after the Photo Shoot on July 26, 2015, he promptly told four others in *Maxim* management what happened, including the Photo Shoot Truth. Maxim's corporate representative, Price, conceded at deposition that *he knew that at least the Editor-in-Chief, Kate Lanphear, knew.*

142.   Maxim's lead PR respresentative also testified at deposition that she heard rumors that the model was uncomfortable on the set and discussed the subject with at least Kevin Martinez (the then-publisher)("Martinez") and Price.

The PR agent further testified that "I told them, we have to prepare for this to come out in the press." She and her colleagues "**thought it could be anybody**." She testified further that given conversations she had with Maxim management -- including Martinez and Price -- and "how much was happening," "**they had to know that there was a good possibility that it *wasn't* Mr. Gross who had spoken to [the reporter]."**

143.    One December 2015 email produced by the PR firm records a staff exchange that "[the lead PR agent] and I are increasingly convinced that [Aaron Gell] is leaking to the press." Aaron Gell was Maxim's Executive Director, Digital. Another recently produced e-chat by the firm is even more explicit: a staff member recommended "play[ing] it safe" by not including Gell on a communication to Price and Martinez because she had discussed with Maxim's lead PR agent "we definitely think he's leaking to the post."

144.    Maxim's corporate representative also admitted at deposition that the December *Post* Article included information which the reporter had previously already reported in a September 1, 2015 article, ("September *Post* Article"), about Biglari's "creepiness" and his "muscling in on" the Photo Shoot. In recent responses to Notices to Admit ("NTA") about the September *Post* Article, Biglari admitted under oath that *i)* with respect to the "Creepiness Information,"

"internal inquiries were made to discover the identity of the source of false and defamatory information being provided to the press."; *ii)* with respect to the "Muscling in Information," "Plaintiffs [Biglari and Maxim] "sought to discover the identity of the source of false and misleading information being provided to the press"; and *iii)* Kate Lanphear "was asked about the identity of the source of false and misleading information being provided to the press."

145.  The lead PR representative referred to these inquiries as "an investigation" in her deposition testimony.  Maxim's corporate representative rejected that characterization, but admitted that Maxim "undertook certain measures," and that at least Maxim's General Counsel, Ian Warren, was involved in collecting emails from the entire data base.

146.  In addition to information gleaned from these efforts, Maxim knew there were a lot of disgruntled employees. The September *Post* Article reported that "there has … been a big turnover in the creative and fashion side," and that "morale is plummeting." Maxim's corporate representative testified that beginning in September, Maxim "rightsized" the business by cutting its staff from 110 to 30 by mid-January.

147.  Significantly, Maxim's lead PR agent at deposition testified that from the very start of the "investigation" of the source, the focus was on Gross, and

that it appeared to her that Biglari was pursuing ***an early vendetta against Gross to just "screw" him***. She explained that "it was just like, screw Wayne Gross, we're going to get him for slander. And when you're dealing with the media, once again, it just makes the brand look like it's all over the place." She added that "It makes them look like bullies and not a good employer."

148.    Even more significantly, Maxim's corporate representative acknowledged at his deposition that Maxim received this advice, ***but went instead with their lawyers' advice.***

149.    In connection with the same September *Post* Article, the lead PR agent further testified about her first-hand experience with Biglari's vindictive streak, as well as his unethical tactics.  She testified that Biglari was so upset about the September *Post* Article, that after a call about it with Biglari and Kai Olderog (then an employee of a BH entity and now Maxim's Vice President of Operations), she emailed a colleague the following:

> Welp, I got so angry at the owner of Maxim, they may fire us today. But I am very happy with how I handled it.  He was trying to get us to do all this ***shady shit*** and I said I couldn't compromise my team's integrity for his nonsensical goals.

(Emphasis added).  She further testified that ***Olderog threatened her that her agency had to do what they were told because they were being paid***.

150.    Upon information and belief, Latham, reportedly BH's corporate counsel, was at least aware – at the time of the First Call -- of the September *Post* Article, because the management of Cracker Barrel had proposed a poison pill against Biglari to their shareholders, and in a position piece they filed with the SEC, they cited the September *Post* Article to demonstrate that "Sardar Biglari has a track record of dubious corporate governance." At the time, BH's largest and most successful common stock holding, through a related entity, was in Cracker Barrel, worth $600M at the end of 2015.

151.    Biglari, Maxim and Latham thus knew by the First Call that they had sued the wrong insider.

> b.  *At the time of the First Call, Biglari, Maxim and Latham Also Knew the First Action Was Frivolous on the Merits*

152.    Biglari, Maxim and Latham knew before the First Call that every element of the claims pled in the First Action was substantively frivolous.

153.    ***The Photo Shoot Truth Was the Only Material Allegedly False Statement:*** Even though the First Action pled that the December *Post* Article contained five material False Statements, Maxim, and thus Biglari too, knew when Latham filed the case that only one of them was *material*.  Maxim's corporate

representative specifically so testified in deposition, because the September *Post* Article had already called Biglari out for his "creepiness" and "muscling in on" the Photo Shoot.  The only new information about Biglari was the the Photo Shoot Truth: the model asked Gross if the photos of her with Sardar Biglari would be published and he told her no.

154.    ***The Photo Shoot Truth Was True****:*  Biglari and Maxim and many others knew that the Photo Shoot Truth was in fact true:  that the exchange between the model and Gross had actually occurred.

155.    Gross testified that right after the photos were taken of the model and Biglari together, the model said to Gross, "That's not going to run, is it?" Gross responded, "No."  Maxim and Biglari, through substitute counsel, twice responded to NTA's about this exchange that "they are unable to admit or deny the accuracy" of it. Thereafter, Maxim's corporate representative conceded at deposition that Maxim had no evidence to refute Gross' testimony that this exchange occurred, and that Maxim "could repeat what [Gross] said" in response to these NTAs.

156.    Further according to Gross' testimony, after the Photo Shoot, he promptly told four others in *Maxim* management what happened, including the Photo Shoot Truth, all of them agreed that the pictures of Biglari and the model

should not run.  All of them, however, had been terminated by the time of publication.

157.   The Centerfold Photo of Biglari with the model appeared on line on the morning of November 23, 2015. The online version, however, was only "up for half hour or so" before it was pulled down.  According to a recently produced chain of e-chats from the PR firm, a PR staff member reported to another: "aaron [Gell] just called me" "*apparently mr. biglari saw alessandra [the Centerfold Photo]" "freaked out" ". . . and told them to take it down.*"

158.   The "take down" instruction was also contemporaneously memorialized in an email to Gell with the subject line "Alessandra Pictures Rollout" date-stamped November 23, 2015 from Faisal Kahn – a Biglari Capital employee who assisted Biglari, *inter alia*, with planning the "Biglari requested shoot" in Biglari's hotel suite in Monaco. Kahn instructed Gell: "Please take it down immediately. There may be a press release. Please take it down immediately." Later that day, Gell confirmed that it was taken "down" and "[a]lso pulled off social" to the following recipients:  Kahn, a PR staff person, Maxim's General Counsel Ian Warren, Price, and Jared Keller with Maxim.

159.   Also on November 23d, shortly after Gell received Kahn's instruction, a colleague of Feifer's still working at Maxim gchatted with him about the

"technical blunder" and "the alessandra thing." Consistent with the Photo Shoot Truth, she shared: "I hear french mumblings" -- between Biglari's new Creative Team, Maxim's French Features Director, Jacqueline Miro, and the French Art and Design Director, Guillaume Bruneau -- that the model's "manager was given our word that we wouldn't use that photo …."

160.    Other related contemporaneous e-chat strings between the PR staff were also replete with admonitions against denying the Photo Shoot Truth, as in these exchanges:

> i)    "aaron [Gell] said he didn't know but **he think [sic] biglari did**" "and then evil laughed"; "***sooo we definitely can't deny***"
>
> ii)    "and again, robert [Price] **we cant [sic] say the story is false if there's a history to him being a creep**"

161.    Maxim's lead PR agent also testified that the firm was aware that Biglari "had made women in the office and on sets uncomfortable."

162.    The Centerfold Photo was the only photo in the issue not just of the model.  When the online version went back up on line, the model "liked" certain photos on Maxim's Instagram and Twitter accounts -- *but not the Centerfold Photo*.  One PR staff person on December 4 emailed the head of the PR agency about the model's response: "While her team stated on the record that she was

happy with the shoot they also said she had no comment on his behavior, which ultimately put us in a position where it is not being denied."

163.    As addressed more particularly below, Maxim's corporate representative confirmed under oath that Clark spoke to the *Post* about the inaccuracies of the December *Post* Article.

164.    The *Post* published a revised article on December 8, 2015 (the "Revised December *Post* Article").  Although the Post made some changes – which Biglari, Maxim and Latham maintained were "immaterial" -- the revised article conspicuously did not retract The Photo Shoot Truth.

165.    Thus at the time of the First Call when Sherman told Savla and Latham that the case against Gross was frivolous and filed in bad faith, Biglari, Maxim and Latham knew that she was right.

**G.**    At the Time of the First Call, Maxim, Biglari and Latham *Had to Know* that There Were No "Clear Cut" Non-disclosure Agreements Binding on Sherman's Client

166.    Before the First Call, Biglari, Maxim and Latham had to know there were multiple issues as to the enforceability of each of the two purported non-disclosure "agreements" with Maxim which Feifer had executed, which wholly undercut their "extortion analysis" that Sherman was attempting to commit

criminal extortion.  Neither purported NDA was "clear cut" for each of the reasons identified in this section, among others.

167.   The Complaint in the Second Action alleged that each these purported "agreements" were "*clear-cut*," imposed *indisputable* "obligations on Feifer" "as a matter of contract law," and thus their claim that Sherman's supposed "threats" of "extortion" violated them was "ripe for judicial determination."

168.   Even the transcript of Latham's surreptitious taping of the Recorded Fourth Call  documents a dispute Sherman had with Savla about his – unethically-- trying to deliver the consideration of the latter "agreement" to Sherman's client. Latham thus knew Sherman had revoked the latter "agreement" before any consideration had even been put in the mail.

169.   Latham also knew that the execution of the second "agreement" by Maxim's corporate representative was **undated**, since they attached an undated version to the Complaint.  Maxim COO/CFO Robert Price also had to know pre-suit that he had not dated his counter-execution of the copy Feifer had executed, especially since he was copied on the email chain forwarding the First Sherman Email to Clark and Savla on December 14, 2015.

170.   The Lower Court later expressed doubts about any such "clear cut" enforceability of this "agreement" based in part of the face of the second "agreement":  the Lower Court "noted here also that the copy of the Release annexed to plaintiff's papers is signed by the corporate plaintiff's Chief Operating Officer **and is undated**." (Emphasis added).  When Sherman deposed Price about this suspicious circumstance, he was evasive and untruthful.  In testimony that bound Maxim, he confessed to having "no knowledge of" when *he* signed it and knew of "no other way to determine" when he did so.  Although he resorted to his alleged practice of "usually" signing such releases "promptly," he could not explain why he did not sign the same release Maxim entered into with Gross, nor had he looked to see whether he had signed and dated any other such releases. Despite the clear relevance of the timing of his counter-signature, Biglari and Maxim have still refused to produce documents evidencing any of the following, all of which information was available to them and Latham:

  *i)*      What HR did with the copy Feifer executed and sent to HR;

  *ii)*     Any communications about having it executed by Price;

  *iii)*    To whom, when, how and where any of the versions were shared and/or stored;

  *iv)*     Any documents confirming or refuting Price's sworn pattern and practice;

*v)*     Any efforts to locate and/or transmit any of the versions to attach to the litigation Latham subsequently filed against Sherman and her client; and

*vi)*     Whether any unsigned versions were provided to Latham before Price executed the version attached to the litigation.

171. The second "agreement" also expressly supplanted the first "agreement."

172. And, as shown on the face of the copy of the first "agreement" Latham submitted to the Lower Court, Feifer executed it ***after*** he was already employed, with no promise or payment of additional consideration.

173. Thus at the time of the First Call, Biglari, Maxim and Latham knew that a threshold fact of Latham's extortion "determination" was not true: specifically, they knew Sherman was not threatening to violate "*clear-cut*" non-disclosure obligations.


**H.**    At the Time of the First Call, Maxim, Biglari and Latham *Knew* Biglari Had Not Suffered Any Injury

174. Before the First Call, Biglari, Maxim and Latham knew Biglari had not suffered any injury from publication of the Photo Shoot Truth. The Complaint in the First Action asserted Biglari's "trustworthiness, integrity, dependability and

professional fitness" were impugned and he incurred a "loss of standing in the professional and business community." But Biglari, Maxim and Latham all knew that he had a sullied reputation in each of these areas that effectively made him defamation proof.

175.    In fact, recent documents produced by the PR firm memorialize that before the First Call, Biglari did not even "care about the *Post*." And the firm recommended Biglari just "brush aside" the article as "media gossip."

a.   <u>*Biglari Already Had a Reputation as a Creep*</u>

176.    Biglari's reputation as a creep began long before the Photo Shoot. When Biglari, through BH, purchased Maxim, there were widespread reports in the press that Biglari bought the magazine just to get close to the models. The Restaurant Finance Monitor wrote, "[p]erhaps he'll put pictures of himself surrounded by bikini models in every issue." Investors too were skeptical. A BH investor tweeted that Biglari would rename the magazine as "Big's Skin Mag."

177.    Press articles *after the Photo Shoot, but before* the December *Post* Article not only expressly reported on his "creepiness," but his "want[ing] the old Maxim back so he can meet the girls in the edit." Maxim's lead PR agent testified that "by virtue of the *September* article and all of the articles that happened *prior to the publication of the December issue*" … "there was a concern internally that a

lot of folks weren't going to want to work with the magazine, or … if you're an

agent, put one of your female talents on set with [Biglari] if you felt that this was

the sort of thing that was going to happen."  Indeed, she presciently – before the

#MeToo movement -- opined that she thought this concern was "right. I mean,

you have a couple of stories in the press about bad behavior by a powerful man, I

think there is an impact with that."

178.   There also was a widespread belief at Maxim and at the PR firm that

the "Biglari requested photo" with the model was itself creepy.

179.   Before the First Call, the Complaint Latham had filed in the First

Action on behalf of Biglari expressly quoted (only in part) an email from July 27,

2015, from Gross calling the pictures in Biglari's suite "super cheesy."  The email

has still not been produced.

180.   Contemporaneous e-chats among the PR staff reveal similar

reactions when the Centerfold Photo was posted online:

> i)  *"thought we were trying to bury it"* (emphasis added)
>
> ii)  "one off response from kevin [Martinez]: Kill me"
>
> iii)  "ew," "did that really have to be the first image," and "hate that
> picture"
>
> iv)  "warned them on the previous Friday, but 'they didn't take [the
> lead PR partner's] warning about this seriously"

*v)* "I feel like no one wants to own this issue" "except mr. biglari…"

181.   Maxim's lead PR representative testified that:

> From a media perspective, I found the idea of the owner of the magazine inserting himself into the photos concerning, and I was concerned it was going to become a consistent thing in which it was him with models without very much clothes on. And from a brand perspective, that does not look good. …I believe it would hurt his personal brand incredibly, and I think it would cause people who look at the magazine industry to wonder where this was going to head.

She further expounded as to her professional view of the photo that it was "unusual" for the owner of the magazine to be featured in a photo with the cover model.  Personally, she also thought "it was distasteful and that I knew very quickly that it was going to have a strong media reaction to it."  She reasoned:

> There was an incredible amount of internal turmoil at this point that had been making its way out to the media.  And I was hearing enough rumors about his behavior at this point that I could not imagine a scenario where that photo existed with her team knowing that she was uncomfortable and it not becoming a story.

182.   She also agreed under oath that the mere publication of that photo with the addition of Biglari's signature on the front cover effectively merged his brand and reputation with the brand of Maxim. She testified her firm was "really concerned the brand was going to take a massive hit," and in her view, it did.

b. _Biglari Did Not Have a Business Reputation for Trustworthiness, Integrity, Dependability and Professional Fitness_

183.   Before the First Call, Biglari, Maxim and Latham knew that Biglari's reputation in the business community had been repeatedly attacked and sullied since at least his purchase of Maxim in 2014, and thus he was defamation proof on this score as well.   _Forbes_ in fact published an article in March 2015 titled "_The Implosion of a Warren Buffet Wannabe_" and another in June 2015 titled "_How Wall Street Enabled A Controversial Power Grab At A Wannabe Berkshire Hathaway_."

i)  _Biglari's Purchase of Maxim_

184.   From the outset of Biglari's purchase, through BH, of a "lad mag," there was skepticism in the investment community.  BH had largely been focused on fast food businesses -- Steak N Shake Operations, Inc., Western Sizzlin Corp. and Cracker Barrel.  Notwithstanding Biglari's purported justifications, the purchase was – presciently -- ridiculed in the investment community as a Biglari "vanity project with little upside."

### ii) The Proxy Fight with Groveland

185.    At precisely the same time Biglari purportedly launched the "new"
*Maxim,* Biglari's reputation came under siege from a serious proxy challenge to
oust him and his board members from the BH Board by Groveland Capital LLC
("Groveland"), led by CEO Nick Swenson ("Swenson"). Cooley testified that it was
like "Trump versus Clinton in terms of all the nasty—all the mudslinging and all
the nastiness," which "didn't help" Biglari's reputation.

186.    Maxim COO/CFO Price even reached out to the PR firm to assist
Biglari to "push back against Groveland's PR campaign … leading up to Biglari's
April 9 [2015] annual meeting." Price conveyed that "Biglari is claiming the info
Groveland is putting out there about him is not accurate," advised them to read
both a negative article by the same *Post* reporter and the March *Forbes* article.
The reputational damage done was borne out by Price's indication that "Biglari
himself, whom [sic] never does press but seems to be willing to for this."

187.    Biglari's reputation was so tainted by the proxy fight, Maxim's
management charged its new PR firm with "distinguish[ing] between Mr. Biglari's
reputation and the Maxim brand."  Maxim's PR representatives not only agreed
that Biglari's reputation was "not good," but strenuously advised Maxim further
to keep Biglari "separate" from the *Maxim* brand.

188.   Although Biglari narrowly defeated the challenge, the *New York Times* reported that the "victory is all the more remarkable because the company is a symbol of bad governance. It paid Mr. Biglari $34.4 million last year, prompting recommendations against the management slate from I.S.S. and Glass Lewis, the other big proxy adviser."

### iii)  Biglari's Reputation for Vindictiveness

189.   Although Biglari narrowly defeated the proxy challenge, Biglari earned a reputation for vindictiveness by swiftly engaging in a complex series of public moves to punish Swenson, including allocating BH resources to acquire significant interests in two of Swenson's companies, and secure leadership positions adverse to Swenson.  As early as one April 2015, one article detailed how "*Biglari st[u]ck[] it to critics after shareholder victory*."  The article also quoted Biglari's arrogant view of the investment community: when asked about the proxy contest, Biglari said, "There are more idiots in the stock market than I previously thought.  And I had low expectations."

190.   A mere week before the First Call, Biglari and Cooley assumed Board positions, over Swenson's objection, and entered into a standstill agreement.  On the day of the First Call, Elegantinvestor.com published a critique of these

"shenanigans" and BH's related "underperformance" on line: "Once again, Mr. Biglari has chosen to spend his time and the company's money on his personal vendetta and personal wealth rather than increasing value for shareholders."

### iv)  Biglari's "Wreck[age]" of Maxim

191.    Biglari's ineptitude in running Maxim, and its massive losses, also received extensive press coverage.

192.    Whereas Biglari had touted in an SEC filing during the Groveland proxy battle of his having hired 57 new "top talent" employees "from leading publishing companies," he started terminating all but three of them in September.  By September 22, a staff member on the PR team advised the top management of Maxim that "Due to the New York Post story last month, the internal discord at Maxim is now part of the brand's narrative."

193.    Internal communications indicate that Biglari effectively pushed out the EIC, Kate Lanphear, by mid-September.  When the termination was finally announced a month later, without a successor, the *New York Times* revisited the "raised eyebrows and doubts from the outset." The *Times* reported that in addition to Lanphear, "many of the editors she hired to reshape Maxim, are out or on their way, and the publication is in the throes of another reinvention."

194.   Similarly, by way of example, the same *Post* reporter dogged Biglari with negative articles, including one in October, 2015, that "insiders said [Biglari] has no knowledge of how to run a media company and he often clashed with those who did." ("October *Post* Article").  As to the economics, the article reported that the "limited info on Maxim in the SEC filings does not paint a pretty picture," due, *inter alia*, to "increased costs" of Biglari's "redesign." According to "[o]ne source," just putting the magazine on glossier paper "cost an extra $12 million a year."

### v)  The Cracker Barrel Poison Pill

195.   In October, Biglari became embroiled in yet another battle with another adversary: this time, the management of Cracker Barrel who had proposed to their shareholders a poison pill against Biglari. At the time, BH's largest and most successful common stock holding, through a related entity, was Cracker Barrel, worth about $600M at the end of 2015.

196.   CB management filed with the SEC a lengthy position piece which, among other things, submitted evidence to back up their claims that "Sardar Biglari has a track record of dubious corporate governance."  Supporting slides not only pictured the September *Post* Article, but also the March *Forbes* article

and the March *New York Times* article. Even Biglari admitted his reputation had

been maligned, since his responsive SEC filing cited "numerous personal attacks"

and "gross misrepresentations."

197.   On November 12, 2015, the shareholders apparently were not

convinced by Biglari's arguments about his business, professional and personal

reputations and adopted the poison pill.


vi)  *Biglari's Tender Offer*

198.   This bounty of negative press in the months preceding the First Call is

all the more significant against the backdrop of Biglari's efforts during the same

period to regain a controlling percentage BH shares through a June 2015 tender

offer.  Although he did not clinch control until the end of February 2016, at least

one commentator sarcastically applauded him as an "Evil Genius" who really

benefitted from the negative press coverage, because it convinced wary

shareholders to accept Biglari's tender offer.


vii)  *Biglari Was in Fact Not Trustworthy and Did Not Have Integrity*

199.    By virtue of filing the First Action against Gross, Biglari, Maxim and

Latham put at public issue whether Biglari in fact was trustworthy and had

integrity.  Yet, before the First Call, Biglari, Maxim and Latham knew neither was

true.

■ Before the First Call, Biglari lied to the press

200.    Biglari was bound by the BH Code of Conduct to "make disclosures

that are full, fair, [and] accurate …"  Further according to the binding testimony of

Maxim's corporate representative, "it's important for Maxim not to make false

statements of fact to the press" and "Maxim certainly doesn't want to bully the

press … into not publishing true information." Nonetheless, after the publication

of the December *Post* Article, *but before the First Call*, Biglari, Maxim, and Latham

schemed together to do both.

201.    Contemporaneous emails produced by the PR firm state that at least

by December 4, 2015 Price had communicated with the firm "throughout the

day" "***how Biglari wants to dictate our handling of the strategy.***"  (Emphasis

added). According to these emails, Biglari was concerned about the *Post* story

"getting pickup" and "***wants to kill it by whatever means possible***." (Emphasis

added).  According to these emails, the means considered included "get[ting]

lawyers involved." Maxim's corporate representative confirmed under oath that

at least Clark spoke to the *Post* about the inaccuracies of the December *Post* Article.

202.    Significantly the Revised December *Post* Article included new "facts" from "Biglari's representatives" which, *inter alia*, misleadingly suggested that Biglari's attendance at the Photo Shoot was merely coincidental.  The most material of these new "alternative facts" was *knowingly false.*  Specifically, the Revised Article reported that "Biglari's representatives insist that … [Biglari] was only on set because the photo shoot was near his hotel room."  Biglari's own records, however, confirm that months earlier not only had *he* "requested" the shoot, picked the model and directed preparations for the shoot, but also arranged to have the shoot *in* his hotel room.  When Sherman deposed Maxim's corporate representative about the truth of this representation to the press, he incredulously testified:

> You know, even if he was at the suite, my understanding is that it's pretty big, so he may have been in a separate room, a separate wing. I don't know how big the suite was, so I don't know if that constitutes him being at the photo shoot.

203.    On December 4, 2015, Price also emailed the PR firm *and Clark* concerning another outlet's interest in whether Biglari had written the cover story about the model in the December issue. Price stated: "This matter is very serious

as you know."  He directed the PR firm "get Clark connected asap so they don't

publish an article with incorrect data like the post."  But Biglari and Maxim knew

that *Biglari* had in fact written the cover story. The outlet never published the

truth.

■ Before the First Call, Biglari knew Maxim was
engaging in deceptive publishing practices

204.    As Feifer's tapes record, and as Maxim's corporate representative

testified, Biglari and Maxim knew -- before the First Call -- that Maxim engaged in

a deceptive practice, internally referred to as "bifurcation," whereby Maxim

published different versions of its magazine – both in terms of content and paper

quality – to different markets.  Thus subscribers, for example, did not receive the

same quality issue that was sold on the stands in major markets.  Further,

Maxim's corporate representative could identify only one advertiser whom he

knew to be aware of this potentially fraudulent practice.

■ Before the First Call, Biglari knew he was violating
federal securities public disclosure laws

205.    Upon information and belief, Biglari Capital LLC is owned by Biglari

and is the entity through which he manages two investment partnerships which

largely hold BH's assets in Cracker Barrel stock.  A June 2018 SEC settlement with

Biglari Capital LLC found that over fiscal years relevant to his honesty and integrity

at the time of the First Call -- 2013, 2014, and 2015 -- "Biglari willfully violated"

federal securities laws by repeatedly failing to make required public disclosures.

The settlement defined a "willful violation of the securities laws" as meaning

"'that the person charged with the duty knows what he is doing.'"  Pursuant to

the settlement, Biglari Capital LLC was censured and ordered to pay a penalty of

$75,000.

206.   In sum, at the time of the First Call, Biglari, Maxim and Latham knew

that Biglari's claim of defamation and purported injury to his reputation was

frivolous.


**I.** At the Time of the First Call, Maxim, Biglari and Latham *Knew*
     Maxim Had Not Suffered Any Injury


207.   At the time of the First Call, Biglari, Maxim and Latham knew that

Maxim also had suffered no injury to its goodwill as a result of the December *Post*

Article. Specifically, the First Action alleged that the disclosures in the December

*Post* Article "directly and proximately injured and damaged Plaintiff Maxim, which

because of Biglari, has invested substantial resources and efforts in attracting

high-quality photographers and well-known models, figures and actors to provide

their serves to Maxim magazine, with the goal of making it successful." Yet, at

deposition, even eight months past the filing of the First Action, Maxim's

corporate representative could not name a single model, photographer, or any

other person who had refused to work for Maxim because of the *Post* Article.  In

fact, the only specific damage he could articulate were the legal fees Maxim had

spent on the litigation, including to Latham.

208.   Maxim's corporate representative even refused to verify the truth of

these allegations at his deposition, and by motion of substitute counsel, these

allegations were retracted from the Complaint.

209.   Even more significant, Biglari, Maxim and Latham knew that such

injury, if any, was inflicted *by Biglari.*  In the months preceding the December *Post*

Article, Biglari engaged in what one of the PR staff termed a "hostile takeover."

Biglari began the dismantling of the new "relaunch" team about whom he had

boasted in his March proxy filing and on whom he had spent millions to hire. He

terminated the EIC he had lauded to his shareholders and the press as well, hired

another new Creative Team, and secretly assumed the roles not just of Editor-in-

Chief, but "factchecker," so he could "make stuff up."  He interfered with the

creative and editorial teams, insisted on distasteful content, and engaged in

unethical practices, contrary to representations he had made to his shareholders and the press.  He also rejected the advice of the PR firm, fired them, and then replaced them with a "crisis management firm."

210.   Thus at the time of the First Call, Biglari, Maxim and Latham knew that its suit to recover goodwill damages for the purported breach of an NDA was frivolous.


**J.**  Despite Knowledge Before the First Call Which Refuted and Precluded Latham's Extortion "Determination," Latham Surreptitiously Recorded Three More Calls With Sherman To Try – Unsuccessfully -- to Entrap Her

211.   Contrary to Latham's "determination" Sherman was attempting to commit criminal extortion, the Appellate Court found that the record on which they sought to justify their determination – both before the First Call *and after* -- reflected ***"no threat" by Sherman "to disclose confidential information to third parties."***

212.   Rather, Latham's "determination" was just a pretext they made up to try to entrap -- and record -- her into making such a threat – so that they could sue Sherman, and in turn prevent her from disclosing the truth of their having filed a knowingly frivolous First Action against Gross.  The answer of Maxim's

corporate representative at deposition to the question whether Maxim had any good faith basis to file the First Action could not be more poignant in this regard: the response was an objection by substitute counsel that the answer was attorney-client privileged.

213.   Latham set up three more calls with Sherman, each of which they recorded.  Savla and Naftalis recorded the conversation they had with Sherman two hours after the First Call on December 14, the Recorded Second Call.  Savla, Naftalis and Latham associate Eric Taffet recorded a conversation they had with Sherman on December 16 at 10:35 AM, ("Recorded Third Call").  Savla and another Latham associate, Matt Salerno recorded a conversation they had with Sherman on December 21, at 4:30 PM, ("Recorded Fourth Call"). On the transcript of this last call, no Latham attorney stated for the record, as Naftalis had for the others, that Sherman was in Cleveland, Ohio.  And in fact, prior to the call, Sherman had requested by email that they use her cell "since I'm out of town," ("Third Sherman Email").

214.   Latham apparently did not undertake any investigation about Feifer, since even weeks later at the first hearing on February 8, 2016, Savla was unable to answer the Lower Court's query about what position Feifer had held at Maxim.

215.    Latham's transcripts further document that Latham never inquired where Sherman was located for each of these calls, even though the First Sherman Email indicated that she was travelling, and the Third Sherman Email expressly informed them she was "out of town."  Nor did any of Latham's submissions defending their surreptitious recording mention any research at any time of consent laws in other states, or even any sort of conflict of laws analysis as to which state recording laws would apply.

216.    Most conspicuous in its absence from Latham's defense of this conduct is any evidence that these former prosecutors and white collar defense experts hesitated or even thought twice about making such an unconscionable accusation against another lawyer.  After reading the transcripts, renown ethics expert Lawrence J. Fox reacted:

> These  purportedly acclaimed attorneys not only engaged in fraud, but "one or more of them" may "still [have] thought of themselves as prosecuting AUSA's working with wiretaps and wired witnesses to catch the bad guys for the United States of America, as opposed to bringing a rather weak civil defamation claim over, of all things, a trivial Page 6 New York Post sentence or two about a photo shoot."

217.    Not long after Naftalis "determined" Sherman was attempting to commit extortion, he unwittingly gave voice to the gravity of Latham's conduct. Naftalis was named a Rising Star by *Law360*.  In the *Law360* announcement of the

award, Naftalis payed homage to the simple, but invaluable life lesson he learned from his lawyer father: "***Make sure you are thought of as an ethical and good person … because if you're not, you're really going to have to change careers***." Apparently he did not learn that the lesson applied to others, since the Latham lawyers paid no heed to destroying Sherman's career.

218.   To the contrary, each of the transcripts of these calls not only reveal Latham's repeated attempts to entrap Sherman – *unsuccessfully* -- into threatening to disclose information to the public, but reinforce and detail further ***what Biglari, Maxim and Latham knew, before they sued Sherman,*** about each of the areas addressed above.

219.   ***First***, Latham had to learn over the course of these calls that Feifer was at least a source of the December *Post* Article, because Sherman all but told them he was:

> i)   ***Sherman implored them to do the math:*** Sherman implored them to re-read their complaint, told them point blank that she thought the "information and belief" about Gross pled in their complaint was "wrong," that ***they should repeat what she was saying "out loud to [them]selves and, you know, do the equivalent of the math.***"
>
> ii)   ***Sherman implored them to connect the dots:*** Sherman repeated and stressed not only that she had provided them "credible information" that their suit against Mr. Gross "is a baseless lawsuit," but explained why Feifer was personally

interested in settling it: "I've been clear what I want.  I want this entire issue of your clients suing over a newspaper article about him put to rest. I want it put to rest *for everyone involved*. I want it – and I want it done *before anyone connects the dots to my client*." When Savla professed that her "connect the dots" reference was too "cryptic" for him to understand, she was even more insistent: "You know, honestly, guys, you are smart people.  You've dealt in white collar criminal cases.  You know how to connect the dots.  This is not that hard and I'm not going to be any more forthcoming than I have been.  *I told you I have reason to believe you've brought a baseless case and I told you there's dots.  I mean, really*…."  When another Latham lawyer responded "[b]ut your client is not implicated in this lawsuit. That's why I'm just confused about why he would be involved in any dot connecting," she again led them to the obvious by twice emphasizing that *he's "at least a material witness"* and "*at a minimum*, yes, he would be called as a witness."

(Emphasis added).

220.    That Latham in fact connected the dots is borne out by Savla's all-too-careful wordsmithing in his Third Savla Affirmation about what Maxim and Latham *knew* after the First Call versus what they *knew* after the subsequent recorded calls.  After the First Call, Savla swore – falsely as addressed above -- "*Maxim and Latham had no basis to know of a potential claim against Feifer related to his actions.*" But after the three recorded calls, he conspicuously did not repeat the same allegation.  He swore instead: "[a]t the time of these calls, there was no pending lawsuit, or negotiations as to any claim as between Feifer and

Maxim."  Since the First Action was pending, Savla's first representation was at least misleading.  Biglari, Maxim and Latham knew the second representation materially false.

221.  **Second**, contrary to Savla's representation, Sherman not only expressly conditioned each of the conversations at the outset as settlement negotiations pursuant to Rule of Evidence 408, but also outlined the gravamen of the claim Feifer later asserted as a counterclaim in the First Action after he was added as a defendant – that Maxim fraudulently induced a respectable journalist to join a purportedly respectable relaunch, when in fact, as Biglari, Maxim and Latham knew even before the First Call, Biglari was instead fashioning *Maxim* in his creepy and shady image.  Sherman twice explained:

> *i)*  Feifer "doesn't have a job because of the way your guys conducted the business, which is at issue in this case." She expounded that he, along with others, were fired because they had "a very different view on ethics in that industry.…"

> *ii)*  "You're not getting … the underlying problem of [Biglari's] firing a whole group of people [with] a very different view on ethics in that industry in which they all work. Okay? And that's what you're going to end up litigating if you want to go proceed with this."

222.  The abject falsity of Savla's affirmation that there were no "negotiations as to any claim as between Feifer and Maxim" is refuted in the

transcripts by Savla's specific request for "a draft or anything like that you want to send over" so "we can start to run it by our client more." He insisted that he "need[ed] something more concrete to put in front of the client" because they "need[ed] to drill down on these things, and the only way to do that is to get a draft from [me] that we can then consider."

223.    ***Third,*** Sherman explained in detail how the information that Feifer had was ***relevant*** to the First Action against Gross, and thus "***would come out <u>in the litigation</u>***." Given what Biglari, Maxim and Latham actually knew about this information, even before the First Call, they had to know Sherman was right.

224.    As to the tapes Sherman had previously raised in the First Call, she informed them further that Jason had recorded meetings he had with Biglari, as well as Cooley, about their sleazy and unethical practices at Maxim that "will become ***relevant***" since the tapes "***go[] substantively to some of your claims***" in the Gross suit.  She also was clear that this was not a threat to disclose them publicly.  Rather, she was specific as to how the tapes "would find their way" into the public domain":  ***by way of the Gross "litigation."*** She predicted that the tapes would be "at least drawn in by the suit you brought against Mr. Gross," since it is "likely" Feifer would at least become a witness and "would be subject to third party discovery."

225.    She also gave Latham a head's up that Feifer had photographed notes that had been lying around the Maxim office concerning Biglari's poison pill battle with Cracker Barrell. She specifically explained that the information was "***likely to be relevant***" to the First Action since "on their face" "***they bear at least on damages and [Biglari's] belief that he was being disparaged in that controversy as well.***" When Sherman made this point, she did not know what they must have known:  that Biglari had already publicly asserted exactly that claim in his responsive filing to Cracker Barrel management's "numerous personal attacks" and "gross misrepresentations."

226.    Given what Sherman had described about these materials, she implored the Latham lawyers to weigh the consequences of proceeding with litigation she steadfastly maintained was knowingly frivolous.  She specifically explained that Latham was "pursuing a case about your client's reputation and his business practices in a sea of fired employees who are disgruntled … precisely over the fact of [Biglari's] less than honorable conduct, all of which will come to bear if you proceed with this." She further questioned why Latham would pursue a little, insignificant, frivolous case in ***public***, litigation of which invited the far greater risk of Biglari's "shareholders and the management of his other companies to all know about his …view of taking liberties with the truth, of his

views about the sleaze factor, of Mr. Cooley's comparable views in that regard, of the fact that he suffered no damages because he believes he's already been damaged by other controversies ...."

227. Although Latham postured that the First Action was "a whole separate case," Sherman squarely refuted their position: "I told you *it's not a separate case*. It's why I contacted you."

228. *Fourth*, Sherman challenged the enforceability of the separation offer which Feifer had executed. She explained that it had been revoked, that reasonable people could disagree on the enforceability of such a contract, and that the practices she had outlined for them invalidated it. She also challenged as unethical Savla having attempted to deliver directly to her client a check to fulfill the payment terms of the termination proposal he knew she had revoked.

229. *Fifth*, Sherman challenged Latham's position on confidentiality. She argued that "run[ning Maxim's] business on the condition[s] that it's okay to lie" and "you can take liberties with the truth in publishing this magazine" are not "trade secret[s]."

230. As the Appellate Court ruled, Sherman never made a threat over these calls – or at any time -- to disclose confidential information to third parties. Rather, the transcripts of these calls make plain Latham's repeated efforts to bait

her in order to extract the right sound bite to use in the lawsuit they were preparing. But every time these top shelf lawyers incredulously feigned lack of understanding in order to entrap her, she was clear that she was not threatening **public disclosure** of any of the information about which she informed them. Rather, she repeated again and again that the information would come out ***in the litigation* they had elected to pursue *in public*** against Gross for the simple reason that ***it was *relevant*.**

231. She further rebuffed every effort by them to deconstruct her settlement demands. She repeated, again and again, her client's desire to settle the disputes between them, which included dismissing the case against Gross. Latham, however, strung her along with purported, but feigned interest in working through settlement terms, to allow them time to prepare a Second Action and *ex parte* TRO and sealing papers.

**K.** Despite More Developments Concerning the Photo Shoot Truth, Latham Still Proceeded with Recording the Third and Fourth Calls

232. Contemporaneous e-chats record that on or about the morning of December 15, 2015 – the day after the First Call and the Recorded Second Call –

Maxim discovered that a key member of the PR team had commented "SMH" –
*i.e.,* "shaking my head" -- on Maxim's post of the Centerfold Photo on its
Instagram account.  She also tagged another member of the PR team.  She
explained her actions: "I questioned why the client was posting a [sic] inherently
converstail [sic] picture publically [sic]." Despite Maxim's knowledge of this
significant firing over the "controversial" Centerfold Photo, Latham proceeded to
record the Third Call, the next day on December 16.

233.   Even more significantly, in the five days between the Third and
Fourth Recorded Calls, there were communications amongst senior Maxim staff
which verified the multiple points Sherman had been attempting to impress upon
Latham.

234.   In a series of emails dated December 18, Aaron Gell, Maxim's
Executive Director, Digital, made extensive recommendations to Maxim's
COO/CFO Price about how to deal with another former Maxim employee who was
writing an article for *The New Republic* about Maxim, and in particular how to
handle expected questions about the First Action against Gross.

235.   ***First***, Gell advocated Biglari should just "take a page from Donald
Trump," "counter the narrative" and "be bold about it" with this response from
Biglari:

Look, I spend most of my time studying spreadsheets and supply chains. When I get a chance to hang out behind the scene of a glamorous photo shoot with one of the world's most beautiful women, I'm there! Who wouldn't be? It's one of the most fun experiences I've had owning Maxim. As for some unnamed person cally me creepy in the New York Post, I strongly refute the charge. *I'm the least creepy person I know.*

(Emphasis added).

236.    *Second*, Gell, like Sherman, maintained that no real harm had been done. He opined that "nobody except media people in New York cares about this stuff," and just as the PR firm Maxim had previously advised, he advocated that "Maxim should just shrug it off."

237.    Despite Latham's clients' knowledge of the real truth and the absence of any damages, Latham proceeded with its unethical taping.  The Recorded Fourth Call, however, was not just unethical, but it was also illegal. Latham knew in advance of the Recorded Fourth Call on December 21 that Sherman was out of town. When Latham called her, she was in fact at her second home in Florida, where the Florida Wiretap Statute (Florida Security of Communications Act, Fla. Stat. Ann. § 934.01 *et seq*.) not only prohibited such surreptitious recording, but provided *criminal* penalties for violations.

## L. Sherman's December 21 Settlement Proposal

238. Sherman promptly responded to Latham's specific request in the last Fourth Recorded Call that she send them her client's settlement terms in writing. She emailed them at 5:40 PM the same day. Latham conspicuously and in bad faith did not include this email in their *ex parte* submissions to initiate the Second Action, secure a TRO and seal their filings. They obviously withheld it from the Lower Court because it explicitly refuted material and false representations they made to the Lower Court.

239. ***First***, Sherman not only expressly referred to settling "disputes between [Feifer] and your clients," but listed, as requested by them, the specific terms of a settlement offer on behalf of her client. Of special consequence, they included, *inter alia*, dismissing the First Action with prejudice, and terms upon which *Feifer would return the tapes and the notes*.

240. ***Second***, Sherman not only reiterated the relevance of the tapes to the First Action, but provided them specific quotes from them that tied them directly to the model and the Photo Shoot, including "mak[ing] stuff up" and making creepy comments about portraying a woman's pussy "with a Picasso" purportedly to make it "classy."

241.   **Third**, Sherman accurately challenged their good faith.  She submitted that their "professed, collective failures to remember or comprehend the substance of any [of our multiple, lengthy communications] is at best disingenuous, and clearly designed to delay." She also repeated that the First Action "is not only frivolous, but being maintained in bad faith."

**M.**   Latham Appeared in Court the Next Day, *Ex Parte*, to Sue Sherman and Silence Her, in Order to Incapacitate Her as Opposing Counsel

242.   As alleged at the beginning of this Complaint, Latham instead filed suit against Sherman and her client on behalf of Maxim – and thereby, Biglari -- the next day, the day before Christmas Eve.  Even though they knew how to reach Sherman, they appeared *ex parte*, and secured a TRO and an order that the case be sealed. They informed Sherman of the fact of their filings and the Lower Court's order, but did not provide her a copy of any of them and refused her demand that they promptly do so.  (They did not in fact do so until January 6, in violation of an express order by the Lower Court.)

243.   Their filing papers included multiple, material representations and/or omissions which Biglari, Maxim and Latham knew to be false and/or misleading. These included, *inter alia*:

1. The knowingly false representation that Sherman had engaged in criminal extortion.

2. The knowingly false representation that Sherman threatened to disclose confidential information to third parties.

3. No disclosure of Sherman's statements to the contrary:  that the information would come out in the First Action.

4. The knowingly false representation that the Second Action was "unrelated" to the First Action. Latham emphasized the import of this "fact": "The Gross lawsuit was unrelated to Feifer, Sherman, or the present action, thereby ***underscoring*** the need for this Court to provide the relief sought." (Emphasis added).

5. No disclosure of Sherman's contention or the facts she presented that the First Action was related.

6. The knowingly false representation that the recordings and notes were "unrelated" to the First Action.

7. No disclosure that the First Action was knowingly frivolous.

8. No disclosure that Biglari, Maxim and/or Latham had to know, or at least suspected, that Feifer was a source of the December *Post* article.

9. The knowingly false representation that Maxim "has a clear-cut case as a matter of contract law …."

10. No disclosure that Biglari, Maxim and/or Latham knew there were issues as to the enforceability of the subject "agreements."

11. No disclosure that these were "clearly settlement negotiations," that Latham requested settlement terms, that Sherman contended they were settlement negotiations, and that Sherman

had provided express "settlement" terms in writing at Latham's request.

12. The knowingly false representation that the information was confidential.

13. The knowingly false representation that Sherman had refused to return the information.

244.   The initial filings are plain on their face how intentionally they were drafted to intimidate, bully and silence Sherman as a lawyer, and further, interfere with her ability to defend her client.  Even though the Complaint only sought declaratory relief as to the validity of the two purported agreements, the filings were strewn with knowingly inflammatory and clearly -- and unreasonably -- ***extraneous*** accusations of "criminal extortion."

245.   As delineated next, Latham's subsequent actions on behalf of their clients exponentially compounded the harm of these egregious abuses of process and made even clearer the malicious and improper purposes of this second frivolous lawsuit, including to incapacitate Sherman's ability to represent Feifer, defend herself, and even practice law.

### N. Latham Repeatedly and Knowingly Accused Sherman – Falsely -- of Violating Court Orders and Sought, Without Basis, to Restrict Sherman's Represention of Her Client in the First Action

246.    As a result of a fortuitous interruption by phone of another *ex parte* court appearance by Latham on December 23, 2015, the Lower Court ordered Sherman to enter into a stipulation with Latham on behalf of her client to temporarily maintain the status quo.

247.    In the short time available, before the Justice left that afternoon for the Christmas holiday, and without the filed papers, Sherman agreed to such a stipulation, which the Lower Court promptly "so ordered."  This so-ordered stipulation became known as the Sealing Order.  From the outset, it was always intended to be only *temporary*, which intent was expressly reflected in the terms of the stipulation.  As soon as Sherman understood that Latham intended to abuse it, she demanded on January 5, 2016 that they "take ***immediate*** action to unseal" the Second Action. (Emphasis in original). Latham did not accede to her demand.  Even though the Sealing Order expired by its own terms no later than April 11, 2016, Latham continued to insist upon its continuation even thereafter, and to abuse it.

248.   Latham improperly abused the Sealing Order in order to gain

advantages in each of the two Actions for their clients, and in so doing, interfered

with Sherman's defense of her client, as well as herself.   These abuses included

preventing Sherman and Feifer from disclosing relevant and exculpatory

information to Gross, and pressuring Gross to swear to knowingly false

information to use against the Defendants. Of particular significance to this case,

Latham also tried to silence, intimidate, and bully Sherman by claiming falsely –

repeatedly and knowingly -- that she had violated the Sealing Order.

249.   On December 27 and 28, 2017, respectively, she informed Latham

and then Gross' counsel, Cameron Stracher ("Stracher"), that her client was

"reasonably certain" he was the "only *direct* source" of the Photo Shoot Truth in

the December *Post* Article. She informed Stracher that she was limited in what

she could discuss because of another action that was under seal.  Stracher

independently found the case caption on the court's electronic docket system.

250.   On December 29, Stracher informed Latham that he objected to his

client being sealed from access to the Second Action, and expressed his concern

that Latham was using it to get "free discovery." In response, Latham:

> *i)*     Reported to Stracher -- falsely, and without basis -- that
>          Sherman had violated a court order;

    *ii)*    Implied to Stracher -- falsely, and without basis -- that Sherman had not informed him that the Second Action was under seal.

    *iii)*    Lied to Stracher that "they [Latham] were not suing the insider"; and

    *iv)*    Misrepresented that the Second Action was unrelated.

251.    Latham further threatened Stracher to "be mindful in your communications with Ms. Sherman that the case, and its associated filings, are confidential and sealed."  Stracher responded that he was "obviously not bound by a sealing order entered in another case, the terms of which I haven't even seen."  Clark, in response, raised the level of the threat: "You are now aware of the sealed status of the other matter. Proceed at your peril."  Stracher requested a copy of the Sealing Order. Latham refused to do so and instead warned: "If you take the position that you are unconcerned, that is your decision."

252.    Thereafter, Gross subpoenaed Feifer in the First Action for testimony and documents, just as Sherman had forewarned and as Latham had to have expected.  Sherman accepted service of it on January 4, 2016, the first business day of the new year.

253.    Since the subpoena sought information covered by the Sealing Order, Sherman promptly forwarded the subpoena to Latham expressly in order to

"afford [them] ample notice to timely allow [them] to seek whatever protections from [the Lower Court] to which [they] believe[d their] clients [we]re entitled."

254.    Sherman also copied Gross' counsel and explained why:

> Mr. Stracher is aware of your TRO action before Judge Kenney, which -- by virtue of your actions -- is a matter of public record. I am accordingly copying him here to ensure that you seek to include him in any proceedings you pursue before Judge Kenney concerning the terms and conditions of his subpoena.

255.    The next day, Savla accused Sherman of violating the Sealing Order merely for copying Stracher.

256.    At the first joint appearance of counsel on February 8, 2016, in the Second Action, the Lower Court not only removed Sherman from the TRO, but instructed Sherman and her co-counsel to relay certain of the Lower Court's advice to Stracher.  Nonetheless, Latham objected to defense counsel just notifying Gross's lawyer that there was a preliminary conference in the case: Latham maintained that "[t]he fact of today's appearance is non-public and subject to the seal, and just underscores our prior concerns."

257.    Even after Latham switched gears and urged the Administrative Judge of the Lower Court to have the two Actions designated as "related," they claimed that a letter sent by Sherman and her co-counsel in support of their proposal violated the Sealing Order because Stracher was copied.

258.  Only a March 21, 2016 order of the Lower Court finally granted --
*over Latham's opposition* -- Gross' counsel access to the "related" file in the
Second Action, three months after the case was commenced.

259.  The improper and malicious nature not just of these accusations, but
the knowing hypocrisy of Biglari, Maxim, and Latham's insistence upon the
Sealing Order, were borne out most clearly when Sherman and her co-counsel
filed Feifer's responsive pleadings to the First Action, and quoted relevant
portions of the tapes he had made of Maxim meetings.

260.  Latham took unilateral and *ex parte* action *again,* this time by
improperly and secretly applying to a clerk in the Lower Court to seal *Feifer's*
Amended Answer and Counterclaim in the First Action.

261.  This procedure was not permitted under the rules of the Lower
Court.  The Lower Court's staff lawyer accordingly undertook an investigation to
determine how Latham had secured this restriction of an adversary's filing.
Significant to the subject action, Latham went so far as to argue that Sherman
could not participate in a court conference held with counsel for the parties. The
staff attorney refused Latham's demand that Sherman be barred from
representing her client.

262.   In a May 3, 2016 order, The Lower Court not only chided Latham for

"fail[ing] to indicate what information in the Amended Answer was revealed in

violation of the parties 'So Ordered' sealing stipulation," but rejected Latham's

unilateral restriction on access to Feifer's filings precisely the reasons that were

obvious before the Second Action was ever filed:

> *i)*    "[T]he factual allegations [in Feifer's Answer and Counterclaim]
> do not reveal any trade secrets or confidential information … ."
>
> *ii)*   "The fact that allegations made in the context of any litigation
> document may have the potential to be embarrassing or even
> damaging to a reputation, or a party has a general desire for
> privacy, does not constitute good cause to seal court
> records…."

263.   Thus what Latham had originally twisted into a threat by Sherman to

commit extortion and later a violation of the Sealing Order was nothing more

than an accurate prediction of what would happen, ***and did***, in the First Action, *by*

*virtue of **Latham's** actions*.


**O.**   Latham Threatened, Without Basis, to Report Sherman to
"Appropriate Bar Authorities"

264.   Latham knew from Sherman's fortuitous interruption of their

December 23, 2015 *ex parte* hearing with the Lower Court both that she had

raised her not being admitted in New York, and that the Lower Court nonetheless had ordered her to enter into the Sealing Order, including on behalf of her client.

265.   Nonetheless, after Sherman informed Latham that she had accepted service of Stracher's subpoena on the first business day of 2016, Latham wrote Sherman a letter the next day on January 5, 2016 threatening to report her to the "appropriate bar authorities" for the unauthorized practice of law.

266.   Two days later, former Chief Judge Lippman joined Latham as Of Counsel. Latham knew, or should have known, when they communicated their threat to report Sherman that on December 10, 2015, then Chief Judge Lippman had promulgated 22 NYCRR §523 (Section 523), permitting temporary practice in New York.  This threat was just intended to intimidate Sherman.

267.   Latham continued to make the threat, even after Sherman retained co-counsel in the First Action. While Sherman's co-counsel was discussing with Latham whether they would consent to Sherman's *pro hac vice* admission in the First Action, Sherman sent Latham a preservation request on January 28, 2016, with the consent of and a "cc" to Sherman's co-counsel.  Clark haughtily responded: "Pardon, Has your pro havoc [sic] application been granted? Or made?"  Since the preservation request concerned both Actions, Sherman responded, *inter alia*, by "not[ing]" her right as a defendant to seek such

preservation, since Latham had sued her.  Clark, even more arrogantly, responded: "Sure did.  With great cause."

268.   Savla then jumped in to threaten objecting to Sherman's *pro hac vice* admission:

> [W]e were previously inclined to take no position with respect to such an application, while reserving our rights to contest your role at a later stage, along with all factual and legal matters.  I have not read your letter and attachments yet, but your communications highlight precisely why pro hac admission is ill-advised, and we will now take that issue under advisement.

269.   The malicious nature of Latham's threats are borne out by how quickly they abandoned them when it was strategically in their interest to do so.  Just days later, on February 5, 2016, they wrote a letter opposing Sherman's and Feifer's request to transfer the Actions to the commercial division of the Lower Court.  Among Latham's arguments was one related to the schedule in the First Action, which they supported by representing:  Sherman's "[p]ro hac admission is not required for the simple purpose of filing a responsive pleading in the First Action … ."

270.   It could not be more revealing that *despite* Latham's extortion claims, the Lower Court admitted Sherman *pro hac vice* in the First Action.

**P.** Latham Opposed, Without Basis, Sherman's Obligatory
   Disclosures to Her Malpractice Carrier

271.   Having sued Sherman for criminal extortion, Latham certainly had to

understand that she was obligated to timely put her malpractice carrier on notice.

Latham's position regarding the Sealing Order was so extreme, however, that

they aggressively maintained that Sherman's mere disclosure of the Second

Action would violate the Sealing Order.  Their refusal of her request was

accompanied with highly combative communications on the subject.  Even when

Sherman's lawyer (and her co-counsel in the First Action)  proposed a mutual

carve-out, Clark arrogantly responded: "Your allusion to a joint carve-out is noted.

No thanks."

272.   Sherman thus had to move to get a court order to proceed, which

the Lower Court granted.  Sherman suffered substantial and irreparable damages

as a result.

**Q.** Latham Opposed, Without Basis, Sherman's Obligatory
   Disclosures to the Florida Bar

273.   At the time Sherman was sued for extortion in the Second Action,

Sherman had an admissions application pending before the Florida Bar. On the

basis of the same, extreme position with respect to the Sealing Order, Latham refused Sherman's request to disclose the matter to the Florida Bar, which the Florida Bar required. Accordingly, Sherman had to move to get another court order to proceed. Since the Lower Court limited the disclosures Sherman could make, her admission into the Florida Bar was jeopardized, and she endured unnecessary concern and anxiety, until she was admitted on the basis of her outstanding, otherwise unblemished record.

**R.** Biglari, Maxim and Latham Pursued a Coordinated Press Campaign to Leverage Sherman and Feifer's Court Ordered Silence to Spread Alternative Facts and Fake News About the Suits

274.   In furtherance of the Scheme to "kill" the story about the Photo Shoot "by any means possible," Biglari, Maxim and Latham leveraged the opportunity to launch a press offensive about the lawsuits *while Sherman and her client were barred by the Sealing Order from responding.*  In today's parlance, they used the litigation to spread "alternative facts" and "fake news" to the public and the investment community about Biglari and what happened in Monaco, and also scare those who knew the truth with the fear of being sued like Gross, Feifer and Sherman.

275.     Despite applicable BH Code of Conduct disclosure provisions and the

binding testimony of Maxim's corporate representative about not misleading or

bullying the press, Biglari, Maxim and Latham made these dual, wholly improper

purposes virtually express in one *Politico* article published on January 8, 2016.

276.     A (still) unidentified Maxim spokesperson stated that "the suits

against Feifer and Gross are not about muzzling former employees, but just about

setting the record straight" – conveying precisely the opposite message.  Maxim's

corporate representative similarly testified with respect to this statement that the

cases were filed to "***prove the truth of what happened to the public***," but

admitted under oath Plaintiffs' strategy "*to keep everything under wraps until*

*Feifer has to go through the expense and time in order to allow the truth to come*

*out*."

277.     The article also reported about the Second Action "against both

Feifer and his attorney, Chandra [sic] Sherman" and a "mysterious restraining

order" against them, yet they were precluded from defending themselves

precisely because of that Sealing Order.

278.     It is all the more telling that the phrase "setting the record straight"

was exactly the same phrase Biglari coined to defend against Cracker Barrel

managment's allegedly "personal attacks" and "gross misrepresentations" in

October 2015.  That is, just as Biglari went after Swenson for challenging his

control at BH, and just as the "notes" Feifer photographed reflected a plan to go

after Cracker Barrel's management, the crux of this Scheme was to use the

litigation not only to punish those who had spoken out and might still, but also to

spread fake news about the litigation to scare other Biglari detractors from telling

the truth to the public, and in turn, his shareholders.

279.   Significantly, Latham was not just indispensable to this strategy, but

Clark himself knowingly misled the press about the suits. The *Politico* article

reported:

> Clark, told POLITICO Media that Gross has refused to sign an affidavit
> stating that he never spoke to anyone about the shoot. If Gross had
> done that, Clark said, then Maxim would have dropped him from the
> suit. "Gross is in the lawsuit because he's refused to state that he
> never made the false statements included in the article. That's all he
> needs to for the lawsuit to be resolved, but it's quite telling that his
> lawyer repeatedly refuses to call us back," Clark said in a statement.

Yet, according to the binding testimony of Maxim's own corporate representative,

Maxim knew that Gross *had* told at least the EIC about the Photo Shoot Truth.

Gross testified that he had told others in management as well, pursuant to his

role as Fashion Director.  Gross accordingly testified that he refused to sign the

affidavit because the "***Plaintiffs' lawyers knowingly demanded [he] swear that***

***facts were true when they were false***." (Emphasis added). Indeed, the email from

Gross which Clark and Savla quoted in the First Action as evidence of Gross'

malice – about wanting to "kill" the "super cheesy" suite photos -- makes plain

that Clark knew he was spreading false information to and through *Politico*, which

he knew not to be true.

280.   *Politico* appears not to be the only news outlet manipulated by

Biglari's lawyers.  Another article published in *Fashionista* on the same day as the

*Politico* Article stated that "Biglari's legal representative says the story was

planted."  At the first joint appearance of counsel on February 8, 2016, in the

Second Action, the Lower Court expressly admonished Latham for Clark's

speaking to the press about the litigation.

281.   Also relevant, the *Politico* article included extensive commentary

from the photographer at the Photo Shoot, including his purporting to refute *i)*

that Biglari muscled his way onto the Photo Shoot, *ii)* that there was any advance

plan to shoot a two-page photo of Biglari with the model, and *iii)* the longstanding

narrative about  Biglari because he "doesn't need a magazine to hang out with

models." Conspicuously, within days, Maxim announced on January 13, 2016, the

hiring of the photographer as its Special Creative Director.  Although Maxim was

in the process of drastic cost cutting and layoffs, Maxim contracted to pay the

photographer $440,000.

282.   Even more damning, at the same time that Biglari, Maxim and Latham were choreographing this fake news campaign about the litigation, Biglari, again through Faisal Kahn, ordered Gell to take down another Instagram post of a picture from the "cover story" of the model from the December issue. A January 9, 2016 email string between Kahn and Gell with the subject line "REMOVE ASAP: Instagram picture of Alessandra Ambrosio" reflects that Kahn "spotted" the post "late last night," ordered the picture "be removed asap," and reiterated that "Anything related to the cover story pictures need [sic] to be reviewed in terms of postings on social media … ."

283.   Gell responded to Kahn's "***panic*** and annoyance" with the explanation that a Maxim employee had "misunderstood the guidelines," pursuant to which "***the Alessandra post should not have happened – no ifs, ands or ahem, buts.***" He specifically referenced a "procedure for *social media emergencies like this, implemented <u>in November</u>.*" He also conveyed that he had reiterated to her that "no cover-related material will ever [sic] posted on social media without express written approval." This string was copied to Biglari's assistant, through whom Biglari typically exchanged email with Maxim staff. Four other Maxim employees were copied as well, including COO/CFO Price. (Emphasis added).

**S.** Biglari, Maxim and Latham Opposed Sherman and Her Client's Motion for Latham's Disqualification by Submitting Knowingly Inaccurate, Damning Expert Opinions About Her Based on Assumptions of Fact Biglari, Maxim and Latham Knew to Be Materially False

284.   Biglari, Maxim and Latham submitted two opinions from reputable ethics experts to support their opposition to a motion by Sherman and Feifer to disqualify Latham, ("DQ motion").

285.   None of Biglari, Maxim, or Latham, however, provided either expert with materially exculpatory information they knew would have precluded these opinions, including Biglari, Maxim and Latham's knowledge of the following facts, amongst others:

i)   Biglari was dictating a strategy to "kill" the story about the Photo Shoot by "any means possible";

ii)   Biglari, Maxim and Latham had maliciously and knowingly sued the wrong insider in the First Action for improper purposes;

iii)   The Photo Shoot Truth was the only material allegedly false statement, and it was true;

iv)   Neither the tapes nor the notes were confidential, and both were squarely relevant to the public First Action;

v)   Biglari and Maxim had claims against Sherman's client after the First Call;

vi)      Pursuant to an explicit request by Latham that Sherman send a "*settlement*" term sheet, she did, and Latham withheld it from the Lower Court.

vii)      The purported non-disclosure "agreements" with her client were not "clear cut."

286.     As further delineated above, the material facts these experts were asked to assume have been squarely rejected as untrue in rulings of the Lower and Appellate Courts. Thus Sherman could not have committed the extortion Latham determined or that these experts assumed and/or concluded, where court rulings have dispositively determined, *inter alia*, that *i)* there was "no support in the record" they reviewed "for Maxim's assertions that Feifer or his counsel threatened to disclose confidential information to third parties;" *ii)* the information was not even "confidential," *iii)* the information was relevant to the First Action; *iv)* these were "clearly settlement negotiations," and *v)* all of the issues Sherman raised with Latham before the Second Action would "be disposed of" in the pending First Action.

287.     Thus it is even more conspicuous in hindsight that oft-quoted New York University law professor Stephen Gillers ("Gillers") declined to address whether Sherman's "conduct violated New York penal law." Rather, he opined, based on the materially false assumptions he was provided, only that the Latham

lawyers had a "reasonable good faith basis to believe that Sherman was attempting to extort their clients." Also more conspicuous in hindsight, he did not separately analyze Latham's "reasonable good faith basis" with respect to each recorded call, and even raised the potential "ambiguity in the first, unrecorded conversation."

288.   Gillers' opinion further failed to analyze Latham's compliance with applicable standards of care about which he has subsequently opined in the press.  Specifically, he told *The American Lawyer* that "no lawyer should be allowed to make this decision [to secretly record a conversation] on his or her own in the lawyer's own case."  Rather, a decision to record a conversation should be made by a "member of the executive or ethics committee" of a law firm.  Savla conspicuously failed to affirm any such further precautions. Presumably at least the former AUSAs, Clark and Naftalis, had to have known that no such decision could have been made under Department of Justice guidelines or the Manual for AUSAs without a higher level review.

289.   Gillers also opined that "There should be a writing explaining the justification [for secretly recording a conversation]."  Conspicuously at no time has Latham proffered any such contemporaneous writing to the Lower Court, either expert according to their reports, or the Defendants in discovery.

290.   Gillers also opined that law firms "should have a policy of forbidding taping except in narrow circumstances where it can be justified, such as when there is reason to believe that the other party is engaging in threatening behavior or inviting a bribe." Here, Latham at no time has proffered any such writing to the Lower Court, either expert according to their reports, or the Defendants in discovery, nor divulged any information about whether any of the Latham attorneys complied with any such policy.

291.   Latham's other ethics expert, Anthony V. Alfieri, Esq., a law professor at the University of Miami School of Law, focused only on the Recorded Fourth Call and opined that "Latham did not violate the Florida Security of Communications Act." His opinion was replete with assumptions and even apparent conclusions which directly conflict with dispositive rulings by the New York courts, the jurisdiction he further opined had the "greatest interest." He further did not appear to consider that Sherman informed Latham in advance of the Recorded Fourth Call that she was "out of town."  Nevertheless, based upon facts and assumptions Biglari, Maxim, and Latham knew to be false, he opined not only that the "repeated threats" Sherman allegedly made "m[]et the statutory definition of extortion under … the Florida Criminal Code …,"  but also that

"Florida courts recognize and condemn extortionate threats, as here, in the context of counsel-to-counsel communications."

292.    Thus pursuant to the Scheme, Biglari, Maxim, and Latham proffered damning and professionally ruinous expert opinions about Sherman's purportedly *criminal* conduct *i)* which they knew to be based on materially inaccurate factual assumptions and *ii)* which they thus knew, recklessly disregarded, had to know, or should have known were *inaccurate* and *unfounded*.

293.    At no time has Biglari, Maxim, Latham, or substitute counsel ever sought to withdraw these opinions, or even amend them. By virtue of this malicious and tortious conduct, the opinions have been accessible electronically by anyone -- including press outlets known by Biglari, Maxim and its counsel to be following the Actions -- and foreseeably will continue to exist in the public realm -- even if withdrawn -- through the remainder of Sherman's career, life and beyond.  Biglari, Maxim, and Latham thus have maliciously, tortiously and permanently injured her legal career, law practice and livelihood.

294.    The Lower Court did not reach the assertions alleged herein that Latham's surreptitious taping of settlement negotiations was unethical and that their taping of their last call to Sherman was also illegal. Instead, the Court disqualified Latham on May 3, 2016, under Rule 3.7 of New York's Rules of

Professional Conduct, which prohibits a lawyer from acting as both a witness and an advocate in an action, and declined at that time to consider the ethical and legal implications of their knowing, malicious and tortious conduct.

295.   Biglari, Maxim and Latham intentionally submitted expert "opinions" based on "facts" they knew to be false, and opinions they knew to be professionally ruinous to bully and punish Sherman, and improperly shift the burden to her to prove her innocence.  Particularly telling of their tortious and malicious intent was Biglari and Maxim's -- and perhaps Latham's -- decision to turn down the Court's express offer for Latham to stay as their counsel "[w]ere L&W wish [sic] to reconsider its use of these recorded conversations, and ***discontinue this action against Sherman*** … ."  (Emphasis added.) Although Plaintiffs had trumpeted, through Latham, how important their choice of counsel was, Biglari and Maxim preferred to litigate against Sherman.


**T.**   Biglari, Maxim and Latham Also Knowingly Failed to Preserve Information Sherman Specifically Requested Be Preserved

296.   Sherman sent Latham at least two document preservation notices, respectively on January 4 and 28, 2016. The second preservation notice was

extensive, and explained the relevance of each category of documents to both Actions, and prospectively, this lawsuit as well.

297.    Information secured through discovery reflects, upon information and belief, that Maxim waited until February 17, 2016 to even send out a woefully insufficient preservation notice, which conspicuously did not even request documents relevant to the Second Action.  Further, according to the binding testimony of Maxim's corporate representative, Maxim did not begin searching for relevant documents until July 2016, after Latham was disqualified.  To date, Biglari has provided no evidence that he ever sent out a preservation notice to BH and BH related staff, or to his personal staff, or attempted to gather any of his own personal documents until just before he was scheduled to be deposed on May 25, **2017**.

298.    Among these preservation requests was a time-sensitive request for prompt preservation of documents from "Slack," a cloudbased communications and messaging system used by Maxim, which would have recorded contemporaneous communications concerning events of consequence in the cases -- as the incriminating e-chats and g-chats acquired during discovery from third party sources have demonstrated.  Sherman explained the import of such preservation by disclosing the incriminating g-chat her client had received

concerning the first take-down of the Centerfold Spread on November 23, 2015. To date, Maxim has represented that no such documents exist, and has not produced any.

**U.** <u>Biglari, Maxim, and Latham Fraudulently Opposed Sherman's Motion to Be Dismissed from the Second Action</u>

299.    When Sherman and Feifer opposed the Plaintiff's motion for preliminary injunction, Sherman also cross-moved on April 8, 2016, to be dismissed.  Even though Biglari, Maxim, and Latham knew there was no good faith basis to sue her, let alone keep her in the case, they opposed her motion. Even the pendency of the DQ motion did not cause them to moderate in any way their irrelevant extortion hysteria. To the contrary, they were even more strident that Sherman was a "necessary party" because of her "egregious" commission of extortion: ***"Lest there be any doubt, Sherman's conduct meets all the elements for extortion under the New York Penal Law … ."***  They further falsely cast her good faith attempt to "tr[y] to stop a suit that she regarded as frivolous" as an "after-the-fact" "rationalization" – even though their own tapes memorialized her repeatedly imploring them ***pre-suit*** that the First Action was frivolous, and her

sending them **pre-suit, at their request,** a settlement demand that they dismiss the First Action against Gross.

300.    Their arguments were so extreme that they just ignored the Lower Court's removal of her months earlier from the TRO:  they argued that "[w]ithout Sherman as a party, she would be free to willfully ignore the obligations imposed under the contracts, and thereby vitiate the very relief sought here."

301.    On May 3, 2016, the Lower Court disqualified Latham and denied the "drastic relief" of a preliminary injunction against Sherman.

302.    Eight months later, even after the Appellate Court had reversed the Sealing Order because it could not find in the entire court files of both Actions a single document which was confidential, the Lower Court on January 18, 2017, denied Sherman's motion to dismiss.  The order adopted just what Latham had argued: that the Lower Court "must accept" Maxim and Latham's factual allegations as true. Thus the Lower Court ruled that "plaintiff has stated a cause of action **sounding in extortion** against defendant, Charna Sherman." (Emphasis added). Only because the Lower Court assumed as true what Biglari, Maxim and Latham actually knew was false – and clearly not reasonably related to the declaratory judgment action about the enforceability of NDAs -- Sherman had to

appeal, and continue defending their outrageous and knowingly frivolous litigation.

**V.** Biglari and Maxim's New "Fixer" Not Only Abandoned the Extortion Claim Against Sherman, But Admitted it was ***Irrelevant***

303.    After Latham was disqualified from the Second Action and withdrew from the First Action, Biglari and Maxim switched to a local, three-lawyer firm headed by a self-proclaimed "*front line fixer*." Tellingly, Biglari and Maxim's new counsel not only abandoned the "extortion" claim Latham had constructed and ruthlessly pursued on behalf of their clients, they vigorously argued the claim was "***irrelevant***."

304.    Specifically, almost two years after the Second Action was filed, substitute counsel – on behalf of Biglari and Maxim -- ***agreed with Sherman on appeal that the only basis upon which the Lower Court had denied her motion to dismiss was wrong!*** Even though every filing Latham filed on behalf of Biglari and Maxim in the Second Action was rife with outrageous accusations of "criminal extortion, new counsel submitted an appellate brief -- also on behalf of Biglari and Maxim -- filed on December 11, 2017, which stated:

Plaintiff-Respondent concedes on appeal that the Lower Court erred in finding the "plaintiff has stated a cause of action sounding in extortion against defendant, Charna Sherman" because the ***Complaint never alleged a cause of action for extortion against Ms. Sherman***.

(Emphasis added). Subsitute counsel further affirmed under oath not just that Maxim "NEVER brought a claim for extortion," but that Maxim "never alleged such a claim." (All caps in original).

**W.** Biglari and Latham Refused to Comply with ***"Irrelevant"*** Discovery

305.    The outrageous and impertinent nature of the criminal extortion charges Biglari, Maxim and Latham levelled at Sherman is borne out most demonstrably by their refusal to submit to discovery with respect to these unconscionable claims.

306.    On behalf of Feifer, Sherman and her co-counsel served a subpoena on Clark in the First Action narrowly tailored to his ***public, unprivileged*** communications concerning issues relevant to the case, including to the press.

307.    Clark did not respond to the subpoena, and did not seek relief from the Court.

308.   Substitute counsel represented, and later confirmed in an affirmation under oath, that Latham had responsive documents that were not privileged and "will produce them." None were ever produced and no privilege log was ever provided.

309.   Substitute counsel successfully moved to quash the subpoena on September 15, 2017.

310.   On May 17, 2018, the Appellate Court upheld the Lower Court's grant of the motion to quash *only* on the ground that the Lower Court had the discretion to order party discovery precede nonparty discovery.  The Appellate Court, however, expressly "note[d]" that Clark's "public communications to the press are ***not privileged***." (Emphasis added).

311.   After the Lower Court on January 18, 2017, denied Sherman's motion to be dismissed from the Second Action -- because, as Latham had argued, the allegations "sounded in extortion" -- Sherman served different subpoenas upon Latham's custodian of records and Latham partners Clark and Savla, directed this time to Biglari and Maxim's claims that "sounded in extortion."

312.   Again, Latham did not respond to the subpoenas, and did not seek relief from the Lower Court.

313.    And again, substitute counsel moved to quash, even though the

Lower Court, in disqualifying Latham, had expressly ruled that the Latham lawyers

would be *fact witnesses*:  "[i]t is **undisputed** that L&W [Latham] has used the

content of recorded conversations [to] substantiate their client's claim" and

"several members of L&W will have to be called as witnesses **to attest to the facts**

and circumstances leading up to their decision to record the Sherman

conversations—not to mention the fact that members of L&W also participated in

these conversations."

314.    Most significantly, in support of Biglari and Maxim's motion to quash

the Latham subpoenas, substitute counsel vigorously argued that discovery

regarding the alleged extortion was "***irrelevant***" because the Complaint was

"narrowly framed" and only set forth a "simple limited legal issue" of the

enforceability of the two purported non-disclosure "agreements" Sherman's

client had signed.  Thus Latham eschewed lawful subpoenas in reliance on ***a***

***motion by its own clients which not only abandoned the outrageous charge of***

***extortion Latham had made up on their behalf, but further asserted that the***

***discovery sought about the extortion charges was so clearly not reasonably***

***related to the single claim asserted in the Second Action that even the liberal***

***rules of discovery did not encompass the information.***

315. In short, substitute counsel argued what Sherman had argued from the start in opposing the filing of the Second Action: the unconscionable extortion claims were just extraneous leverage to bully, intimidate and silence Sherman in order to gain an advantage in the First Action, where precisely that same issue of the enforceability of the two "agreements" was already being litigated.

316. Similarly, Biglari refused to be appear for deposition.

317. On May 25, 2017, Sherman properly served a deposition notice to depose Maxim by Biglari, the date for which was delayed until August 29, 2017.

318. Prior to this notice, Biglari had refused to appear for a deposition in the First Action, first noticed on April 6, **2016**. Even after the Court ordered him to appear for deposition, and even though Plaintiffs knew in advance that Sherman was flying from Ohio to New York for the sole purpose of taking Biglari's deposition on May 25, **2017**, substitute counsel waited until less than two hours before the scheduled start time, to refuse to produce Biglari, based on a frivolous objection to Biglari being videotaped, which had been noticed multiple times over the intervening 413 days.

319. In the Second Action, substitute counsel expressly represented that *instead of producing Biglari, Maxim would file a motion to discontinue the action*.

In fact, on August 5, 2017, substitute counsel specifically represented that they would "do so by week's end."

320.  Despite this representation, no such motion was ever filed and Biglari refused to appear for deposition. Even though Biglari and Maxim's counsel had conceded the Second Action should be discontinued, Biglari, Maxim and its counsel continued to make Sherman defend it, and necessitated her having to file another motion to compel, this time also for a conditional order of preclusion.

321.  The Appellate Court dismissed the case before the motion was heard by the Lower Court.

**X.**  Biglari's Improper Purpose to Manipulate the Market

322.  The woefully belated timing of Biglari and Maxim's retraction of the extortion claim against Sherman was driven as well by a business agenda of Biglari's unrelated to the litigation.  Biglari was just about to announce on December 21, 2017, a controversial, new merger plan for his public company, BH, which he knew would, and did, cause shareholders -- and potentially even class action lawyers -- to investigate his potential wrongdoing.  It was recently reported by the Indianapolis Business Journal, which regularly covers BH, that "[i]t's been

an especially rough run for investors since the restructuring," BH stock "has fallen 52 percent since starting" 2018, and "[c]ritics say the discrepancy stems from a string of controversial moves that have sowed distrust and confusion."

323. Thus Biglari had a pressing and dire new business need to avoid discovery, especially of information that he and his counsel knew would embarrass Biglari, impugn his management record, and bring to light his direction of "massive resources" to "faux litigate" these frivolous Actions on his company's dime.

324. This patently improper purpose to avoid discovery was made even more explicit in defense of their simultaneous effort to claw-back the allegations originally asserted in the First Action. Specifically, at the same time they retracted their extortion claim against Sherman in the Second Action, they moved in the First Action to retract Biglari's defamation claim in the First Action, ostensibly to "narrow" the case and *expressly to limit discovery*.

325. Thus where Biglari had once considered it useful to file knowingly frivolous litigation to spread alternative facts and fake news about his conduct and his reputation *during a tender offer*, now it was more expedient and important to his plans to take even more control over the company to narrow the

cases he never intended to litigate in the first place, in order to avoid the truth finally coming out.

## CAUSES OF ACTION

326.   Biglari, Maxim and Latham launched the legal equivalent of nuclear war to destroy Sherman's career, even though none of them, even three years later, can point to a single public disclosure she made, or even threatened to make, of confidential, proprietary or trade secret information.

327.   Rather, their real fear was that Sherman predicted to a tee what the proper -- damaging and embarrassing -- scope of discovery would be in the public First Action. She was a threat to the success of their Scheme to use the First Action not to prove the truth about Biglari, but to muzzle those who knew it. They thus filed outrageous and sham litigation accusing her of "criminal extortion" to incapacitate her as lawyer. But they underestimated her.  Indeed, she also warned them from the outset that not only would Biglari and Maxim, but also Latham be held accountable for "making stuff up in lawsuits," as now set forth in the counts below.

## **FIRST CAUSE OF ACTION FOR ABUSE OF PROCESS**

### ***Against all Defendants***

328.    All of the allegations alleged in this Complaint are incorporated as if fully set forth herein.

329.    Maxim, Biglari, through Maxim, and the Latham Defendants initiated process by filing the Second Action, and securing a temporary injunction and then a Sealing Order, against Sherman.

330.    This process was initiated and maintained for the improper purpose to incapacitate her as a lawyer, and harm her legal career, her law practice, and her livelihood.  As a direct and proximate result of the Defendants' abuse of process, Sherman incurred special damages, including, but not limited to having been silenced, and incurring irreparable and permanent damages to her legal career, her law practice, and her livelihood.

331.    This process was initiated and maintained pursuant to an unlawful, improper, unethical and vindictive Scheme and conspiracy to, *inter alia*, kill the December *Post* story by any means possible, including but not limited to:

> *i)*    To bully, intimidate, silence and incapacitate Sherman as a lawyer;

> *ii)*    To punish Sherman;

*iii)*     To gain improper leverage in the First Action;

*iv)*     To interfere with Sherman's capacity to defend her client, and thereby silence him from disclosing the evidence he had that the First Action was frivolous and/brought in bad faith;

*v)*     To scare, intimidate, bully, and/or punish Feifer;

*vi)*     To keep the truth from coming out of what happened at the Photo Shoot;

*vii)*     To keep the truth from coming out about Biglari's mismanagement of Maxim;

*viii)*     To keep the truth from coming out about Biglari's financial ruin of Maxim;

*ix)*     To keep the truth of Biglari's mass firing after the Photo Shoot of nearly all of the top shelf team he had touted hiring to his shareholders in order to defeat a BH proxy challenge by Groveland Capital;

*x)*     To keep the truth from coming out of Biglari's lies to the press about Maxim and his other businesses;

*xi)*     To keep the truth from coming out of Biglari's lies to his shareholders about Maxim and his other businesses;

*xii)*     To keep the truth from coming out of Biglari's poor and sullied reputation;

*xiii)*     To keep the truth from coming out of Biglari's unethical practices in running Maxim;

*xiv)*     To scare, intimidate, and/or bully others from telling the truth; and

*xv)*   To increase the costs of Sherman's defense.

332.   The Defendants had no justification for abusing process to harm and injure Sherman's legal career, law practice and livelihood.

333.   None of these purposes were legitimate ends of the subject process, which was purportedly to protect Maxim's confidential information.  Indeed, the Appellate Court found "no support in the record for Maxim's assertions that Feifer or his counsel threatened to disclose confidential information to third parties."  The Appellate Division also found that none of the documents filed in the Second Action contained confidential information or warranted sealing.

334.   As direct and proximate results of Defendants' abuse of process, and their conspiracy to abuse process:

*i)*   The temporary injunction and Sealing Order, imposed restraints on Sherman;

*ii)*   Sherman incurred special damages, including, but not limited to being silenced and incurring permanent damages to her career as a lawyer, her legal practice and her livelihood;

*iii)*   Sherman had to devote exorbitant time from her legal practice to defend herself;

*iv)*   Sherman was precluded from representing her client Feifer and receiving payment for those services;

*v)*   The fees and costs of her defense of the Second Action were exorbitant;

  *vi)*  Sherman incurred additional costs and expenses and future economic losses, including with respect to her malpractice insurance;

  *vii)*  Sherman suffered extreme emotional distress.

335. Because each of the Defendants abused process, and conspired to abuse process, and thus are jointly and severally liable to Sherman for compensatory and punitive damages in an amount to be determined at trial, together with interest thereon.

## SECOND CAUSE OF ACTION FOR MALICIOUS PROSECUTION

### *Against all Defendants*

336. All of the allegations alleged in this Complaint are incorporated as if fully set forth herein.

337. The Defendants commenced and maintained the Second Action against Sherman.  The Second Action ended in Sherman's favor, including rulings and findings that Sherman made "no threat … to disclose confidential information to third parties," the information was not confidential, and the Second Action was

related to the First Action, and all of the issues Sherman raised would be disposed of in the First Action.

338.   From the commencement of the Second Action until it was dismissed in Sherman's favor, the Defendants knew, had to know, recklessly disregarded and/or should have known that every material allegation of the Complaint and related filings in the Second Action against her were false.  Defendants accordingly proceeded with relentless and knowing malice.

339.   As direct and proximate results of Defendants' malicious prosecution and conspiracy to maliciously prosecute the Second Action:

> *i)*     The temporary injunction and Sealing Order, imposed restraints on Sherman;
>
> *ii)*    Sherman incurred special damages, including, but not limited to being silenced and incurring permanent damages to her career as a lawyer, her legal practice and her livelihood;
>
> *iii)*   Sherman had to devote exorbitant time from her legal practice to defend herself;
>
> *iv)*    Sherman was precluded from representing her client Feifer and receiving payment for those services;
>
> *v)*     The fees and costs of her defense of the Second Action were exorbitant;
>
> *vi)*    Sherman incurred additional costs and expenses and future economic losses, including with respect to her malpractice insurance;

*vii)*     Sherman suffered extreme emotional distress.

340.    Because each of the Defendants committed tortious malicious prosecution, and conspired to commit the tort of malicious prosecution, and thus are jointly and severally liable to Sherman for compensatory and punitive damages in an amount to be determined at trial, together with interest thereon.

**THIRD CAUSE OF ACTION FOR VIOLATIONS OF N.Y. JUD. LAW SECTION 487**

***Against Latham, Clark & Savla***

341.    All of the allegations alleged in this Complaint are incorporated as if fully set forth herein.

342.   New York Judiciary Law Section 487 ("Section 487") provides, in pertinent part:

> An attorney or counselor who: (1) Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent as to deceive the court or any party; * * * *
>
> Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

343.   Here, Latham, Clark and Savla  *i)* conspired with, colluded with and/or consented to their clients' serial, fraudulent representations to the Lower and Appellate Courts; and/or *ii)* "made up" their own deceits and fraudulent representations to the Lower Court.

344.   The subject deceits, collusion and/or consents were successful, until the Appellate Court finally determined they were false.

345.   As a proximate and direct result of the deceits, collusion and/or consents set forth above, Sherman was a "party injured" by Latham, Clark and Savla within the meaning of Section 487.

346.   Latham, Clark and Savla are liable to Sherman and must forfeit to her treble damages.

347.   By reason of the deceits, collusion, and/or consents by the Latham, Clark and Savla, Sherman was proximately and directly damaged for the following pecuniary harms:

> *i)*     The legal fees and disbursements for Sherman's defense in the Second Action, in an amount to be proven at trial, not less than $345,000.00, trebled pursuant to Section 487, together with statutory interest thereon.

*ii)*    Legal fees and disbursements paid to Latham by Maxim and/or

Biglari to file, prosecute, and maintain the Second Action,

including the disqualification proceedings, in an amount not

presently unknown to Sherman, trebled pursuant to Section

487, together with statutory interest thereon.

*iii)*    The legal fees Sherman would have earned defending her

client in the Second Action, in an amount to be proven at trial,

trebled pursuant to Section 487, together with statutory

interest thereon.

*iv)*    The legal fees and disbursements Sherman is due in the First

Action from her client, which are not readily collectible,

precisely because Latham, Clark and Savla's strategy to file a

separate Second Action was intended to and did

astronomically increase the fees and expenses to Feifer to

defend an otherwise garden-variety employment case. The

amount will be proven at trial, trebled pursuant to Section 487,

together with statutory interest thereon.

WHEREFORE, Sherman demands judgment in her favor, as follows:

1. Awarding damages for the First and Second Counts in Sherman's favor against each of the Defendants, jointly and severally, in an amount to be determined at trial, together with punitive damages, and prejudgment interest thereon;

2. Awarding damages for the Third Count in Sherman's favor against Latham, Clark, and Savla, jointly and severally, trebled pursuant to Section 487, together with statutory interest thereon; and

3. Such other and further relief as the Court deems just and proper, including costs, disbursements, interest, attorneys' fees, and/or disgorgement of the fees and expenses paid by Biglari and/or Maxim to Latham.

**JURY DEMAND**

Plaintiff hereby demands a trial of all causes by jury allowable by law.

Dated: Cleveland, Ohio

December 17, 2018

_/s/ Charna E. Sherman_

Charna E. Sherman, Esq.
Ohio Bar No. 0045862
Charna E. Sherman Law Offices Co., LPA
3029 Prospect Ave.
Cleveland, OH 44122
Tel: 216-453-9133
Email: csherman@charnalaw.com

*Pro se*