## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| Charna Sherman, | Case No. 1:18cv2887 |
| Plaintiff, | |
| -vs- | JUDGE PAMELA A. BARKER |
| Sardar Biglari, et al., | |
| Defendants. | MEMORANDUM OPINION AND ORDER |

Currently pending is the Motion of Defendants Sardar Biglari, Maxim, Inc., Christopher Clark, and Sandeep Savla to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), (b)(2), (b)(3), and (b)(6).  (Doc. No. 8.)  Plaintiff Charna Sherman filed a Brief in Opposition, to which Defendants replied.  (Doc. Nos. 24, 33.)  Supplemental Briefing was filed in October and November 2019.  (Doc. Nos. 65, 68, 69.)

The Court has reviewed the parties' extensive briefing and determined that an evidentiary hearing is not necessary.  For the following reasons, Defendants' Motion to Dismiss (Doc. No. 8) is GRANTED to the extent it seeks dismissal on the basis of lack of personal jurisdiction.  Defendants' Motion is DENIED AS MOOT to the extent it seeks dismissal for improper venue and failure to state a claim.

I.      **Procedural History**

On December 17, 2018, Plaintiff Charna Sherman ("Plaintiff" or "Sherman") filed a Complaint against Sardar Biglari; Maxim, Inc.; Latham & Watkins, LLP; Christopher Clark; and

Sandeep Savla, asserting state law claims for malicious prosecution, abuse of process, and violations of New York Judiciary Law § 487. (Doc. No. 1.)

On February 15, 2019, the above Defendants moved for dismissal of Plaintiff's Complaint in its entirety, asserting various grounds including lack of both subject matter and personal jurisdiction.[1] (Doc. Nos. 8, 9.) Plaintiff opposed the motion. (Doc. No. 24.) On February 28, 2019, upon motion of the Defendants, then-assigned District Judge Christopher Boyko stayed discovery in this matter except for "discovery necessary to address the dispute over diversity jurisdiction." (Doc. No. 18.)

Plaintiff subsequently filed an Unopposed Motion to drop Latham & Watkins LLP as a Defendant in order to retain diversity jurisdiction, which was granted. (Doc. No. 23.) *See* Non-Document Order dated April 30, 2019. Thereafter, the parties filed a joint motion, in which they "agree[d] that instead of requiring Plaintiff to file an amended complaint, it is proper to simply drop Latham as a defendant and proceed with the current complaint." (Doc. No. 26.) On May 3, 2019, the Court granted the motion in part, stating that: "On or before May 10, 2019, Plaintiff shall file an Amended Complaint removing Latham & Watkins, LLP as a Defendant and removing any of the substantive claims asserted against Defendant Latham. Since there will be no new claims or allegations asserted, and in view of the parties' joint agreement, the pending Motion to Dismiss (ECF DKT #8) will be deemed filed as against the Amended Complaint and will not be mooted." (Doc. No. 27.)

On May 7, 2019, Plaintiff filed her First Amended Complaint. (Doc. No. 29.) Defendants then filed a Motion to Strike Substantive Changes, in which they argued that Plaintiff had improperly

---

[1] On that same date, Defendants also filed an Answer. (Doc. No. 10.)

"added new and irrelevant substantive allegations to what was already a 143-page slog of insults, profanity, unattributed quotations, and gratuitous references to current events."  (Doc. No. 32.) Plaintiff opposed the motion.  (Doc. No. 36.)

The Court[2] referred the Motion to Magistrate Judge Baughman.  (Doc. No. 46.)  On September 23, 2019, Judge Baughman issued an Order granting the motion and striking Plaintiff's First Amended Complaint.  (Doc. No. 57.)  Rather than requiring Plaintiff to refile a proper First Amended Complaint, Judge Baughman attached a redlined version of the Complaint to his Order that removed language in accordance with Judge Boyko's Order.  (*Id*.)  Judge Baughman then "incorporate[d] by reference Attachment 1 to this order, which shall be deemed the First Amended Complaint in this case."  (*Id*.)  Thus, Attachment 1 to Judge Baughman's September 23, 2019 Order (Doc. No. 57-1) constitutes the operative Complaint in this matter.

Meanwhile, on May 22, 2019, Defendants filed a "Motion to Continue Stay of Discovery Until Personal Jurisdiction Issue is Decided."  (Doc. No. 31.)  In response, Plaintiff asked the Court to permit her to proceed with jurisdictional discovery, citing a number of alleged factual disputes relevant to the issue of Defendants' alleged contacts with the State of Ohio.  (Doc. No. 34.)  She further asked the Court to conduct an evidentiary hearing on the issue, once jurisdictional discovery has been completed.  (*Id*.)

On August 5, 2019, the Court issued an Order finding that limited jurisdictional discovery was warranted.  (Doc. No. 45.)  The Court allowed the parties sixty (60) days from the date of the

---

[2] On June 27, 2019, this matter was reassigned to the undersigned pursuant to General Order 2019-13.

3

Order (i.e., until October 4, 2019) to engage in limited discovery relating to the issue of personal jurisdiction. (*Id.*) All other discovery remained stayed.[3] (*Id.*)

On September 27, 2019, the parties filed a Joint Motion for a Supplemental Briefing schedule, which the Court granted. (Doc. No. 61.) Supplemental Briefing regarding the issue of personal jurisdiction was thereafter filed in October and November 2019. (Doc. Nos. 65, 67, 68, 69.) Plaintiff also filed Supplemental Authority in January 2020, to which Defendants responded. (Doc. Nos. 70, 71.)

## II. Factual Allegations[4]

### A. The First New York Action

On December 10, 2015, Maxim, Inc. ("Maxim") and Sardar Biglari[5] filed a Complaint in the Supreme Court of New York, County of New York against former Maxim employee Wayne Gross.

---

[3] Defendants later filed a Letter requesting a telephonic conference with the Court "to discuss their objections to the discovery propounded by plaintiff [] in the above-captioned matter, which Defendants believe 'exceed the scope and purpose of limited jurisdictional discovery' permitted by the Court." (Doc. No. 50.) Therein, Defendants stated that "[b]etween August 8 and August 13, 2019, Ms. Sherman served: (1) three sets of written discovery to the Defendants containing over 300 document requests, as well as interrogatories and requests for admission (attached as Exhibits A-C); (2) a subpoena containing over 150 document requests to Latham & Watkins, the defendants' law firm, duplicating many of the individual requests to Mr. Clark and Mr. Savla (attached as Exhibit D); (3) a subpoena to a third-party New York PR firm, Hiltzik strategies (attached as Exhibit E); and (4) deposition notices for each individual defendant: Mr. Clark, Mr. Savla, and Mr. Biglari (attached as Exhibit F)." (*Id.*) The Court referred the matter to Judge Baughman, who ordered the parties to meet and confer in his courtroom on September 24, 2019. (Doc. No. 56.) Thereafter, Judge Baughman noted that the parties had reached agreement on all outstanding discovery issues except for one, which does not appear to be relevant to the Court's resolution of the instant Motion. (Doc. No. 58.)

[4] The factual allegations set forth herein are based on Plaintiff's allegations in the First Amended Complaint (Doc. No. 57-1), as well as information contained in the public docket and the parties' filings in the First and Second New York Actions (discussed *infra*). Plaintiff expressly incorporates the New York state court filings into her First Amended Complaint (Doc. No. 57-1 at ¶¶ 63, 71), and both parties rely on these documents in their briefing regarding Defendants' Motion to Dismiss.

[5] In the Complaint filed in the First New York Action, Maxim alleges that: "Maxim is a wholly owned subsidiary of Biglari Holdings, a company which lists its common stock on the New York Stock Exchange. Maxim is a brand management company, with a business in print and digital media, including Maxim magazine, and in licensing products and services. Its headquarters are in New York County, New York." (Doc. No. 9-2 at ¶ 7.) Biglari alleged that he is

4

(Doc. No. 9-2.)  *See Maxim, Inc. v. Gross*, Index No. 654137/2015 (Sup. Ct. N.Y., Cty of N.Y.) (hereinafter referred to as the "First New York Action.")  In this Complaint, Maxim and Biglari alleged that Gross made numerous false statements to the New York Post about a photo shoot of model Alessandra Ambrosio for Maxim Magazine that took place in Monaco on July 26, 2015.  (*Id.* at ¶ 1.)  Specifically, Maxim and Biglari alleged (among other things) that Gross falsely stated to the New York Post that Ms. Ambrosio (1) was "creeped out by Biglari, who hung around on the set;" (2) "reluctantly" agreed to pose for a photo with Biglari during the photo shoot; and (3) expressly sought assurance that that photo would not be published.  (*Id.* at ¶ 2.)

Maxim and Biglari asserted that, on December 2, 2015, the Post printed these (and other) allegedly false statements in an article entitled "Maxim owner was really creepy toward Alessandra Ambrosio during shoot."  (*Id.* at ¶ 12.)  In this article, the Post attributed the allegedly false statements to an "insider."  (*Id.* at ¶ 14.)  Maxim and Biglari claimed that, since Gross was the only Maxim employee present at the shoot, he was necessarily the "insider" that had made the false statements.  (*Id.* at ¶¶ 15, 16.)  They asserted that the Post subsequently published a revised article on December 8, 2015 (entitled "Maxim publishes photo of owner with Alessandra Ambrosio despite objection") that made minor revisions but was still false.  (*Id.* at ¶ 33.)

Maxim and Biglari alleged that Gross' alleged statements to the Post were untruthful and, further, that his conduct violated a non-disclosure agreement that Gross executed in November 2014, as well as a release that he had entered into when his employment with Maxim was terminated in September 2015.  (*Id.* at ¶¶ 3, 40-41, 48-54.)  Maxim and Biglari asserted state law claims for breach

---

Chairman of the Board and Chief Executive Officer of Biglari Holdings, as well as "the sole director of, and creative force behind, Maxim."  (*Id.* at ¶ 8.)

5

of contract and defamation, and sought compensatory and punitive damages.  (*Id*. at ¶¶ 56-78.)  At the time of the filing of the Complaint, Maxim and Biglari were represented by Christopher Clark and Sandeep Savla of Latham & Watkins' New York office.  (*Id*. at p. 14.)

### B.      Plaintiff's Communications with Defendant Savla and other attorneys at Latham & Watkins

At some point in time (it is not clear from the record before this Court exactly when), Jason Feifer retained Plaintiff herein, Charna Sherman, to represent him.  (Doc. No. 57-1 at ¶¶ 8,101.)  Jason Feifer was hired by Maxim in early 2015 and signed a Non-Disclosure Agreement on March 21, 2015 that contained confidentiality and nondisclosure provisions.  (Doc. No. 9-1 at ¶¶ 14-20.)  Mr. Feifer's employment with Maxim was subsequently terminated, at which time he signed a Release Agreement that contained various terms, including a severance payment and confidentiality and nondisclosure provisions.  (Doc. No. 57-1 at ¶ 98; Doc. No. 9-1 at ¶¶ 14, 21-29.)

In the First Amended Complaint, Sherman alleges that it was, in fact, Feifer that reached out to the New York Post in November 2015 regarding the photo shoot with Alessandro Ambrosio.  (Doc. No. 57-1 at ¶ 100.)  Sherman alleges that "[w]hen Feifer learned weeks later that Biglari and Maxim had sued the wrong insider – Gross—over the new information in the December Post Article *he* had provided to the reporter, he contacted Sherman."  (*Id*. at ¶ 101) (emphasis in original).

Plaintiff Sherman is an attorney admitted to and practicing in the State of Ohio.  (Doc. No. 57-1 at ¶ 27.)  On December 13, 2015, Sherman contacted Defendant Clark by email on behalf of Mr. Feifer "to try to negotiate a private out-of-court settlement."[6]  (*Id*. at ¶ 102.)  In that email, Sherman

---

[6] Sherman alleges that, as of the date of this email, Maxim had not yet signed Feifer's Release Agreement or tendered Feifer's severance payment to him thereunder.  (Doc. No. 57-1 at ¶¶ 166-172.)

"communicated Feifer's revocation of his execution of Maxim's severance offer and requested that 'efforts' be 'undertake[n]. . . forthwith to cancel any . . . . arrangements' underway for payment by Maxim of the consideration of additional compensation."  (*Id*.)  Sherman further requested to speak with Clark as soon as possible to discuss a suitable termination agreement, "which she specified 'would have bearing' on the First [New York] Action." (*Id*.)

On December 14, 2015, Defendant Savla left a voicemail for Sherman.  (*Id*. at ¶ 104.)  In response, Sherman emailed Savla that she would try to reach him that afternoon.  (*Id*.)  Later that day, Savla and Sherman had an "initial telephone conference" as a follow-up to Sherman's email.[7]  (*Id*. at ¶ 105.)  In New York state court filings, Defendant Savla filed an Affidavit under oath, in which he described this initial conversation as follows:

> In that call, Sherman stated: (a) that the case against Gross had no merit; (b) that her client had additional information that would be damaging to Maxim and Biglari, including recordings; and (c) that Maxim and Biglari would not want this damaging information to become public.  Id., ¶ 33.  Sherman requested:  (a) dismissal of the case against Gross so that it "does not roll out of control"; (b) a different termination agreement between Maxim and Feifer containing non-disparagement and liquidated damages provisions; (c) a positive reference for Feifer; and (d) a severance payment equal to the salary he earned during the approximately nine months that her client was at Maxim.  Id.  According to Savla, Sherman stated that "time was of the essence" and that if her demands were met, the information in Feifer's possession would not become public.  Id., ¶¶ 34-35.

(Doc. No. 24-1 at ¶ 6.)

After this conversation, Savla consulted with Defendant Clark and another Latham & Watkins attorney, Benjamin Naftalis, both of whom are former Assistant United States Attorneys with experience in federal criminal law.  (*Id*. at ¶ 8.)  During this meeting, Savla, Clark and Naftalis

---

[7] It is not clear from the record before this Court who initiated this telephone call. Sherman does not allege (or direct this Court to any evidence that) any of the Defendants herein initiated this call to her in Ohio.  Thus, the Court will assume that it was Sherman that placed this initial telephone call to Defendant Savla in New York.

"reviewed the elements of the New York Penal Law on extortion" and "determined that Sherman's conduct constituted an attempt at criminal extortion under New York state law." (*Id.* at ¶ 9.)  Savla, Clark, and Naftalis concluded that "these circumstances made it justifiable to commence recording further calls with Sherman to collect evidence of and attempt to stop her criminal conduct."  (*Id.*)

The first recorded call occurred at 5:30 p.m. on December 14, 2015.  (Doc. No. 65-1 at PageID# 1405.)  Defendant Savla and Mr. Naftalis initiated this call to Sherman in Ohio, from Latham & Watkins' New York office.  (*Id.*)  It is undisputed that this call was recorded and, further, that Sherman was not aware at that time that the call was being recorded.[8]  During this call, Sherman indicated that she was "confident that it is more likely than not that your case against Mr. Gross is frivolous and perhaps even in bad faith."  (*Id.* at PageID# 1407.)  She then stated as follows:

> And in addition--and I want to make clear-- in addition, my client has what I think is related, but additional information that is quite damaging to Maxim and Mr. Biglari that comes in the form--that includes a certain number of recordings that are in his possession, in which he participated in so they were legal, and in amongst the issues set forth in those recordings are Mr. Biglari's eschewing of fact-checking and his insistence on taking liberties with the truth.
>
> Don't hold me to those exact words but they're pretty close to what the recordings record. And I wanted to alert you all that I am also confident that all of this that I'm referring to will likely come out[9] if you continue to pursue Mr. Gross, or also if you pursue my client in any shape or form.
>
> Given the news of your filing of the lawsuit against Mr. Gross, I also--I think time is of the essence. I think that kind of news in the industry that we're talking about, people want to talk and whatever issues there are grow bigger, not smaller with time. And

---

[8] The transcript of this call (as well as the transcripts of the two other recorded calls, discussed *infra*) were produced as part of the parties' jurisdictional discovery. Sherman has attached a marked-up version of these transcripts to her Supplemental Opposition to Defendants' Motion to Dismiss (Doc. No. 65-1.)  Neither party objects to this Court's consideration of these transcripts in resolving Defendants' Motion.

[9] Later in the call, Sherman clarified that the information would come out as part of discovery in the First New York Action.  (*Id.* at PageID# 1412.)

> what I would like to do is negotiate a settlement agreement where all of this is put
> behind all of the persons connected to the goings on.

(*Id*. at PageID#s 1407-1408.)  Sherman then suggested that Maxim and Biglari dismiss the First New York Action against Gross and negotiate a new termination agreement with Feifer that included mutual releases and non-disparagement provisions, a liquidated damages provision, a positive reference, and a monetary settlement.  (*Id*. at PageID# 1409, 1416.)

On December 16, 2015, Sherman sent an email to Savla, Clark, and Naftalis in which she stated that "[t]here are some developments that I would like to discuss, which further require me to gauge where you and your clients are at."  (Doc. No. 9-2 at PageID# 259.)  Later that day, Savla, Naftalis and a third Latham & Watkins attorney, Eric Taffet, called Sherman in Ohio, from Latham & Watkins' New York office.  (Doc. No. 65-1 at PageID# 1428.)  Again, it is undisputed that this call was recorded and, further, that Sherman was not aware at that time that the call was being recorded.  During this call, Sherman indicated that Mr. Feifer had taken photographs "of notes that someone on behalf of your clients left in the open for a lengthy period of time that reflect, I believe, Mr. Biglari's notes about his strategy with respect to the Cracker Barrel [SEC] filing and his dispute with various others in management and shareholders."  (*Id*. at PageID# 1430, 1439.)  Sherman stated she believed these photographs would likely be relevant "since they bear at least on damages and [Biglari's] belief that he was being disparaged in that controversy as well."  (*Id*. at PageID# 1430.)

Sherman stated that "the proverbial wagons are circling" and indicated she was "under pressure" to reach an agreement regarding Mr. Feifer.  (*Id*. at PageID#s 1429-1430.)  She asked Savla, Naftalis and Taffet for a timeframe "as to, you know, up or down, whether you want to put this whole matter behind you and do so through a settlement with my client."  (*Id*. at PageID# 1432.)  Naftalis

indicated that they would talk to their client and get back to Sherman with a timeframe.  (*Id*. at PageID# 1442.)

The next day, Sherman emailed Savla, Naftalis, Clark and Taffet seeking, at a minimum, a timeline for a substantive response.  (Doc. No. 9-2 at PageID# 258.)  Mr. Naftalis responded via email that they would get back to her on December 21, 2015.  (*Id*. at PageID#s 257-258.)  On December 21, 2015, Savla and attorney Matt Salerno called Sherman from Latham & Watkins' New York office. (Doc. No. 65-1 at PageID# 1450.)  Although Savla and Salerno dialed Sherman's Ohio cell phone number, it is undisputed that she was physically located in Florida at the time of this call.[10]  (Doc. No. 57-1 at ¶¶ 12, 237.)  Like the previous two calls, this telephone call was recorded and Sherman was not aware at that time that the call was being recorded.

During this call, Savla asked Sherman if she had "a draft or anything like that" that she wanted to send over to them.  (Doc. No. 65-1 at PageID# 1452.)  When Sherman expressed frustration, Savla stated that he needed "something more concrete to put in front of the client."  (*Id.* at PageID# 1453.) He also indicated that any photographs or other information in Mr. Feifer's possession would need to be returned to Maxim pursuant to Mr. Feifer's March 2015 Non-Disclosure Agreement.  (*Id.* at PageID# 1455.)  Sherman disputed the existence of a valid, binding non-disclosure agreement that covered the information in question.  (*Id*. at PageID# 1456.)  However, she agreed to send a draft containing her proposed terms.  (*Id.* at PageID# 1457.)  Sherman also insisted on a substantive response by 3:00 the following day.  (*Id*. at PageID# 1462.)

### C.      The Second New York Action

---

[10] In her First Amended Complaint, Sherman states that, at the time of this call, she was "in fact at her second home in Florida, where the Florida Wiretap Statute (Florida Security of Communications Act, Fla. Stat. Ann. § 934.01 et seq.) not only prohibited such surreptitious recordings but provided criminal penalties for violating."  (Doc. No. 57-1 at ¶ 237.)

On December 22, 2015, Maxim (through counsel Clark and Savla) filed a Complaint for Declaratory Relief in the Supreme Court of the State of New York, County of New York against Sherman and Feifer.  (Doc. No. 9-1.)  *See Maxim, Inc. v. Feifer*, Index No. 162933/2015 (Sup. Ct. N.Y., Cty of N.Y.) (herein after referred to as the "Second New York Action.")  In this Complaint, Maxim and Biglari alleged as follows:

1. This action seeks to stop Feifer and his attorney, Sherman, from engaging in extortion by willfully disregarding the obligations imposed by non-disclosure and employment termination agreements that Feifer entered into with Maxim, and instead demanding better terms - and much more money - in a new contract as the ransom for not providing confidential information to third parties.

2. Most recently, Sherman has threatened that Feifer will make public photographs of notes of confidential information relating to a Securities and Exchange Commission filing by Biglari Holdings Inc. ("Biglari Holdings"), Maxim's parent company, unless Plaintiff entered into a new contract with Feifer.  These are photographs that Feifer presumably took after entry into the office of Sardar Biglari ("Biglari") - Maxim's sole director and the CEO of Biglari Holdings - or otherwise through access to information that Feifer knew was not his to take, let alone share with others.  Sherman has also stated that Feifer had made and retained recordings of business meetings that had taken place at  Maxim and at which Biglari and/or Mr. Philip Cooley, Biglari Holdings' Vice Chairman, were present.

3. Defendants' threatened disclosure of confidential information violates the terms of non-disclosure and release agreements that Feifer had executed with Maxim.

\*\*\*

8. This Court should not condone Defendants' blatant attempts at extortion, and instead order them to abide by the confidentiality and other provisions of the NDA and Release and to return Plaintiffs confidential information, documents or materials.

(*Id*. at ¶¶ 1-8.)  The Complaint contained a sole count for declaratory judgment relief.  (*Id*. at ¶¶ 41-56.)  Specifically, Maxim sought a declaratory judgment that "(a) that the [non-disclosure agreement

11

or "NDA"] and Releases [between Feifer and Maxim] are binding legal contracts, (b) that Sherman may not assist in or cause the breach of, or otherwise interfere with, the obligations set forth in the NDA and the Release; (c) that Feifer must abide by the terms of the NDA and Release; and (d) that Feifer must not disclose Trade Secret Information or confidential information, documents or materials to third parties and that he must return to Plaintiff all information or documents in his possession, custody or control, as required by the NDA and the Release."  (*Id.* at ¶ 56.)  Maxim also sought an order (1) enjoining Feifer and Sherman from disclosing confidential information to third parties; and (2) enjoining Sherman from assisting in or causing the breach of, or otherwise interfering with, the obligations set forth in the NDA and Release.  (*Id.* at p. 14.)

According to Sherman, Maxim and Biglari appeared *ex parte* in the New York state court the following day and secured a Temporary Restraining Order ("TRO") and an order that the case be sealed.[11]  (Doc. No. 57-1 at ¶ 242.)  Sherman alleges that the New York state court thereafter ordered her to enter into a stipulation with Maxim and Biglari on behalf of her client to "temporarily maintain the status quo."  (*Id.* at ¶ 247.)

This Court will not recite the entire ensuing procedural history of the First and Second New York Actions, as it is not relevant to resolution of Defendants' Motion to Dismiss.  However, the Court does note that the underlying New York state court dockets reflect the following.

On March 21, 2016, the trial court in the Second New York Action determined that the First and Second New York Actions should be "joined for a joint trial."  *See Maxim, Inc. v. Feifer*, Index No. 162933/2015 (Sup. Ct. N.Y., Cty of N.Y.) (Docket Sheet).  On May 3, 2016, the trial court

---

[11] The state trial court's sealing order was subsequently vacated by the state appellate court on December 13, 2016.  *See Maxim, Inc. v. Feifer*, 145 A.D.3d 516 (2016).

determined that Sherman could not represent Feifer in the Second New York Action.  *Id* at Doc. No. 171.  On that same date, that court granted Sherman and Feifer's motion to disqualify Latham & Watkins from representing Maxim and Biglari, on the basis of the New York's advocate-witness rule.[12]  *Id.*  Also on May 3, 2016, the trial court issued a separate Order granting Maxim and Biglari's request for a preliminary injunction as against Feifer, but denying it as against Sherman.  *Id*. at Doc. No. 172.

On appeal, the state appellate court overturned the trial court's order granting a preliminary injunction.  *See Maxim v. Feifer*, 161 A.D.3d 551, 553 (2018).  Specifically, on May 17, 2018, the state appellate court determined that:

> Maxim failed to establish that it would suffer irreparable harm absent the preliminary injunction it sought (*see Chiagkouris v. 201 W. 16 Owners Corp*., 150 A.D.3d 442, 54 N.Y.S.3d 5 [1st Dept. 2017]). We find no support in the record for Maxim's assertions that Feifer or his counsel threatened to disclose confidential information to third parties.

> The declaratory judgment action should be dismissed, because all the issues involved in it will be disposed of when the pending breach of contract action is resolved (*see Reynolds Metals Co. v. Speciner,* 6 A.D.2d 863, 175 N.Y.S.2d 605 [1st Dept. 1958]).

*Id*.  It appears that Feifer was thereafter added as a defendant in the First New York Action.

In July 2018, Feifer asserted counterclaims against Maxim and Biglari for fraudulent inducement, malicious prosecution, and abuse of process.  (Doc. No. 9-5.)  On January 8, 2019, the state trial court issued an Order dismissing all three of Feifer's counterclaims.  *See Maxim v. Gross*,

---

[12] In this regard, the court noted as follows: "It is undisputed that L&W has used the content of recorded conversations to substantiate their client's claim that Sherman interfered with a contract. Several members of L&W will have to be called as witnesses to attest to the facts and circumstances leading up to their decision to record the Sherman conversations --- not to mention the fact that members of L&W also participated in these conversations. On this basis alone, this Court is compelled to disqualify plaintiffs' attorneys from further roles in this matter."  *See Maxim, Inc. v. Feifer*, Index No. 162933/2015 (Sup. Ct. N.Y., Cty of N.Y.) (May 3, 2016 Order, Doc. No. 171.)

2019 WL 132529 at * 4-5 (N.Y. Sup. Jan. 8, 2019).  On appeal, the state appellate court reversed the state trial court's decision to dismiss Feifer's fraudulent inducement counterclaim.  *See Maxim v. Gross*, 179 A.D. 3d 536, 537 (2020).  This decision of the state appellate court did not, however, reverse the dismissal of Feifer's malicious prosecution and abuse of process claims.  *Id.*

## III.    Analysis

In the instant case, Defendants seek dismissal under Fed. R. Civ. P. 12(b)(2), (b)(3) and 12(b)(6).  First, Defendants argue that the Complaint should be dismissed for lack of personal jurisdiction under Rule 12(b)(2) because Plaintiff has failed to establish the existence of either general or specific jurisdiction.  (Doc. No. 9.)  Assuming there is personal jurisdiction, Defendants next argue that the instant action should be dismissed on the basis of improper venue.  (*Id.*)  Lastly, Defendants argue that all three of Plaintiff's claims should be dismissed for failure to state a claim pursuant to Rule 12(b)(6).  (*Id.*)  As it is dispositive, the Court will first address the parties' arguments regarding personal jurisdiction.

### A.    Personal Jurisdiction

Plaintiff bears the burden of proving personal jurisdiction.  *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).  If a court rules on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction prior to trial, "it has the discretion to adopt any of the following courses of action: (1) determine the motions based on affidavits alone; (2) permit discovery, which would aid in resolution of the motion; or (3) conduct an evidentiary hearing on the merits of the motion."  *Intera Corp. v. Henderson*, 428 F.3d 605, 614 n.7 (6th Cir. 2005).  "[T]he decision whether to grant discovery or an evidentiary hearing before ruling on a 12(b)(2) motion is discretionary."  *Burnshire Dev., LLC v. Cliffs Reduced iron Corp.*, 198 Fed. Appx. 425, 434 (6th Cir. 2006).

14

When a district court rules on a jurisdictional motion to dismiss made pursuant to Rule 12(b)(2) without conducting an evidentiary hearing, the court must consider the pleadings and affidavits in a light most favorable to the plaintiff.  *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996).  To defeat such a motion, a plaintiff need only make a *prima facie* showing of jurisdiction, which can be met by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction."  *Neogen Corp. v. Neo Gen Screening, Inc.,* 282 F.3d 883, 887 (6th Cir. 2002).  A court disposing of a Rule 12(b)(2) motion does not weigh the controverting assertions of the party seeking dismissal but may consider a defendant's undisputed factual assertions.  *See CompuServe*, 89 F.3d at 1262; *Theunissen*, 935 F.2d at 1459; *NTCH-West Tenn, Inc., v. ZTE Corp.*, 761 Fed. Appx. 485, 488 (6th Cir. Jan. 16, 2019) (citing *Kerry Steel, Inc. v. Paragon Industries, Inc.,* 106 F.3d 147, 153 (6th Cir. 1997)).  "Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff . . . alleges collectively fail to state a *prima facie* case for jurisdiction."  *Id*.  *See also Kerry Steel, Inc.,* 106 F.3d at 149.

"In a diversity case, a federal court can exercise personal jurisdiction over a defendant if jurisdiction is (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment."  *Tharo Systems, Inc. v. Cab Producktechnik GMBH & Co., KG*, 196 Fed. Appx. 366 (6th Cir. 2006).  Because "Ohio's long-arm statute is not coterminous with federal constitutional limits," to establish a *prima facie* case of personal jurisdiction, a plaintiff must demonstrate that (1) Ohio's long-arm statute has been satisfied and (2) exercising jurisdiction would comport with Due Process.  *Schneider v. Hardesty*, 669 F.3d 693, 699 (6th Cir. 2012) (quoting *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp.*

15

*Worldwide*, 545 F.3d 357, 361 (6th Cir. 2008)); *Kauffman Racing Equip., LLC v. Roberts*, 126 Ohio St.3d 81, 930 N.E.2d 784, 790 (Ohio 2010)).

Here, Defendants argue that this matter must be dismissed because they are not subject to either general or specific personal jurisdiction in Ohio.  As the Sixth Circuit has explained, "[p]ersonal jurisdiction comes in two flavors: [1] 'general' jurisdiction, which depends on a showing that the defendant has continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims the plaintiff may have against the defendant, and [2] 'specific' jurisdiction, which exposes the defendant to suit in the forum state only on claims that 'arise out of or relate to' a defendant's contacts with the forum." *Kerry Steel, Inc.*, 106 F.3d at 149 (citing *Helicopteros Nacionales de Colombia S.A., v. Hall*, 466 U.S. 408, 414–415 & fns. 8–10 (1984) and *Third Nat'l Bank in Nashville v. WEDGE Group, Inc*., 882 F.2d 1087, 1089 (6th Cir.1989)).

Although provided numerous opportunities to do so, Plaintiff does not substantively address or oppose Defendants' arguments regarding general jurisdiction and, instead, limits her argument to the issue of specific personal jurisdiction.[13]  Thus, and in the absence of any meaningful opposition,

_____

[13] In her Brief in Opposition, Plaintiff states, in a footnote, that, because she easily satisfies the standard for specific personal jurisdiction, she need not address any of Defendants' substantive arguments regarding the issue of general jurisdiction.  (Doc. No. 24 at p. 6, fn 4.)  She then states that "[i]f the Court disagrees, Plaintiff requests jurisdictional discovery on both general and specific jurisdiction and an evidentiary hearing."  (*Id.*) The Court subsequently allowed "limited discovery relating to the issue of personal jurisdiction as raised in or relevant to Defendants' Motion to Dismiss." (Doc. No. 45 at p. 3.)  In her Supplemental Brief in Opposition, Plaintiff again fails to substantively address Defendants' arguments regarding general jurisdiction, stating as follows: "Plaintiff has not addressed herein her contention that this Court can also exercise general jurisdiction over Biglari, given his continuous and systematic frauds upon and even crimes against the State in a capacity where he is a hybrid person and business brand. But given that this argument would be a case of first impression, she requests only the opportunity to conduct related discovery in connection with merits discovery."  (Doc. No. 65 at pp. 4-5, fn. 6.) Defendants argue that Plaintiff's failure to respond constitutes a waiver of opposition regarding the issue of general jurisdiction.  (Doc. No. 68 at p. 3, fn. 1.)  The Court agrees.  Defendants clearly raised the issue of general jurisdiction in their Motion to Dismiss.  Plaintiff cannot simply elect not to address this issue and unilaterally "reserve" it for an unspecified later date.  Plaintiff had the opportunity to address (and conduct discovery

16

the Court finds that general jurisdiction does not exist and will limit its analysis to the question of whether Plaintiff has made a *prima facie* showing of specific jurisdiction over Defendants.

In making this determination, "the crucial federal constitutional inquiry is whether, given the facts of the case, the nonresident defendant has sufficient contacts with the forum state that the district court's exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). *See also CompuServe*, 89 F.3d at 1263; *Theunissen*, 935 F.2d at 1459. The Sixth Circuit has established the following three-part test for determining whether specific personal jurisdiction exists:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable.

*CompuServe, Inc.*, 89 F.3d at 1263. *See also Calphalon v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000); *Southern Mach. Co. v. Mohasco Indus.*, 401 F.2d 374, 381 (6th Cir. 1968).

### 1. Purposeful Availment

The question of whether a defendant has purposefully availed itself of the privilege of doing business in the forum state is "the *sine qua non* for *in personam* jurisdiction." *Mohasco Indus.*, 401 F.2d at 381–82. *See also Calphalon*, 228 F.3d at 721 ("The purposeful availment prong . . . is essential to a finding of personal jurisdiction.") The "purposeful availment" requirement is satisfied when the defendant's contacts with the forum state "proximately result from actions by the defendant

---

regarding) the issue of general jurisdiction. She failed to do so. Under these circumstances, the Court finds that Plaintiff has waived opposition to the issue of general jurisdiction.

*himself* that create a 'substantial connection' with the forum State," and when the defendant's conduct and connection with the forum are such that he "should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985) (quoting *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980)); *Reynolds v. International Amateur Athletic Fed'n*, 23 F.3d 1110, 1116 (6th Cir. 1994).  Courts require purposeful availment to ensure that "random," "fortuitous," or "attenuated" contacts do not cause a defendant to be haled into a jurisdiction. *Burger King Corp.*, 471 U.S. at 475 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)).  In this regard, the Supreme Court has explained that, in examining a defendant's contacts, courts "look[] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014).  In other words, "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with persons affiliated with the State." *Id.* at 286.

Here, Plaintiff asserts that "the crux of [her] jurisdictional claim is Defendants' intentional and knowing surreptitious taping of her in Ohio." (Doc. No. 65 at p. 7.)  Specifically, Plaintiff argues that Defendants purposefully availed themselves of this forum because, by secretly recording their phone calls with Plaintiff in December 2015, Defendants "deliberately reached into Ohio to engage in unlawful, unethical, and tortious conduct."  (Doc. No. 24 at p. 7.)  She maintains that Defendants Clark and Savla "led a team of Latham attorneys in the pre-suit collection *in Ohio* of evidence about an *Ohioan* they intended to sue."  (*Id.* at p. 8) (emphasis in original).  Plaintiff further asserts, at length, that Defendants' surreptitious recordings constitute a crime under Ohio's wiretapping statute,

Ohio Rev. Code § 2933.54(B)(4), and violate the Ohio Rules of Professional Ethics.[14]  (*Id.* at pp. 8-10.)   Lastly, she maintains that Defendants' act of secretly recording her was part of their "overarching unlawful, unethical, tortious and malicious Scheme aimed . . . . at incapacitating her ability to practice law in Ohio," and, therefore, all Defendants are subject to suit in this State.  (Doc. No. 65 at p. 13.)

Defendants argue that Plaintiff cannot demonstrate purposeful availment for several reasons.  First, Defendants emphasize that it was *Plaintiff* that initiated contact with Defendants.  (Doc. No. 33 at p. 2.)  Specifically, Defendants assert that "Sherman 'reached out to' defendant Christopher Clark – a New York based lawyer — on behalf of her New York-based client, Jason Feifer, to discuss a lawsuit filed on behalf of Maxim – a New York-based company - in New York state court asserting claims based on a news article that ran in the New York Post."  (*Id.*)  Defendants further argue that "Sherman's claim that she happened to be in Ohio for some of the subsequent calls with Savla is exactly the kind of 'random, fortuitous, or attenuated,' contact" that is insufficient to demonstrate purposeful availment.  (*Id.* at p.4.)  In this regard, Defendants assert that (1) none of the Defendants ever travelled to Ohio in connection with either of the New York Actions; and (2) "no one involved in the Second New York Action – the source of all of Sherman's claims – had any connection to Ohio, apart from Sherman herself."  (Doc. No. 68 at p. 7.)

Lastly, Defendants argue that, whether analyzed as part of the purposeful availment prong or the "arising from" prong of the test for specific jurisdiction, the Sixth Circuit requires that a causal

---

[14] Although Defendant Savla was the only named Defendant who actually participated in the recorded phone calls, Plaintiff argues specific personal jurisdiction exists as to all Defendants because "all of the Defendants relied in the New York litigations on their collective knowledge to defend their surreptitious taping of Sherman, [and] also submitted proof—sworn to by Savla—about what 'Latham and Maxim knew' at the time of such recording."  (Doc. No. 65 at p. 7.)

connection exist between the party's contacts with the forum state and the cause of action.  (Doc. No. 33 at p. 3) (citing *Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 507 (6th Cir. 2014)).  Defendants maintain that the requisite "causal connection" is lacking in this case because Plaintiff's claims in this action are based on the institution of the Second New York Action, not the recorded calls.  (*Id.*)

As set forth above, Plaintiff rests her jurisdictional argument on Defendants' surreptitious recording of the three recorded phone calls that occurred in December 2015.  For the following reasons, the Court finds that these telephone calls are insufficient to demonstrate purposeful availment.  It is undisputed that it was Plaintiff that first initiated contact with Defendants when she emailed Defendant Clark in New York on December 13, 2015.  (Doc. No. 57-1 at ¶ 102.)  In that email, Plaintiff requested that Clark contact her "as soon as possible to discuss a suitable termination agreement."  (*Id.*)  In response to Plaintiff's email, Defendant Savla called Plaintiff in Ohio on December 14, 2015 and secretly recorded their conversation.  (Doc. No. 65-1 at PageID# 1405.)  The other recorded telephone calls that Defendant Savla placed to Plaintiff occurred on December 16 and 21, 2015.[15]  (Doc. No. 65-1 at PageID#s 1428, 1450.)  Both of these calls were likewise in response to emails from Plaintiff requesting that Savla contact her.  (Doc. No. 9-2 at PageID# 259.)  Aside

---

[15] As discussed *supra*, Sherman was not physically located in Ohio when Savla called her on December 21, 2015 but, rather, was at her second home in Florida at the time of this call.  In light of the fact that Sherman was not in Ohio at the time of this call, the Court has serious doubt as to whether the December 21, 2015 telephone call constitutes a "contact" with the State of Ohio for purposes of establishing specific jurisdiction.  However, in order to give Sherman every possible benefit of the doubt, the Court will assume, *arguendo* and for purposes of this opinion only, that Savla's December 21, 2015 recorded telephone call constitutes a contact with the State of Ohio.

from these three telephone calls, there is no evidence that any of the named Defendants had any contact with the State of Ohio relevant to Plaintiff's claims in the instant lawsuit.[16]

Based on the above, the Court finds that Defendants' three recorded phone calls are precisely the type of random, fortuitous contacts that courts have found to be insufficient to demonstrate purposeful availment. As the Supreme Court has noted, "our 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285. The Supreme Court explained:

> [T]he plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him. *See Burger King, supra*, at 478, 105 S.Ct. 2174 ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot"); *Kulko v. Superior Court of Cal., City and County of San Francisco*, 436 U.S. 84, 93, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978) (declining to "find personal jurisdiction in a State ... merely because [the plaintiff in a child support action] was residing there"). To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction. *See Rush, supra*, at 332, 100 S.Ct. 571 ("Naturally, the parties' relationships with each other may be significant in evaluating their ties to the forum. The requirements of *International Shoe*, however, must be met as to each defendant over whom a state court exercises jurisdiction"). Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the "random, fortuitous, or attenuated" contacts he makes by interacting with other persons affiliated with the State. *Burger King,* 471 U.S., at 475, 105 S.Ct. 2174 (internal quotation marks omitted).
>
> These same principles apply when intentional torts are involved. In that context, it is likewise insufficient to rely on a defendant's "random, fortuitous, or attenuated contacts" or on the "unilateral activity" of a plaintiff. *Ibid.* (same). A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on

---

[16] Defendants Savla, Clark and Biglari each submitted affidavits stating that they never travelled to Ohio in connection with either of the New York actions. *See* Savla Decl. (Doc. No. 9-8) at ¶¶ 8-10; Clark Decl. (Doc. No. 9-9) at ¶¶ 8-11; Biglari Decl. (Doc.No. 9-10) at ¶¶ 8-9.

21

intentional conduct by the defendant that creates the necessary contacts with the forum.

*Id*. at 285-286.  Here, Defendants' three recorded calls with Plaintiff relate to Ohio only because Plaintiff happens to reside there.  Plaintiff does not argue, and offers no evidence, that any of these phone calls demonstrate the sort of connection or affiliation between Defendants and the State of Ohio that has been deemed sufficient to confer specific personal jurisdiction.[17]  *See e. g., Burger King*, 471 U.S. at 475 (finding specific jurisdiction where defendants purposefully reached into the forum state by entering into a contractual relationship with the plaintiffs that "envisioned continuing and wide-reaching contacts" in the forum state); *Calder v. Jones*, 465 U.S. 783 (1984) (finding specific jurisdiction with respect to plaintiff's libel claims where defendants wrote an article for publication in California that was read by a number of California citizens and relied on phone calls with California sources for information in their article).  Indeed, the fact that Plaintiff was actually

---

[17] For this reason, Plaintiff's reliance on this Court's decisions in *Commodigy OG Vegas Holdings LLC v. ADM Labs*, 2019 WL 5552606 (N.D. Ohio Oct. 28, 2019), *Parker Hannifin v. Standard Motor Products*, 2019 WL 5425242 (N.D. Ohio Oct. 23, 2019), and *CrossCountry Mortgage, Inc. v. Messina*, 2019 WL 5653288 (N.D. Ohio Oct. 31 2019) is misplaced.  In *Commodigy*, defendant entered into a contractual relationship with the Ohio plaintiff for the sale of hemp.  Defendant's contacts with the Ohio plaintiff included numerous contacts relevant to establishing that contract, including sending samples to the plaintiff in Ohio, purchasing supply bags from the plaintiff in Ohio, and receiving payment from plaintiff from an Ohio bank.  *Id*. at * 5.  Moreover, in *Commodigy*, the Court noted that defendant directed activity into Ohio "for the purpose of initiating and sustaining a continuing business relationship there."  *Commodigy OG Vegas Holdings*, 2019 WL 5552606 at * 6.  Likewise, in *Parker Hannifin*, the Court found specific jurisdiction where the Agreement between the parties "created a continuing relationship and ongoing obligations between Standard Motor and Parker Hannifin in Ohio with respect to the handling, defense, and indemnification of EIS asbestos claims."  *Id*. at * 10.  These continuing obligations extended over a significant period of time (nearly 30 years) and included multiple contacts with the forum state, including notices, correspondence, and telephone calls.  *Id*.  at * 10-11.  Finally, in *Crosscountry*, the Court found purposeful availment where "defendants reached into Ohio by contracting with an Ohio corporation and agreeing to be bound by the continuing non-competition, non-solicitation, and confidentiality obligations set forth in their respective Employment Agreements."  *Crosscountry*, 2019 WL 5653288 at * 13.  Moreover, in that case, both defendants directed activity into Ohio by communicating with plaintiff in Ohio, accessing plaintiff's confidential information from its Ohio computer database, and allegedly misappropriating plaintiff's confidential information to divert plaintiff's customers to Parkside.  *Id*.  By contrast, here, Plaintiff has not alleged, or directed this Court's attention to any evidence, that Defendants directed activity into this State for the purpose of initiating or sustaining any such continuing relationship with Sherman in Ohio.

physically located at her second home in Florida for one of these three calls underscores the fact that Defendants' contacts were with *Plaintiff* (wherever she happened to be residing) and not with the *State of Ohio*.  This is insufficient under both Supreme Court and Sixth Circuit authority.[18]  *See also Power Investments LLC v. SL EC, LLC*, 927 F.3d 914, 918 (6th Cir. 2019) ("A foreign defendant's relationship with an in-forum Plaintiff does not suffice 'standing alone' to confer jurisdiction.  The defendant needs it 'own affiliation' with the State.") (internal citations omitted).

Plaintiff, however, argues that Defendant Savla's three recorded calls are nonetheless sufficient to establish purposeful availment because they constitute tortious and/or unlawful conduct directed to an Ohio resident in the State of Ohio.  Plaintiff relies principally on *Neal v. Janssen*, 270 F.3d 328 (6th Cir. 2001) and *Power Investments, LLC v. SL EC, LLC*, 927 F.3d 914 (6th Cir. 2019) in support of her argument.  Both of these cases are distinguishable.

In *Neal*, the Sixth Circuit found personal jurisdiction existed where the nonresident defendant was found to have directed false information to the plaintiffs in the forum state of Tennessee regarding the commission for the sale of a dressage horse named Aristocrat, which was boarded in the Netherlands.  Specifically, the defendant (who was plaintiffs' agent in selling the horse) represented to the plaintiffs that he had found a buyer that would pay $312,000 for Aristocrat.  *Neal,* 270 F.3d at 330.  Based on this representation, plaintiffs accepted the offer.  *Id.*  Plaintiffs subsequently learned, however, that the buyer had actually paid defendant $480,000.  *Id.*  Although the defendant never

---

[18] Although not argued by Plaintiff, the Court notes that the Sixth Circuit has held that the institution of legal proceedings against a forum resident in a non-forum State is not sufficient, standing alone, to confer specific jurisdiction.  *See e.g., Bulso v. O'Shea*, 730 Fed. Appx. 347 (6th Cir. 2018) (affirming dismissal of malicious prosecution action in Tennessee for lack of personal jurisdiction where the underlying lawsuit was in California and defendant's only link to the forum was that plaintiff was from Tennessee); *Harmer v. Colom*, 650 Fed. Appx. 267 (6th Cir. 2016) (affirming dismissal of abuse of process action in Tennessee against Mississippi law firm where underlying suit took place in Mississippi).

visited the forum state, the Sixth Circuit found that representations made to the forum state residents were pivotal, noting that "the [defendant's] actions of sending false information into [the forum state] by phone and fax had foreseeable effects in [the forum state] and were directed at individuals in [the forum state]." *Id*. at 332.   The court explained as follows:

> Under *Mohasco*, we must first decide if defendant "purposefully availed himself" of the privilege of acting in Tennessee. The acts of making phone calls and sending facsimiles into the forum, standing alone, may be sufficient to confer jurisdiction on the foreign defendant **where the phone calls and faxes form the bases for the action**. *See, e.g., Oriental Trading Co. v. Firetti*, 236 F.3d 938, 943 (8th Cir.2001); *Wien Air Alaska, Inc. v. Brandt,* 195 F.3d 208, 213 (5th Cir.1999); *Heritage House Restaurants, Inc. v. Continental Funding Group, Inc.*, 906 F.2d 276, 282 (7th Cir.1990). **The plaintiffs contend that Janssen intentionally defrauded them in phone calls and faxes directed to plaintiffs or their agents in Tennessee about the price he received from the sale of Aristocrat. When the actual content of the communications into the forum gives rise to an intentional tort action, that alone may constitute purposeful availment.** It is the quality of the contacts, not the quantity, that determines whether they constitute "purposeful availment." *LAK, Inc. v. Deer Creek Enter.*, 885 F.2d 1293, 1301 (6th Cir.1989). Furthermore, the actions of sending false information into Tennessee by phone and fax had foreseeable effects in Tennessee and were directed at individuals in Tennessee. **These false representations are the heart of the lawsuit**—they were not merely incidental communications sent by the defendant into Tennessee.

*Id*. (emphasis added).

In *Power Investments, supra*, the Sixth Circuit expressly relied on *Neal* to find specific jurisdiction. *Power Investments, LLC*, 927 F.3d at 918-919.  In that case, Michael Becker, a Missouri citizen, secured financing from Power Investments to purchase a power plant. *Id.* at 916.  Power Investments was incorporated in Nevada, and had one member, Mason Miller, who lived in Kentucky. *Id*.  "Becker called, texted, and emailed Miller many times, seeking funds and making many allegedly false assurances." *Id*.  Eventually, Miller came to believe that Becker had been "less than honest" about his use of the loaned funds as well as the power plant's liabilities and operating costs. *Id.* at

24

917.  Power Investments sued Becker in Kentucky for fraudulent misrepresentation and unjust

enrichment.  *Id*.  The district court dismissed the case for lack of specific jurisdiction.  *Id*.

> The Sixth Circuit reversed, relying heavily on *Neal*.  The court explained as follows:
>
> *[*In *Neal v. Janssen,]* [w]e concluded that the defendant's intentional, fraudulent
> communications into Tennessee were not "merely incidental" but at the core of the
> lawsuit. *Id*. at 332; *see Trois v. Apple Tree Auction Ctr., Inc*., 882 F.3d 485, 491–92
> (5th Cir. 2018). The *Neal* defendant "expressly aimed" tortious acts at the forum,
> *Calder*, 465 U.S. at 789, 104 S.Ct. 1482, as opposed to taking actions that did not have
> "anything to do with" the forum, *Walden*, 571 U.S. at 289, 134 S.Ct. 1115.
>
> So also here. Becker initiated the ill-starred relationship with Miller, a Kentucky
> resident. He communicated with him extensively for well over a year, wheedling
> several advances, gathering third-party financing, and eventually obtaining a bailout
> of the power-plant purchase. These fraudulent communications far exceed the handful
> of phone calls at issue in *Neal*. Becker called Miller's central-Kentucky cell phone
> number, as well as his landline at a Lexington law firm, "on hundreds of occasions."
> R. 8-1 at 2. Becker texted Miller "hundreds, if not thousands," of times. *Id.* He sent
> about 300 emails to Miller's law firm address. **And Becker's alleged**
> **misrepresentations in these communications constitute the core of Miller's fraud**
> **claims—just as in Neal.**

*Id*. at 918-919 (emphasis added).

*Neal* and *Power Investments* are both readily distinguishable from the instant case because,

unlike the plaintiffs in those cases, Plaintiff herein has not sufficiently alleged or demonstrated that

Defendants' recorded telephone calls form the basis of her malicious prosecution, abuse of process,

and/or New York Judicial Law claims.[19]  Rather, the First Amended Complaint clearly alleges that

each of these claims are based on the filing of the Second New York Action.  Specifically, with regard

---

[19] Notably, in both *Neal* and *Power Investments,* the Sixth Circuit addressed the connection between the out-of-state
defendants' alleged forum contacts and plaintiffs' claims in the context of the purposeful availment prong.  Moreover,
the Sixth Circuit has recognized that "the analysis on the first prong of the *Southern Machine* test involves some overlap
with the analysis on the second prong. . . . In all cases, however, the elements required to establish personal jurisdiction
remain the same – some cases simply address them at different levels of analysis."  *Beydoun v. Wataniya Restaurants
Holdings, Q.S.C.*, 768 F.3d 499, 507 (6th Cir. 2014).  Thus, the Court rejects Plaintiff's argument herein that this issue
must be evaluated solely in the context of the "arising from" prong.

to her abuse of process claim, Plaintiff alleges that "Maxim, Biglari, through Maxim, and the Latham

Defendants initiated process **by filing the Second Action, and securing a temporary injunction**

**and then a Sealing Order, against Sherman**. (Doc. No. 57-1 at ¶ 329) (emphasis added).  She

further alleges (in relevant part) as follows:

> 330.  This process was initiated and maintained for the improper purpose to incapacitate her as a lawyer, and harm her legal career, her law practice, and her livelihood.  As a direct and proximate result of the Defendants' abuse of process, Sherman incurred special damages, including, but not limited to having been silenced, and incurring irreparable and permanent damages to her legal career, her law practice, and her livelihood.

> 331.  This process was initiated and maintained pursuant to an unlawful, improper, unethical and vindictive Scheme and conspiracy to, inter alia, kill the December Post story by any means possible, including but not limited to:

> > i)      To bully, intimidate, silence and incapacitate Sherman as a lawyer;

> > ii)     To punish Sherman;

> > iii)    To gain improper leverage in the First Action;

> > iv)     To interfere with Sherman's capacity to defend her client, and thereby silence him from disclosing the evidence he had that the First Action was frivolous and/[or] brought in bad faith;

> > v)      To scare, intimidate, bully, and/or punish Feifer;

> > vi)    To keep the truth from coming out of what happened at the Photo Shoot;

> > vii)    To keep the truth from coming out about Biglari's mismanagement of Maxim;

> > viii)   To keep the truth from coming out about Biglari's financial ruin of Maxim;

> > ix)     To keep the truth of Biglari's mass firing after the Photo Shoot of nearly all of the top shelf team he had touted hiring to his shareholders in order to defeat a BH proxy challenge by     Groveland Capital;

26

x)       To keep the truth from coming out of Biglari's lies to the press about Maxim and his other businesses;

xi)       To keep the truth from coming out of Biglari's lies to his shareholders about Maxim and his other businesses;

xii)      To keep the truth from coming out of Biglari's poor and sullied reputation;

xiii)      To keep the truth from coming out of Biglari's unethical practices in running Maxim;

xiv)      To scare, intimidate, and/or bully others from telling the truth; and

xv)      To increase the costs of Sherman's defense.

(Doc. No. 57-1 at ¶¶ 330-331.)  Nowhere in this Count is there any mention of Defendants' decision to secretly record the December 2015 phone calls.  Rather, it is clear from a review of Plaintiff's allegations that the basis of her abuse of process claim is the Defendants' filing of the Second New York Action and procurement of a TRO and Sealing Order therein.

Likewise, Plaintiff's malicious prosecution claim is predicated on the filing of the Second New York Action, as follows:

337.     **The Defendants commenced and maintained the Second Action against Sherman.**  The Second Action ended in Sherman's favor, including rulings and findings that Sherman made 'no threat . . . to disclose confidential information to third parties,' the information was not confidential, and the Second Action was related to the First Action, and all of the issues raised by Sherman would be disposed of in the First Action.

338.     **From the commencement of the Second Action until it was dismissed in Sherman's favor,** the Defendants knew, had to know, recklessly disregarded and/or should have known that every material allegation of the Complaint and related filings in the Second Action against her were false.  Defendants accordingly proceeded with malice.

(*Id.* at ¶¶ 337-338) (emphasis added).  As with her abuse of process claim, Plaintiff's malicious prosecution claim is not based on Defendants' recorded phone calls but, rather, on the filing of the Second New York Action.

Finally, Plaintiff's New York Judiciary Law claim alleges as follows:

342. New York Judiciary Law Section 487 ("Section 487") provides, in pertinent part:

An attorney or counselor who: (1) Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent as to deceive the court or any party; * * * *

Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

343. Here, Clark and Savla i) conspired with, colluded with and/or consented to their clients' serial, fraudulent representations **to the Lower and Appellate Courts**; and/or ii) "made up" their own deceits and fraudulent representations **to the Lower Court.**

344.  The subject deceits, collusion and/or consents were successful, until the Appellate Court finally determined they were false.

\*\*\*

347. By reason of the deceits, collusion, and/or consents by Clark and Savla, Sherman was proximately and directly damaged for the following pecuniary harms:

i) The legal fees and disbursements for Sherman's defense in the Second Action, in an amount to be proven at trial, not less than $345,000.00, trebled pursuant to Section 487, together with statutory interest thereon.

ii) Legal fees and disbursements paid to Latham by Maxim and/or Biglari to file, prosecute, and maintain the Second Action, including the disqualification proceedings, in an amount not presently unknown to Sherman, trebled pursuant to Section 487, together with statutory interest thereon.

iii)     The legal fees Sherman would have earned defending her client in the Second Action, in an amount to be proven at trial, trebled pursuant to Section 487, together with statutory interest thereon.

iv)     The legal fees and disbursements Sherman is due in the First Action from her client, which are not readily collectible, precisely because Clark and Savla's strategy to file a separate Second Action was intended to and did astronomically increase the fees and expenses to Feifer to defend an otherwise garden-variety employment case. The amount will be proven at trial, trebled pursuant to Section 487, together with statutory interest thereon.

(*Id.* at ¶¶ 342-347.)  Here, Plaintiff's claim is not based on Defendants' recorded phone calls but rather, on Defendants' representations to the New York courts in the First and Second New York Actions.  Moreover, Plaintiff's damages associated with this claim are all predicated on, and related to, the filing of the Second New York Action.

Plaintiff, however, asserts that "Defendants' egregious surreptitious taping of her goes to the heart of each of her claims:  precisely because the gravamen of each are Defendants' lies—both affirmative lies and material omissions – to the Lower Court about their pre-suit communications with her."  (Doc. No. 69 at pp. 12-13.)  Plaintiff then goes on to detail examples of how the tapes of the recorded phone calls are relevant to her claims, as follows:

1. With respect to Plaintiff's malicious prosecution claim, she will use the tapes as evidence to prove i) Defendants lacked probable cause; ii) Defendants trumped up their extortion claim specifically to secure, ex parte, a TRO with which to literally restrain her; and iii) Defendants proceeded with malice, as evidenced by their commission of a crime, their breach of ethics rules, and their failure even to disclose to the Lower Court an accurate record of the calls, including the audio files which caught them expressly agreeing to deceive and entrap her.

2. Similarly with respect to Plaintiff's abuse of process claim, she will use the tapes, their wiretapping crime, and their ethical breaches to prove that the collateral purpose of the Second Action was to exert leverage in the First Action and further an unethical, illegal, tortious and malicious Scheme to intimidate and silence the truth about Biglari's compromising behavior with a famous model.

29

3. With respect to her §487 claim, she will use the tapes, their crimes and their ethical breaches to prove each of the "deceits" they directed at her and the Lower Court.

(*Id*. at p. 13.)

Plaintiff's argument is without merit. While the tapes of the recorded phone calls may be relevant to her claims in the instant case, that is not sufficient to demonstrate that Defendant Savla's secret recordings "constitute the core of" Plaintiff's malicious prosecution, abuse of process, and New York Judiciary Law claims. Rather, it is clear from the First Amended Complaint that the core of Plaintiff's claims is the Defendants' decision to file the Second New York Action and secure a TRO against her. In sum, the Court finds that the purported relevance of the recordings is too far removed from Plaintiff's actual claims for purposes of establishing specific jurisdiction. As the Sixth Circuit has explained, in order for there to be specific jurisdiction, "the plaintiff's cause of action must be proximately caused by the defendant's contacts with the forum state." *See generally Beydoun*, 768 F.3d at 507-508. Here, Plaintiff's causes of action were not proximately caused by Defendant Savla's surreptitious recording of the three December 2015 phone calls. To the contrary, it is clear from the First Amended Complaint that Plaintiff's malicious prosecution, abuse of process, and New York Judiciary Law claims were proximately caused by Defendants' decisions to file the Second New York Action and seek a TRO against her.[20]

---

[20] Relying on a footnote in *Walden v. Fiore*, 571 U.S. 277, fn 6 (2014), Plaintiff also argues that the allegedly unlawful recorded calls are sufficient to establish personal jurisdiction because wiretapping is subject to regulation in the State of Ohio. (Doc. No. 65 at p.2.) This argument is without merit. The fact that wiretapping is subject to regulation in Ohio is not, in and of itself, sufficient to establish personal jurisdiction over these Defendants because, as discussed at length above, the allegedly unlawful recorded calls do not form the basis of Plaintiff's claims in the instant action. Had Plaintiff asserted a claim for violation of Ohio's wiretapping statute, she might have been able to establish specific personal jurisdiction over Defendant Savla. Plaintiff, however, did not assert any such claim. Moreover, Defendants argue that any such claim would now be time-barred because a private right of action under Ohio's wiretapping statute is subject to a two-year statute of limitations. (Doc. No. 68 at pp. 2-3.) *See* Ohio Rev. Code § 2933.65(c) ("A claimant who brings a civil action under division (A) of this section [for violations of sections 2933.51 to 2933.66 of the Revised Code] shall

Accordingly, the Court finds that Plaintiff has failed to sufficiently allege or demonstrate that Defendants' recorded telephone calls form the basis of her malicious prosecution, abuse of process, and/or New York Judiciary Law claims.[21] Therefore, and for all the reasons set forth above, the Court finds that Plaintiff has failed to make a *prima facie* showing of purposeful availment.[22]

As a result, analysis of the second and third prongs of the *Mohasco* test is unnecessary. *See LAK, Inc. v. Deer Creek Enter.*, 885 F.2d 1293, 1303 (6th Cir.1989) ("The plaintiff having failed to pass the 'purposeful availment' test, we need not dwell on the other criteria of *Mohasco Industries*; each criterion represents an independent requirement, and failure to meet any one of the three means that personal jurisdiction may not be invoked.") *See also Filtrexx International, LLC v. Truelsen*, 2013 WL 587582 at * 12 (N.D. Ohio Feb. 13, 2013).

---

commence the civil action within two years after the date on which the claimant first has a reasonable opportunity to discover the violation.")

[21] Plaintiff's reliance on *Advanced Dermatology v. Adv-Care Pharmacy, Inc.*, 2017 WL 5067576 (N.D. Ohio Nov. 1, 2017), and *Fabec v. Debt Management Partners*, LLC, 2018 WL 4830085 (N.D. Ohio Oct. 4, 2018) is misplaced. In *Advanced Dermatology*, plaintiff asserted a claim under the Telephone Consumer Protection Act ("TCPA") based on an unsolicited fax it received from an out-of-state defendant. There, the court found purposeful availment because the fax at issue was the basis of plaintiff's TCPA claim; i.e., it "form[ed] the basis of Plaintiff's cause of action." *Advanced Dermatology*, 2017 WL 5067576 at * 5. In *Fabec*, plaintiff asserted claims under the Fair Debt Collection Practices Act, the TCPA, and Ohio's Consumer Sales Practices Act, as well as state law claims for invasion of privacy and civil conspiracy, based on the out-of-state defendants' numerous threatening and harassing debt collection telephone calls to plaintiff in Ohio. In that case, the court found purposeful availment because the defendants' telephone calls were allegedly made in violation of the FDCPA, TCPA, and OCSPA and, therefore, "form[ed] the basis of Plaintiff's causes of action." *Fabec*, 2018 WL 4830085 at * 9. Here, as discussed at length above, Plaintiff has not alleged or demonstrated that the three recorded phone calls form the basis of her malicious prosecution, abuse of process, and/or New York Judiciary Law claims. Lastly, Plaintiff's reliance on *Golden Archer Investments LLC v. Skynet Financial Services*, 908 F.Supp.2d 526 (S.D.N.Y. 2012) and *Anderson v. Hale*, 202 F.R.D. 548 (N.D. Ill. 2001) is misplaced as those cases relate to violations of Illinois' wiretapping statutes and have nothing to do with personal jurisdiction.

[22] To the extent Plaintiff is arguing that specific jurisdiction exists as to Defendants Clark and Savla because they were engaged in the "temporary practice of law" in Ohio by virtue of their December 2015 communications with Plaintiff, this argument is rejected. (Doc. No. 65 at pp. 14-16.) Plaintiff cites no Sixth Circuit authority for the argument that specific personal jurisdiction may be established on this basis.

**IV.**     **Conclusion**

For all of the foregoing reasons, Defendants' Motion to Dismiss (Doc. No. 8) is GRANTED

to the extent it seeks dismissal on the basis of lack of personal jurisdiction.  Defendants' Motion is

DENIED AS MOOT to the extent it seeks dismissal for improper venue and failure to state a claim.

**IT IS SO ORDERED.**


                                                    _s/Pamela A. Barker_____
                                                    PAMELA A. BARKER
Date:  June 4, 2020                                 U. S. DISTRICT JUDGE

32